## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **U.S. ALUMINUM EXTRUDERS COALITION,** |
| and |
| **UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,** |
| **Plaintiffs,** |
| v. |
| **UNITED STATES,** |
| **Defendant,** |
| and |
| **EAST ASIA ALUMINUM COMPANY LIMITED, TECHNOGLASS, S.A.S., ERDOGANLAR ALUMINYUM SAN. VE TIC. A.S., MAHLE MEHA USA INC., TESLA, INC., CEDAL DURAN S.A.,** *et al.,* |
| **Defendant-Intervenors.** |

Before:  Hon. Joseph A. Laroski, Jr.
Judge

Consol. Court No. 24-00209

## <u>ORDER</u>

Upon consideration of the Rule 56.2 motion of Plaintiffs the U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (collectively, "Plaintiffs") for judgment on the agency record, and all other pertinent papers and proceedings herein, it is hereby

**ORDERED**, that Plaintiffs' motion for judgment on the agency record is granted; and it is further

**ORDERED**, that this action is remanded to the U.S. International Trade Commission for proceedings consistent with this Court's opinion.

**SO ORDERED**.

_____
Hon. Joseph A. Laroski, Jr., Judge

Dated: _____, 2025
      New York, New York

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

---

**U.S. ALUMINUM EXTRUDERS COALITION,**

and

**UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,**

Plaintiffs,

v.

**UNITED STATES,**

Defendant,

and

**EAST ASIA ALUMINUM COMPANY LIMITED, TECHNOGLASS, S.A.S., ERDOGANLAR ALUMINYUM SAN. VE TIC. A.S., MAHLE MEHA USA INC., TESLA, INC., CEDAL DURAN S.A.,** *et al.*,

Defendant-Intervenors.

---

Before:  Hon. Joseph A. Laroski, Jr.
Judge

Consol. Court No. 24-00209

---

**<u>PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs the U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (collectively, "Plaintiffs"), hereby move for judgment upon the agency record with respect to the U.S. International Trade Commission's ("Commission") final negative determination in the antidumping and countervailing duty investigations of aluminum extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam. *Aluminum Extrusions from China, Colombia,*

Consol. Ct. No. 24-00209

*Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, 89 Fed. Reg. 92,720 (Int'l Trade Comm'n Nov. 22, 2024) (deters.), P.R. 355; *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644, and 1646-1657, USITC Pub. 5560 (Nov. 2024) (Final), P.R. 354.

For the reasons explained in the accompanying brief, Plaintiffs respectfully submit that the Commission's final negative determination, and the attendant findings identified in Plaintiffs' Complaint and opening brief, were not supported by substantial evidence or in accordance with law. Plaintiffs thus respectfully request that the Court remand the Commission's determination for disposition consistent with the Court's final opinion.

Respectfully submitted,

*/s/ Robert E. DeFrancesco, III*
Robert E. DeFrancesco, III, Esq.
Alan H. Price, Esq.
Laura El-Sabaawi, Esq.
Enbar Toledano, Esq.
Elizabeth S. Lee, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union*

Dated: May 12, 2025

NON-CONFIDENTIAL VERSION

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

U.S. ALUMINUM EXTRUDERS COALITION,

and

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,

Plaintiffs,

v.

UNITED STATES,

Defendant,

and

EAST ASIA ALUMINUM COMPANY LIMITED, TECHNOGLASS, S.A.S., ERDOGANLAR ALUMINYUM SAN. VE TIC. A.S., MAHLE MEHA USA INC., TESLA, INC., CEDAL DURAN S.A., *et al.*,

Defendant-Intervenors.

Before:  Hon. Joseph A. Laroski, Jr.
Judge

Consol. Court No. 24-00209

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information Removed from Pages: 1-3, 10, 16, 18- 19, 21-25, 27, 29, 35-36

<u>PLAINTIFFS' MEMORANDUM IN SUPPORT OF RULE 56.2<br>MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Robert E. DeFrancesco, III, Esq.
Alan H. Price, Esq.
Laura El-Sabaawi, Esq.
Enbar Toledano, Esq.
Elizabeth S. Lee, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the U.S. Aluminum Extruders*
*Coalition and the United Steel, Paper and*

NON-CONFIDENTIAL VERSION

*Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union*

**Dated: May 12, 2025**

Consol. Ct. No. 24-00209                                    NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................... 1
II.   RULE 56.2 STATEMENT ........................................................................ 4
      A.    Administrative Decision under Review ................................................ 4
      B.    Issues Presented ................................................................................. 4
            1.    Whether the Commission Majority's determination that
                  subject imports did not significantly undersell the domestic
                  like product was supported by substantial evidence and
                  otherwise in accordance with law (Count Two). .........................................4
            2.    Whether the Commission Majority's determination that
                  subject imports did not have significant adverse price effects
                  on the domestic industry was supported by substantial
                  evidence and otherwise in accordance with law (Count
                  Three). .........................................................................................4
            3.    Whether the Commission Majority's determination that
                  subject imports did not have a significant adverse impact on
                  the domestic industry, because that adverse impact was the
                  result of alleged supply constraints and declining demand,
                  was supported by substantial evidence and otherwise in
                  accordance with law (Counts Four, Five, and Six). ....................................5
            4.    Whether the Commission Majority's determination that the
                  U.S. aluminum extrusions industry was not materially
                  injured by reason of subject imports was supported by
                  substantial evidence and otherwise in accordance with law
                  (Count One). ..................................................................................5
            5.    Whether the Commission Majority's determination that
                  subject imports do not threaten the domestic industry with
                  material injury in the imminent future was supported by
                  substantial evidence and otherwise in accordance with law
                  (Count Seven). ...............................................................................5
III.  BACKGROUND ....................................................................................... 5
      A.    Preliminary Phase Investigation ........................................................ 5
      B.    Final Phase Investigation .................................................................. 7
IV.   LEGAL STANDARDS ........................................................................... 13
      A.    Material Injury and Threat of Material Injury .................................... 13
      B.    Standards of Appellate Review .......................................................... 14
V.    ARGUMENT .......................................................................................... 16

**NON-CONFIDENTIAL VERSION**

A.   The Commission Majority's Negative Injury Determination Was
     Not Supported by Substantial Record Evidence or in Accordance
     with Law ................................................................................................ 17

     1.   The volume of subject imports was undisputedly significant.
          ..........................................................................................................17

     2.   Subject imports had significant price effects on the domestic
          industry, including through significant underselling. ...............................18

     3.   Subject imports had a significant adverse impact on the
          domestic industry, notwithstanding alleged domestic supply
          constraints. ..............................................................................................27

B.   The Commission Majority's Negative Threat Determination Was
     Not Supported by Substantial Record Evidence or in Accordance
     with Law ................................................................................................ 35

VI.  CONCLUSION.................................................................................................. 38

Consol. Ct. No. 24-00209                                    NON-CONFIDENTIAL VERSION

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
    70 F. Supp. 3d 1328 (Ct. Int'l Trade 2015) ...........................................................22

*Altx, Inc. v. United States*,
    25 CIT 1100, 167 F. Supp. 2d 1353 (2001) .............................................................38

*CS Wind Vietnam Co. v. United States*,
    832 F.3d 1367 (Fed. Cir. 2016)................................................................................15

*DAK Ams. LLC v. United States*,
    456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ......................................19, 26, 28, 32

*Fred Beverages, Inc. v. Fred's Cap. Mgmt. Co.*,
    605 F.3d 963 (Fed. Cir. 2010).................................................................................15

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000)..................................................................................6

*Georgetown Univ. Hosp. v. Bowen*,
    862 F.2d 323 (D.C. Cir. 1988)................................................................................15

*Golub v. Sec'y of Health & Hum. Servs.*,
    No. 99-51661, 2000 WL 1471643 (Fed. Cir. Oct. 3, 2000)...................................26

*Mittal Steel Point Lisas Ltd. v. United States*,
    542 F.3d 867 (Fed. Cir. 2008)................................................................................14

*Motor Vehicle Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..................................................................................................23

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003)..............................................................................22

*Nippon Steel Corp. v. USITC*,
    345 F.3d 1379 (Fed. Cir. 2003).........................................................................14, 33

*OCP S.A. v. United States*,
    658 F. Supp. 3d 1297 (Ct. Int'l Trade 2023) ........................................................32

*Suramerica de Aleaciones Laminadas, CA. v. United States*,
    44 F.3d 978 (Fed. Cir. 1994)..................................................................................15

*Taiwan Semiconductor Indus. Ass'n v. USITC*,
    266 F.3d 1339 (Fed. Cir. 2001).................................................................14

*U.S. Aluminum Extruders Coal. v. United States*,
    No. 23-00270, slip op. 25-44 (Ct. Int'l Trade Apr. 18, 2025) ...................6

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv.*
    *Workers Int'l Union, AFL-CIO, CLC v. United States*,
    348 F. Supp. 3d 1328 (Ct. Int'l Trade 2018) ..........................................38

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951)..............................................................................15, 26

*USX Corp. v. United States*,
    11 CIT 82, 655 F. Supp. 487 (1987) .....................................................19, 22

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) ..............................................................................14, 22

19 U.S.C. §§ 1671d(b), 1673d(b) .....................................................................13, 14

19 U.S.C. § 1677(7)(C)(i).................................................................................13, 17

19 U.S.C. § 1677(7)(C)(ii)................................................................................13, 18

**Administrative Materials**

*Aluminum Extrusions from China, Colombia, Dominican Republic, Ecuador,*
    *India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand,*
    *Turkey, United Arab Emirates, and Vietnam*,
     88 Fed. Reg. 71,020 (Int'l Trade Comm'n Oct. 13, 2023) ........................6

*Aluminum Extrusions from China, Colombia, Dominican Republic, Ecuador,*
    *India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand,*
    *Turkey, United Arab Emirates, and Vietnam*,
    88 Fed. Reg. 82,913 (Int'l Trade Comm'n Nov. 27, 2023) .......................6

*Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy,*
    *Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab*
    *Emirates, and Vietnam*,
    89 Fed. Reg. 92,720 (Int'l Trade Comm'n Nov. 22, 2024) .......................4

**Other Authorities**

*Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam,*
   Inv. Nos. 701-TA-695-698 and 731-TA-1643-1657, USITC Pub. 5477 (Nov. 2023) (Prelim.) ................................................................................7, 19, 37

*Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam,*
   Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644, and 1646-1657, USITC Pub. 5560 (Nov. 2024) (Final) ..................................................8, 9, 10, 11

*Brass Rod from India,*
   Inv. No. 701-TA-686, USITC Pub. 5485 (Feb. 2024) (Final)............................30, 33

*Certain Ball Bearings & Parts Thereof from Japan & the United Kingdom,*
   Inv. Nos. 731-TA-394-A and 399-A, USITC Pub. 4082 (May 2009) (Remand).............33, 34

*Certain Mobile Access Equipment & Subassemblies Thereof from China,*
   Inv. No. 701-TA-665, USITC Pub. 5242 (Dec. 2021) (Final) ....................................30, 31, 33

H.R. Rep. No. 96-317 .................................................................................................14

*Metal Lockers from China,*
   Inv. Nos. 701-TA-656 Inv. Nos. 701-TA-656 and 731-TA-1533, USITC Pub. 5218 (Aug. 2021) (Final) .................................................................25

S. Rep. No. 96-249.....................................................................................................14

*Truck & Bus Tires from Thailand,*
   Inv. No. 731-TA-1658, USITC Pub. 5562 (Dec. 2024) (Final)...................................30, 33, 34

I.    **INTRODUCTION**

The U.S. aluminum extrusions industry has been materially injured by dumped and subsidized subject imports, yet the International Trade Commission ("Commission")—in a split decision—denied it relief under the U.S. trade laws. The record of the underlying investigation showed that subject imports took market share from U.S. extruders during the period of investigation ("POI"), at prices that purchasers directly told the Commission were lower than U.S. prices—reports that were supported by substantial corroborating evidence of underselling. Specifically, subject imports took [    ] percentage points of market share from the domestic industry from 2021 to 2023 and another [    ] points of share from interim 2023 to interim 2024 Final Staff Report to the Commission, *Aluminum Extrusions from China, Columbia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-164-1644 and 1646-1657 (Final) (Oct. 17, 2024), C.R. 885, P.R. 334 at C-3 (Table C-1) ("Staff Report").  As a result, the domestic industry's condition collapsed, with nearly all indicators—including production, profits, and employment—dropping substantially over the POI.

This injury occurred and intensified throughout the POI.  In 2021, U.S. extruders added capacity and workers to serve growing U.S. demand.  But just as they sought to utilize this capacity, subject imports surged into the market, increasing by [    ] in 2022.  Post-Hearing Brief of Petitioners, *Aluminum Extrusions from China, Columbia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-164-1644 and 1646-1657 (Final) (Sept. 25, 2024), C.R. 814 & 842, P.R. 307 at 1 ("Petitioners' Post-Hearing Br.").  That trend worsened throughout the year, as subject imports took [    ] points of market share from U.S. extruders from first-half to

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

second-half 2022, causing a decline in production for the domestic industry, a cost-price squeeze, and a 3.3 point drop in operating margin. *Id.* at 1 (citing *id.* at Exhibit 2). The 2022 surge exceeded demand, as a result of which subject import inventories increased by more than 48% at the end of 2022. *Id.* (citing Prehearing Report to the Commission, *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1657 (Final) (Sept. 17, 2024), C.R. 776, P.R. 238 at C-4 (Table C-1) ("Prehearing Report")). The lost share in 2022 and inventory overhang impacted U.S. extruders through 2023, who continued to lose sales to subject imports even as the market slowed. In interim 2024, while demand declined further, subject imports grew [      ] and took [    ] points of market share from U.S. extruders, causing further declines in all trade and financial indicators including 890 jobs lost. *Id.*; Staff Report at C-3 (Table C-1).

Based largely on a single data point (pricing product data representing approximately [ ] of U.S. shipments), two of three voting Commissioners (the "Commission Majority") acknowledged but disregarded this overwhelming evidence of material injury. The basis underpinning their overall conclusion was a finding that "subject imports did not undersell the domestic like product to a significant degree." *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644, and 1646-1657, USITC Pub. 5560 (Nov. 2024) (Final), P.R. 354 at 65 ("USITC Pub. 5560"). Yet that finding focused on flawed and unrepresentative data and disregarded the weight of other, reliable evidence. For example, [        ] before the investigative record closed, but after the parties received the final staff report, one U.S. importer amended its data. Despite being submitted [

], the Commission accepted the amendment on to the record, disregarding the importer's previously submitted data. The impact of that amendment was to swing quarterly pricing product comparisons from demonstrating majority underselling to majority overselling. Despite the inherent dubiousness of that belated amendment, and the fact that nearly every other data point demonstrated significant underselling, the Commission Majority effectively based its negative injury and threat determinations on that importer's amendment alone. Finding no significant underselling, the Commission Majority found that subject imports did not have significant price effects on the domestic industry. Believing that subject imports did not undersell domestic aluminum extrusions, the Commission Majority also determined that subject imports did not cause the domestic industry's undisputed decline. Ultimately, finding neither significant price effects nor a significant adverse impact on the domestic industry by reason of subject imports, the Commission Majority found no material injury nor threat thereof.

For the reasons below, and those explained thoroughly and persuasively in the dissenting Commissioner's ("Commission Minority") Dissenting Views, the Commission Majority's determinations are unsupported by substantial evidence and not in accordance with law. At bottom, the U.S. industry had available and growing capacity to serve more demand and would have done so, at higher prices, but for the injurious impact of subject imports. This left the U.S. extrusions industry materially injured by reason of subject imports and, in an extremely vulnerable state, threatened with further material injury from subject imports. The Commission Majority's erroneous determinations to the contrary should be remanded.

## II.    RULE 56.2 STATEMENT

### A.    Administrative Decision under Review

The administrative determination challenged herein is the Commission's final negative determination in the antidumping and countervailing duty investigations of aluminum extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam. *See Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, 89 Fed. Reg. 92,720 (Int'l Trade Comm'n Nov. 22, 2024) (deters.), P.R. 355; USITC Pub. 5560.

### B.    Issues Presented

**1.    Whether the Commission Majority's determination that subject imports did not significantly undersell the domestic like product was supported by substantial evidence and otherwise in accordance with law (Count Two).**

No.  The Commission Majority's overselling determination rested largely on a single data point that was contrary to the overwhelming weight of record evidence and riddled with flaws.  As such, the Commission's analysis lacked substantial evidentiary support, failed to consider the record as a whole, and arbitrarily departed from relevant agency precedents.

**2.    Whether the Commission Majority's determination that subject imports did not have significant adverse price effects on the domestic industry was supported by substantial evidence and otherwise in accordance with law (Count Three).**

No.  The Commission Majority's price effects determination rested predominantly on its flawed underselling analysis and thus itself lacked substantial evidentiary support and was not in accordance with law.

3.     **Whether the Commission Majority's determination that subject imports did not have a significant adverse impact on the domestic industry, because that adverse impact was the result of alleged supply constraints and declining demand, was supported by substantial evidence and otherwise in accordance with law (Counts Four, Five, and Six).**

No.  The Commission Majority's impact determination was expressly colored by its flawed underselling analysis, in addition to independently lacking substantial evidentiary support and compliance with law.  The weight of record evidence and relevant agency precedents do not support the conclusion that supply constraints were responsible for the domestic industry's decline.

4.     **Whether the Commission Majority's determination that the U.S. aluminum extrusions industry was not materially injured by reason of subject imports was supported by substantial evidence and otherwise in accordance with law (Count One).**

No.  The Commission Majority's negative injury determination expressly rested on its flawed price effects and impact determinations and was contrary to controlling law regarding the "by reason of" standard.

5.     **Whether the Commission Majority's determination that subject imports do not threaten the domestic industry with material injury in the imminent future was supported by substantial evidence and otherwise in accordance with law (Count Seven).**

No.  The Commission Majority's negative threat determination expressly rested on its flawed underselling and supply constraints determinations, failed to consider the record as a whole, and thus lacked substantial evidentiary support and was not in accordance with law.

## III.    BACKGROUND

### A.    Preliminary Phase Investigation

On October 4, 2023, Plaintiffs filed petitions with the Commission and U.S. Department of Commerce ("Commerce") requesting antidumping and countervailing duty relief from imports of aluminum extrusions from China, Colombia, the Dominican Republic, Ecuador, India,

Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam. The petitions alleged that unfairly traded imports of certain aluminum extrusions caused and threatened to cause material injury to the domestic industry. On October 13, 2023, the Commission initiated the preliminary phase of its investigations into the effects of subject imports from the specified countries. *See Aluminum Extrusions from China, Colombia, Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, 88 Fed. Reg. 71,020 (Int'l Trade Comm'n Oct. 13, 2023) (inst. of antidumping and countervailing duty invs. and scheduling of prelim. phase invs.), P.R. 29.

On November 27, 2023, the Commission published its preliminary determination in these investigations. The Commission found a reasonable indication that the domestic industry was materially injured by reason of subject imports from every country under investigation with the exception of the Dominican Republic,[1] and thus made an affirmative preliminary determination with regard to such imports. *See Aluminum Extrusions from China, Colombia, Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, 88 Fed. Reg. 82,913 (Int'l Trade Comm'n Nov. 27, 2023) (deters.), P.R. 168 ("2023 Final Deter. FR Notice"); *Aluminum Extrusions from China,*

---

[1]    Plaintiffs appealed from the Commission's negative preliminary injury determination regarding imports from the Dominican Republic in CIT Case No. 23-270. On April 18, 2025, the U.S. Court of International Trade affirmed the Commission's preliminary determination, emphasizing that the standard of review applicable to preliminary Commission determinations is more deferential than the standard that applies to final determinations. *See U.S. Aluminum Extruders Coal. v. United States*, No. 23-00270, slip op. 25-44 (Ct. Int'l Trade Apr. 18, 2025) at 6 ("The difference between these two standards of review is of import here as the Federal Circuit has explained that the arbitrary and capricious standard is 'highly deferential.' The substantial evidence standard, on the other hand, 'is considered to be a less deferential review standard than arbitrary, capricious' as it 'asks whether a reasonable fact finder could have arrived at the agency's decision.'" (cleaned up; quoting *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000)).

*Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand,*

*Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1657,

USITC Pub. 5477 (Nov. 2023) (Prelim.), P.R. 170 at 1 ("USITC Pub. 5477"). In particular, the

preliminary pricing product data showed majority underselling by volume, with underselling in

74.9% of total reported subject import pricing volume. *Id.* at 63. The Commission found that

subject imports had significant price effects on the domestic industry, including by underselling

that resulted in subject imports gaining market share at the expense of the domestic industry. *Id.*

at 63–65. The Commission also determined "there is a reasonable indication that an industry in

the United States is threatened with material injury by reason of imports of aluminum extrusions

from Turkey that are alleged to be subsidized by the government of Turkey" and thus made an

affirmative preliminary determination with regard to such imports. *See* 2023 Final Deter. FR

Notice; USITC Pub. 5477 at 1.

      **B.**     **Final Phase Investigation**

      On December 20, 2023, the Commission transmitted draft final phase questionnaires to the

parties and requested comment. Plaintiffs requested that, in addition to the traditional quarterly

pricing product data, the Commission collect purchase cost data from U.S. importers—as it has

done in many prior cases—to more comprehensively assess pricing trends, including underselling,

in the final phase of the investigations. *See* Petitioners' Comments on Draft Questionnaires,

*Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico,*

*South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-

695-698 and 731-TA- 1643-1644 and 1646-1657 (Final) (Feb. 2, 2024), P.R. 184 at 5–6. Plaintiffs

explained with respect to this industry: "Many aluminum extrusions consumers in the United

States act as direct importers of the extrusions for their own internal use or for retail sale. Those

importers do not have commercial shipments of extrusions to unrelated U.S. customers and thus cannot (and did not in the preliminary phase) report pricing data as currently requested in section III-2 of the draft U.S. importers' questionnaire. Yet data on these import prices is still critically important to the Commission's investigation of subject import price effects." *See id.* The Commission declined to collect purchase cost data in the final phase questionnaires. USITC Pub. 5560 at 61 n.319.

The parties filed prehearing briefs on September 24, 2024. Plaintiffs argued that the U.S. aluminum extrusions industry has been materially injured by dumped and subsidized extrusions from the subject countries and also faces a real and imminent threat of additional material injury by reason of subject imports if relief is not granted. In particular, Plaintiffs presented evidence that subject imports had adverse effects on U.S. prices, including by underselling the domestic like product, and had an adverse impact on the domestic industry. Prehearing Brief of Petitioners, *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA- 695-698 and 731-TA-1643-1644 and 1646-1757 (Final) (Sept. 24, 2024), C.R. 789 & 797, P.R. 267 at 72, 86 ("Petitioners' Prehearing Br."). With respect to price effects, Plaintiffs highlighted numerous discrepancies and distortions in the pricing product data collected in the final phase of the investigation and noted that once corrected for the most obvious errors, the data show substantial underselling by subject imports, both by comparison and by volume, and that these unfairly priced subject imports suppressed and depressed U.S. producers' pricing. *Id.* at 78–82. Given the discrepancies, distortions, and the nature of the product, however, Plaintiffs argued that the pricing product data is less probative and pointed the Commission to other substantial record evidence of underselling. *Id.* at 72–78.

The Commission held a hearing on October 1, 2024, and post-hearing briefs were filed on October 8, 2024. All four sitting Commissioners participated in the hearing. Plaintiffs again argued that subject imports materially injured the domestic industry and threaten U.S. extruders with additional material injury. With respect to price trends, Plaintiffs reiterated the numerous flaws in the pricing product data, many of which had gone uncorrected. Given this and the low coverage of the pricing product data, Plaintiffs again pointed the Commission to the numerous pieces of evidence on the record demonstrating that subject imports undersold the domestic like product during the POI and had adverse price effects. Petitioners' Post-Hearing Br. at 3–8.

Plaintiffs also presented evidence that subject import underselling, not alleged domestic producer supply constraints, caused the market share shifts during the POI, and that subject imports had an adverse impact on the domestic industry. *Id.* at 8–14. Plaintiffs further disproved many of respondents' allegations of domestic producer supply constraints. *Id.* at 11–12.

The Commission issued the final staff report on October 17, 2024, which it revised on October 23, 2024, and parties filed final comments on October 25, 2024. *See* USITC Pub. 5560 at 5 n.6; Final Comments of Petitioners, *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1757 (Final) (Oct. 25, 2024), C.R. 909 & 911, P.R. 341 ("Petitioners' Final Comments"). Prior to issuance of the final report, the Commission staff recognized certain errors in the data and attempted to reach out to parties and make numerous corrections. *See, e.g.*, USITC Pub. 5560 at 64 n.334, 100. Plaintiffs noted in their final comments, however, that most of the inaccuracies had not been corrected in the final staff report. Prior to issuing the final staff report, the Commission also accepted a questionnaire response from an additional importer that then revised its reporting

shortly prior to the deadline for final comments. This single importer's submissions had a significant impact on the underselling data. As such, Plaintiffs argued that the pricing product data continued to be flawed and of limited probative value. Petitioners' Final Comments at 6–7. In particular, the fact that a single responding importer's data [

] to majority overselling after the importer stated that its revision had in fact been wrong, illustrated why the Commission should not predominantly rely on such data in making its underselling determination.

Plaintiffs argued that the Commission should place less weight on the pricing product data and rely on other substantial record evidence showing that subject imports undersold the domestic like product and had adverse price effects on the domestic like product, as the agency has done in the past. *See id.* at 8–9. After parties filed final comments, the Commission revised the final staff report on October 30, 2024. USITC Pub. 5560 at 64 n.334 ("{P}ricing data were revised in a revision memo issued on October 30, 2024, after an importer contacted the Commission to explain an error in its questionnaire response."). The Commission's revisions to the final staff report showed the volatility of the pricing product data, which further demonstrated the poor coverage and unreliability of the data.

The Commission voted on October 30, 2024. Commissioners Johanson and Kearns voted in the negative. Chair Karpel voted in the affirmative and issued separate and dissenting views with respect to certain aspects of material injury. Commissioner Schmidtlein participated throughout the investigation and in the hearing on October 1, 2024, but recused herself for the vote. *See id.* at 1; Summary Voting Sheet, U.S. International Trade Commission, *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan,*

*Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1657 (Final) (Oct. 30, 2024), P.R. 345. Plaintiffs learned of this recusal only after the Commission's vote had been announced.

The Commission Majority concluded that the domestic industry is not materially injured by reason of subject imports. While the Commission Majority found the volume of subject imports to be significant in absolute terms and relative to consumption in the United States, the Commission Majority determined that this volume of subject imports did not have significant price effects and was not responsible for the significant adverse impact observed in the U.S. aluminum extrusions industry. *See* USITC Pub 5560 at 59.

With respect to price effects, the Commission Majority found that subject imports did not significantly undersell the domestic like product and did not depress or suppress prices for the domestic like product to a significant degree. *Id.* at 59–69. The Commission Majority concluded that pricing product data was most probative and found the data showed predominant overselling by subject imports (*i.e.*, overselling 60.9% of the time). *Id.* at 61–62. The Commission Majority dismissed every other piece of evidence, which uniformly demonstrated majority underselling. *See id.* at 61–65. The Commission Minority found that the record as a whole supports a finding that subject imports undersold the domestic like product to a significant degree, causing the domestic industry to lose market share to subject imports, and had significant price effects. *See id.* at 93–102.

With respect to impact on the domestic industry, the Commission Majority concluded that there is not a causal nexus between subject imports and undisputed declines in the domestic industry's performance during the POI. The Commission Majority found that the declines in U.S. extruders' output and financial indicators are attributable to supposed domestic industry supply

constraints in 2021 and 2022 and a decline in apparent U.S. consumption and increase in nonsubject imports' market share from 2022 to 2023.  *Id.* at 69–80.  The Commission Minority, by contrast, found that subject imports had a significant adverse impact on the domestic industry. In particular, the Commission Minority found that domestic industry supply constraints did not account for the market share shift from the domestic industry to subject imports during the POI to such an extent that subject imports are not a cause of material injury.  *See id.* at 107–112.  The Commission Minority reasoned that all market participants reported supply constraints during the POI, including U.S importers, and that supply constraints reported by U.S. producers decreased markedly as the POI progressed.  *Id.* at 107–108.

Influenced in large part by its erroneous underselling determination, the Commission Majority also found that the domestic industry is not threatened with material injury by reason of subject imports.  Despite evidence that subject imports grew and gained market share during the POI and interim period, maintained substantial excess production capacity, and increased production and production capacity and projected further increases still, the Commission Majority did not find a likelihood of substantially increased subject imports in the imminent future nor likely adverse price effects or impact on the domestic industry.  *Id.* at 111–112.  Those findings turned expressly on the same erroneous overselling and supply constraint determinations that underlay the Commission Majority's present injury analysis.  This appeal followed.

IV.    **LEGAL STANDARDS**

A.    **Material Injury and Threat of Material Injury**

In the final phase of antidumping and countervailing duty investigations, the Commission determines whether a domestic industry is materially injured or threatened with material injury by reason of subject imports.  19 U.S.C. §§ 1671d(b), 1673d(b).  In making an injury determination, the Commission must consider (i) the volume of subject imports, (ii) their effect on domestic prices, and (iii) their impact on domestic producers in the context of domestic production operations.  *Id.* § 1677(7)(B).  In assessing volume, the Commission determines whether the volume of subject imports (or any increase in that volume), in either absolute terms of relative to domestic production or consumption, is significant.  *Id.* § 1677(7)(C)(i).  With regard to price effects, the Commission considers whether there has been significant price underselling by subject imports and whether subject imports have significantly depressed domestic prices or prevented price increases that otherwise would have occurred.  *Id.* § 1677(7)(C)(ii).  In assessing impact on the domestic industry, the Commission considers all relevant economic factors that bear on the state of the domestic industry, wherein no single factor is dispositive.  *Id.* § 1677(7)(C)(iii).

In making a threat determination, the Commission considers whether "further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued or a suspension agreement is accepted."  *Id.* § 1677(7)(F)(ii).  The statute provides eight factors for consideration, *see id.* § 1677(7)(F)(i), which the Commission considers "as a whole," *id.* § 1677(7)(F)(ii).  Generally, the Commission organizes its threat analysis using the same volume-price-impact framework applied to material injury.  *See* Confidential Views of the Commission, *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*,

Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1657 (Final) (Nov. 20, 2024), C.R.

915 at 108 n.434 ("Views").

Overall, the Commission's statutory directive is to determine whether the domestic

industry is materially injured or threatened with material injury "by reason of" subject imports. *Id.*

§§ 1671d(b), 1673d(b). "By reason of" has been interpreted to mean "not by reason of a minimal

or tangential contribution to material harm{.}" *Mittal Steel Point Lisas Ltd. v. United States*, 542

F.3d 867, 873 (Fed. Cir. 2008).[2] Subject imports need not be the main or predominant cause of

material injury to the domestic industry. "As long as its effects are not merely incidental, tangential,

or trivial, the foreign product sold at less than fair value meets the causation requirement." *Nippon*

*Steel Corp. v. USITC*, 345 F.3d 1379, 1384 (Fed. Cir. 2003). That is so even if other economic

factors <u>also</u> have adverse effects on the domestic industry. *See Taiwan Semiconductor Indus.*

*Ass'n v. USITC*, 266 F.3d 1339, 1345 (Fed. Cir. 2001) ("{T}he Commission need not isolate the

injury caused by other factors from injury caused by unfair imports . . . . Rather, the Commission

must examine other factors to ensure that it is not attributing injury from other sources to the

subject imports."); *see also* Views at 58-59 & n.208 ("Nor does the 'by reason of' standard require

that unfairly traded imports be the 'principal' cause of injury . . . ." (citing S. Rep. No. 96-249 at

74-75; H.R. Rep. No. 96-317 at 47)).

### B.    Standards of Appellate Review

The Court considers whether the Commission's final determinations are "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B). Substantial evidence "means such relevant evidence as a reasonable mind might

---

[2]    Unless otherwise noted, all emphasis in this Brief has been added, and all internal
quotations, alterations, and citations have been omitted.

accept as adequate to support a conclusion." *Suramerica de Aleaciones Laminadas, CA. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994). Whether a determination is supported by substantial evidence is evaluated based on the record as a whole, and must take into account any evidence that fairly detracts from the agency's determination. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88 (1951); *Suramerica*, 44 F.3d at 985 ("{T}his court cannot evaluate the substantiality of evidence supporting an ITC determination merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.").

As to whether a determination is in accordance with the law, the Court assesses both the legal soundness of the Commission's decision, in addition to the adequacy of the Commission's explanations. An agency decision is not in accordance with law if it conflicts with governing statutes, binding court decisions, or if it arbitrarily departs from the agency's own relevant precedents. *See, e.g.*, *Georgetown Univ. Hosp. v. Bowen*, 862 F.2d 323, 328 n.12 (D.C. Cir. 1988) ("{A} court {must} set aside an intermediary's decision that directly conflicts with a final and binding court precedent since such a decision would not be 'in accordance with law.'"); *Fred Beverages, Inc. v. Fred's Cap. Mgmt. Co.*, 605 F.3d 963, 967 (Fed. Cir. 2010) ("Where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious."). Likewise, an agency's explanation is inadequate if it is conclusory or otherwise fails to inform the Court of the agency's decision-making path. *See CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) ("If the Court of International Trade and this court are to play their statutorily required roles in reviewing Commerce's determinations, it is important that we have clear guidance from Commerce as to what is actually happening.").

## V.    **ARGUMENT**

The Commission Majority's negative injury and threat determinations were unsupported by substantial evidence and not in accordance with law.

<u>Injury Determination</u>.  The volume of subject imports during the POI was undisputedly significant.  But the Commission Majority found neither significant price effects nor adverse impact by reason of subject imports, largely because it determined that subject imports did not undersell the domestic like product in the majority of pricing product comparisons.  As discussed below, the Commission Majority's underselling determination was erroneous for a number of reasons, including (1) that determination rested predominantly on a single data point that was not representative of the market, that contained flaws, and that was contrary to the overwhelming weight of record evidence, contrary to the Commission's obligation to consider record evidence as a whole; (2) that lone data point turned largely on the reporting of a single importer, which was revised [                              ] by the Commission and thus had inherently limited probative value; and (3) the Commission Majority's analysis was inadequately explained and contradicted relevant agency and judicial precedents.    Accordingly, the Commission's underselling determination, and related finding that subject imports did not have significant price effects, should be remanded.

The domestic industry also experienced undisputed adverse impacts during the POI, which the Commission Majority erroneously attributed primarily to domestic supply constraints emerging from the COVID-19 pandemic.  Because that determination expressly incorporated and relied upon the Commission Majority's flawed determination with regard to a lack of underselling, it, too, necessarily lacked substantial evidentiary support and was not in accordance with law.  And, as discussed below, the Commission Majority's supply constraints analysis independently lacked

evidentiary and legal support for numerous reasons, including (1) it is contradicted by overwhelming record evidence demonstrating that post-pandemic supply constraints were neither limited to the domestic industry nor temporally aligned with the adverse impacts observed— evidence the Commission has consistently taken into account in similar proceedings, and (2) even if domestic supply constraints had contributed to domestic performance declines, they would not preclude an affirmative adverse impact finding under the statutory "by reason of" standard. The Commission's adverse impact determination must therefore be remanded as well.

Threat Determination. The Commission Majority's negative threat determination was expressly informed by the same erroneous overselling and supply constraint determinations, depriving it of substantial evidentiary support and compliance with law. It further failed to fully address arguments on the record and was inadequately explained, in the face of overwhelming record evidence to the contrary.

## A.    The Commission Majority's Negative Injury Determination Was Not Supported by Substantial Record Evidence or in Accordance with Law

### 1.    The volume of subject imports was undisputedly significant.

The first step of the Commission's injury determination is to consider whether the volume of subject imports is "significant." 19 U.S.C. § 1677(7)(C)(i). Here, the Commission Majority and Minority agreed that the volume of subject imports was undisputedly significant, having increased over the POI both as a ratio to domestic production and relative to apparent U.S. consumption. Views at 77–78 & n.311, n.313. However, the Commission Majority "did not find that this volume of cumulated subject imports had either significant price effects or a significant adverse impact on the domestic industry," *id.* at 77—determinations unsupported by substantial evidence and not in accordance with law for the reasons below.

2.    **Subject imports had significant price effects on the domestic industry, including through significant underselling.**

The second step of the Commission's injury determination is to consider whether there has been significant underselling by subject imports of the domestic like product and whether subject imports significantly depressed or suppressed domestic prices to a significant degree. 19 U.S.C. § 1677(7)(C)(ii).

Both collectively and individually, record data overwhelmingly showed that subject imports pervasively undersold U.S. extrusions, in addition to suppressing and depressing U.S. prices:

(1)    A majority of purchasers reported that subject imports were lower priced than U.S. extrusions. This was direct reporting from purchasers about subject imports actually purchased during the POI. Of the [    ] purchasers that purchased subject imports instead of U.S. extrusions, [        ]—including the [                    ]—reported that the imports were lower-priced than U.S. extrusions. Petitioners' Post-Hearing Br. at 4; Petitioners' Final Comments at 5; Staff Report at V-47.

(2)    U.S. purchasers also reported that U.S. extrusions were inferior in price to (*i.e.*, higher priced than) extrusions from all subject sources. Petitioners' Post-Hearing Br. at 5; Petitioners' Final Comments at 5; Prehearing Report at II-33, II-34–II-48 (Table II-15). Notably, U.S. and subject extrusions were reported as comparable on all other factors, and nonsubject import prices were comparable to U.S. prices. Petitioners' Final Comments at 5-6; Staff Report at II-36–II-50 (Table II-15).

(3)    Plaintiffs prepared a purchase cost data analysis for importers with reported pricing products covering all U.S. shipments. Even adjusted to account for additional costs related to importing, that analysis showed subject import underselling in [         ]. Petitioners' Post-Hearing Br. at 5 and Exhibit 37.

(4)    Subject import average unit values ("AUV") were [    ] lower, [    ] lower, and [    ] lower than U.S. producer AUVs in 2021, 2022, and 2023, respectively, and [    ] lower in interim 2024. *Id.*; Prehearing Report at C-1–C-5 (Table C-1). Indeed, new, product-specific AUV data in the final staff report showed that, in [    ] of available comparisons, subject imports were priced lower than U.S. product for crash relevant extrusions, extrusions for window wall units, extrusions for heat exchangers, and all other types of extrusions. Petitioners' Final Comments at 6; Staff Report at M-3–M-6 (Figures M-1–M-4).

(5)    Petitioners presented a uniquely significant amount of contemporaneous, documented evidence showing that customers frequently and specifically informed U.S. producers

that subject imports were priced lower than their U.S. extrusion prices. *See* Petitioners'
Post-Hearing Br. at 5–7 (detailing sixteen specific reports from actual purchasers).

(6)    U.S. producer questionnaires likewise confirmed that subject import prices were much
lower than U.S. extruder prices, resulting in price suppression or depression: "of the 31
responding U.S. producers, 28 reported that they had to either reduce prices or roll back
announced price increases" to avoid losing sales to subject imports. *Id.* at 7; Staff Report
at H-46 (Table H-9), H-47 (Table H-9), V-47.

(7)    Significant testimony at the Staff Conference and Hearing confirmed the extremely and
unfairly low pricing of subject imports. Petitioners' Post-Hearing Br. at 7 n.40
(collecting relevant cites).

(8)    Commerce found nearly all subject country imports to be dumped, at margins up to 605%.
*Id.* at 8 & n.44.

(9)    Significant lost sales and revenues submitted by U.S. producers, showing losses of nearly
[                    ], demonstrated subject import underselling. *Id.* at 8 & n.45.

(10)    Reliable data from the preliminary phase showed "subject imports predominantly
undersold the domestic product by volume in each year of the POI." *Id.* at 7; USITC Pub.
5477 at 63.

(11)    Pricing product data—which accounted for approximately [      ] of domestic
production and [      ] of importer production—showed that cumulated subject imports
undersold the domestic like product in 107 of 274 quarterly comparisons, or 39.1% of
the time, with underselling margins averaging 26.6% and as high as 74.7%. Views at
79–80.

Appropriately considering the record "as a whole," *USX Corp. v. United States*, 11 CIT 82,

84, 655 F. Supp. 487, 489 (1987), the weight of the evidence amply demonstrated significant

underselling by subject imports. That is, of eleven record data points, <u>ten</u> showed significant and

injurious underselling industry-wide. And the eleventh, pricing product data, showed still-

pervasive underselling—particularly in a market characterized by price sensitivity and moderate-

to-high substitutability between domestic extrusions and subject imports. *See* Views at 69

(substitutability); Staff Report at II-1 (price sensitivity); *cf. DAK Ams. LLC v. United States*, 456

F. Supp. 3d 1340, 1356–57 (Ct. Int'l Trade 2020) (collecting Commission determinations finding

that "mixed underselling is more significant in price-sensitive markets for substitutable goods"

and remaining determination that one-third underselling was not significant under such circumstances).  Thus, as the Commission Minority rightly observed: "{T}he weight of the available record reflects that cumulated subject imports generally undersold the domestic like product during the POI.  With the exception of the quarterly price comparisons, which <u>nonetheless show underselling</u> by cumulated subject imports in <u>over a third</u> of the quarterly comparisons and of the reported sales quantity, <u>all</u> other record evidence indicates that cumulated subject imports were predominantly priced below domestic product during the POI."  Confidential Dissenting Views of Chair Amy A. Karpel, *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1657 (Final) (Nov. 20, 2024), C.R. 916 at 6 ("Minority Views").  In addition to improperly disregarding other probative evidence, the Commission Majority, however, failed to explain why subject import underselling in 39.1% of available pricing comparisons was not indicative of adverse price effects, even though the Commission has recognized in other instances that underselling does not need to occur in the majority of occurrences in order for it to be injurious. Views at 80.

In disregarding the clear weight of the evidence, and elevating just pricing product data above all else, the Commission Majority erred.  Throughout its analysis, the Commission Majority acknowledged, but disregarded, <u>every</u> other piece of record evidence demonstrating significant underselling on the grounds that pricing product data was more "probative" or "more instructive." *See, e.g.*, Views at 79–80, 84; *see also id.* at 84 (acknowledging but disregarding data submitted by <u>54</u> responding purchasers as "subjective" and not "as carefully reviewed by Commission staff" for accuracy); *id.* at 85 (acknowledging but disregarding AUV data "because they are based on approximations").  For instance, the Commission Majority recognized that "purchaser responses

to the question about the comparability of prices provide important purchaser-specific information about pricing," yet still found pricing product data to be "more instructive." *Id.* at 84.

The Commission Majority's reasoning supporting its decision not to rely on other record evidence was also highly flawed. For example, the Commission Majority stated that it "considered anecdotal evidence of underselling provided by Petitioners, but the evidence does not demonstrate significant underselling or pricing pressure by subject imports." *Id.* at 85. It then described a few examples of such evidence and found them not probative because, *e.g.*, certain emails pertained to a period after the POI and others stated that they were collected "for use in these investigations." *Id.* at 85–86 n.339. The Commission Majority did not explain why extremely recent (post-POI) evidence of underselling by subject imports even with preliminary AD/CVD duties in place does not indicate that subject imports also undersold U.S. extrusions during the POI. It is also unreasonable to conclude that contemporaneous evidence from the POI that was collected for purposes of these investigations—as was all evidence submitted to the record, by all parties— would render that evidence not probative.

Certain of the Commission Majority's critiques appear to support the opposite conclusion. The Commission Majority explained that Plaintiffs submitted at Exhibit 25 to its Prehearing Brief an "email from [            ] {that} contains a chart showing [

                                    ]." *Id.* at 86 n.339. It followed with a statement that "{i}n sum, the communications attached as exhibits to Petitioners' Prehearing Brief do not demonstrate a pattern of significant underselling or lost sales that undermines the pricing data and lost sales information collected in these investigations." *Id.* The Commission Majority's use of a [

                                                                    ],

to support its finding that the evidence did <u>not</u> demonstrate underselling, was manifestly unreasonable.

The Commission Majority failed to mention other evidence altogether, for example, direct and contemporaneous evidence from a customer showing that a [

], and a [

]. *See* Petitioners' Post-Hearing Br. at Exhibits 3 and 26.

Moreover, while the Commission Majority explained (albeit unreasonably) why it was disregarding each other piece of evidence individually, it failed to explain why the ten categories of evidence showing underselling listed above, collectively, were not <u>at least</u> equally as "instructive" as the pricing product data, which contained significant flaws and represented only [ ]% to [ ]% of market shipments.  For many reasons, the Commission Majority's reasoning misses the mark, depriving its conclusion of substantial supporting evidence and compliance with law.

The Commission's statutory directive is not to select <u>one</u> piece of evidence from among all record data and determine whether it, alone, demonstrates significant underselling to the exclusion of everything else.  Rather, "{u}nder the substantial evidence standard of review, the court must determine whether ITC's conclusions are supported by the evidence on the record <u>as a whole</u>.  ITC may not rely upon isolated tidbits of data which suggest a result contrary to the clear weight of the evidence."  *USX Corp.*, 11 CIT at 84, 655 F. Supp. at 491 (emphasis in original); *see also* 19 U.S.C. § 1516a(b)(1)(B); *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) ("To determine if substantial evidence exists, we review the record <u>as a whole</u>, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence."); *Ad Hoc*

*Shrimp Trade Action Comm. v. United States*, 70 F. Supp. 3d 1328, 1335 (Ct. Int'l Trade 2015)

("{A}n agency acts arbitrarily, and therefore unreasonably, when it . . . offers an explanation for

its decision that runs counter to the evidence before it." (citing *Motor Vehicle Ass'n of U.S., Inc.*

*v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

That is particularly so where the Commission's lone, outlier data point was quite limited

in coverage and facially flawed. Pricing product data accounted for only [      ] of domestic

shipments and [      ] of cumulated import shipments—individually comprising, *e.g.*, just [      ]

of Chinese import shipments, [      ] of Italian import shipments, and [      ] of import shipments

from a number of subject countries. *See* Views at 79 & n.318. And that is [      ] of <u>reported</u>

import shipments. Importers that submitted questionnaire responses to the Commission

represented less than [      ] of total extrusion imports during the POI, and less than [      ] of

subject import shipments. If the Commission had full importer coverage to more accurately

represent the total U.S. market, that [      ] would in fact be much, much smaller, demonstrating

just how unrepresentative the data was of the overall market, given the significant evidence to the

contrary. In total, the Commission found that only "{17} U.S. producers and 18 importers

provided usable pricing data for sales of the requested products"—and even so, "not all firms

reported pricing for all products for all quarters." *Id.* at 78–79. At the Commission hearing,

Commissioner Schmidtlein thus rightly observed:

> But shouldn't we be looking -- I mean, the quarterly pricing data -- I guess this
> comes back again to the coverage -- and <u>there are only a few products, and we know</u>
> <u>there are hundreds of products that are aluminum,</u> you know. So which ones should
> we be looking at? Would it better in a case like this to look at, like, on average,
> right? <u>We're supposed to be considering the industry as a whole versus, well, we're</u>
> <u>going to decide the whole case based on these three tiny products.</u>

Revised and Corrected Hearing Transcript, *Aluminum Extrusions from China, Colombia,*

*Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey,*

*United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1657 (Final) (Oct. 11, 2024), P.R. 310 at 266:15–24; *accord* Minority Views at 8 ("Although these coverage figures are not atypical for an investigation with a broad scope covering a continuum of products, nevertheless, I take into account the relatively limited view of the U.S. market provided by the quarterly price comparisons as a result when evaluating these data and weighing them against the balance of the record, which generally indicates that cumulated subject imports were priced below the domestic like product throughout the POI.").

In addition to its low coverage of the market, the pricing product data received by the Commission was highly flawed. As Plaintiffs demonstrated below, certain importers reported data for inaccurate products and for downstream articles at different levels of trade than the pricing products. *See* Petitioners' Post-Hearing Br. at Exhibit 1, Section 1; Petitioners' Final Comments at 6. Despite Commission efforts to address these issues, the fact is that many inaccuracies remained. *See* Petitioners' Final Comments at 6–7 (detailing unresolved inaccurate reporting in pricing product data); Minority Views at 10–11. Similarly, the final staff report did not include preliminary-phase pricing product data for importers that failed to submit a response in the final phase of the investigations, even though the Commission has included such data in prior cases. *See* Petitioners' Final Comments at 6.

Highlighting the difficulty in obtaining accurate pricing product data and the likelihood of persistent—and likely dispositive—errors, one importer submitted a questionnaire response to the Commission on October 21, 2024, which resulted in a dataset showing majority underselling by volume. [                                    ] after the Commission's staff report was issued and just [

] before the investigative record closed, that importer submitted an unsolicited revision to its pricing product data. Petitioners' Final Comments at 7; Minority Views at 11. The effect of that

eleventh-hour revision—which was submitted too late to be investigated by the Commission but accepted nonetheless—was to unilaterally "change{} the quarterly price comparisons from showing majority <u>underselling</u> by volume to showing majority <u>overselling</u> by volume{.}" Minority Views at 11; Petitioners' Final Comments at 7–8.  As Plaintiffs noted in their Final Comments, the fact that one importer [                                                    ] could unilaterally change the results of the underselling analysis entirely demonstrates the data set's inherent limitations, which is to say nothing of the dubious (and untested) character of the revised data itself.  Petitioners' Final Comments at 7–8.  In light of these factors, the Commission Minority aptly observed that pricing product data should not be unduly "elevat{ed}" above all record evidence to the contrary:

> {T}he apparent difficulty on the part of importers in providing complete and accurate data to the Commission in response to the Commission's questionnaire throughout the proceeding, notwithstanding the laudable efforts of Commission staff throughout these investigations, is notable in my view and <u>counsels caution in elevating the weight given to the pricing data</u>. . . .

> Commission staff received 144 questionnaire responses from U.S. importers and <u>54 revised responses</u>, ultimately arriving at 113 useable responses.  While Commission staff diligently fielded these requests for revision and undertook additional review of U.S. importers' reported pricing data where discrepancies were apparent, <u>the significant number of revisions, including one that was filed [                ] before the closing of the investigative record that changed the quarterly price comparisons from showing majority underselling by volume to showing majority overselling by volume, raises questions about the reliability of the pricing data</u> and urges caution in elevating the weight given to these data relative to other record evidence.

Minority Views at 10–11 (footnotes omitted); *see also Metal Lockers from China*, Inv. Nos. 701-TA-656 and 731-TA-1533, USITC Pub. 5218 (Aug. 2021) (Final) at 27 ("Apparent anomalies in the pricing product data identified by the parties in the preliminary phase of the investigations appear undiminished in the final phase, undermining the reliability of the pricing product data, as explained below.  The pricing product data are also inconsistent with broader record evidence on

pricing in the U.S. market."). The Commission Majority similarly appeared to recognize the difficulties U.S. importers encountered in reporting their data, stating: "Importers had indicated that they found it difficult to respond to the questionnaire in the preliminary phase of the investigations, and they continued to report problems in the final phase." Views at 80 n.319.

In short, Plaintiffs do not appeal from the Commission Majority's finding that pricing product data was "probative," and the Commission Majority was incorrect in referring to "Petitioners' arguments that the pricing data should be disregarded in these investigations." *See id.* at 79–80, 83. But a lawful consideration of the record as a whole necessarily should have included a meaningful acknowledgment of that data's limitations, the fact that even that belatedly adjusted data set indicated substantial underselling, and the fact that every other piece of record data demonstrated underselling to a significant and injurious degree. As the Court explained in *DAK Americas*, "if no other evidence existed, then the price data upon which the Commission relied would be substantial evidence. However, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *DAK Ams.*, 456 F. Supp. 3d at 1367 (remanding overselling determination where Commission elevated one data source over others that "undermine{d} the Commission's reasoning and conclusions"); *accord Universal Camera Corp.*, 340 U.S. at 488 (reversal is appropriate when a reviewing court "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the {agency's} view"); *Golub v. Sec'y of Health & Hum. Servs.*, No. 99-51661, 2000 WL 1471643, at *4 (Fed. Cir. Oct. 3, 2000) (vacating determination that should have been based on record "as a whole" where special master "treat{ed} each element of the evidence individually, discrediting each piece of evidence in turn, without considering the totality of the evidence").

Because the Commission Majority's underselling analysis and resulting price effects determination were unsupported by substantial evidence, inadequately explained, contrary to relevant agency and judicial precedents, and thus not in accordance with law, they should be remanded.

### 3. Subject imports had a significant adverse impact on the domestic industry, notwithstanding alleged domestic supply constraints.

With regard to the impact of subject imports on the domestic industry, the Commission Majority and Minority uniformly found declines in the domestic industry's performance during the POI, including in "production, capacity utilization, sales, and shipments." Views at 92; Minority Views at 19–20 ("As U.S. producers lost market share to low-priced cumulated subject imports over the POI, the domestic industry's production, capacity utilization, U.S. shipments, and sales decreased."). Specifically, as subject imports took market share from U.S. extruders, the domestic industry's production quantity decreased by 15.4% from 2021 to 2023 and a further 6.8% in interim 2024 as compared to interim 2023, Staff Report at III-10 (Table III-5), C-5 (Table C-1); capacity utilization decreased by 13.4% from 2021 to 2023 and a further 5.5% in interim 2024, *id.*; and the domestic industry's U.S. shipments decreased by 15.4% from 2021 to 2023 and a further 5.9% in interim 2024, *id.* at III-30 (Table III-9), C-5 (Table C-1). "As the domestic industry's output indicators declined, so too did its financial indicators, with operating and net income and operating and net sales margins down over the period." Minority Views at 20. "Further, once apparent U.S. consumption began to stabilize across interim periods, the domestic industry's production, capacity utilization, {and} U.S. shipments continued to fall, as did its financial indicators, and U.S. producers began reducing their workforce, as cumulated subject imports gained [    ] points of market share from the domestic industry over the interim period." *Id.* at 20–

21; Views at 64 (acknowledging "plant closures, reductions in production, and layoffs of workers by the domestic industry during the POI").

Notwithstanding these undisputed markers of significant adverse impact on the domestic industry, the Commission Majority did "not find a causal nexus between cumulated subject imports and declines in the domestic industry's performance during the POI." Views at 97. Instead, the Commission Majority attributed the domestic industry's declining performance to domestic "supply constraints as apparent U.S. consumption increased in the wake of the COVID-19 pandemic." *Id.* at 92–93, 98. Because that determination was expressly colored by the Commission Majority's unlawful underselling analysis, and independently contradicts the weight of record evidence, a remand as to price effects requires a remand of this determination as well. *See, e.g.*, *DAK Ams.*, 456 F. Supp. 3d at 1367 (remanding adverse impact determination influenced by erroneous overselling determination unsupported by substantial evidence).

The POI in this case corresponded with a portion of the COVID-19 pandemic and the subsequent lifting of pandemic restrictions from 2021 to 2023. *See* Views at 61. Demand for aluminum extrusions initially contracted at the height of the pandemic, "increased from 2021 to 2022 as the pandemic eased, and then declined again in 2023." *Id.* But, as shown above, the domestic industry's performance steadily declined throughout, and into 2024. Like many industries, the aluminum extrusion industry—both U.S. producers and U.S. importers—experienced temporary supply constraints coming out of the pandemic. *See id.* at 66–67. But for many reasons, the Commission Minority correctly determined that record evidence cannot support the conclusion that such temporally limited supply constraints—as opposed to unfairly priced imports—were to blame for the domestic industry's declines and that the subject imports were not even "a cause" of the material injury:

(1)  As the Commission Majority necessarily acknowledged, domestic supply constraints markedly decreased over the POI, with the number of domestic producers reporting such constraints dropping from 19 of 30 in 2021, to 14 of 30 in 2022, 3 of 29 in 2023, and 0 post-petition in 2023 and 2024.  *Id.* at 67.  Yet, despite the elimination of such supply constraints by the end of the period and the fact that the market is predominantly comprised of spot sales, (1) domestic producers were unable to recapture the [    ] points of market share lost to subject imports in 2022, and (2) by interim 2024, the domestic industry's capacity utilization had fallen to 67.7%, down 15.8% from its high at the beginning of the POI.  Minority Views at 22, 27.  In interim 2024 in particular, when there were zero reported supply constraints by domestic producers, subject imports took [   ] percentage points of market share from the domestic industry.  *Id.* at 22.  Put simply, U.S. extruders had significant excess capacity during the period; they were unable to use it because subject imports took sales and market share from them.

(2)  Emerging from the pandemic, supply constraints impacted domestic producers and U.S. importers alike.  In 2021 and 2022, when the effects of the pandemic were most acute, the number of domestic producers that reported supply constraints "was comparable in absolute terms to the number of responding importers reporting supply constraints."  *Id.* at 22 & n.64.  And in fact, "by 2023 and interim 2024, the number of U.S. importers reporting supply constraints exceeded the number of domestic producers reporting supply constraints during this time."  *Id.* at 23.  The Commission Majority disregarded this important point, instead concluding that "{i}mporters did not report problems with supply constraints or extended lead times to the same extent as the domestic industry." Views at 101.

(3)  Purchaser data does not support the conclusion that domestic extruders lost market share due to domestic supply constraints.  To the contrary, when asked to compare domestic product with subject imports on "availability" and "reliability of supply," "overwhelming majorities of responding purchasers reported that domestic product was either superior or comparable to imports from all 14 subject countries with respect to these purchasing factors."  *Id.* at 24.  The handful of purchasers who responded otherwise "represented a narrow minority."  *Id.*

(4)  Record data regarding lead times and delivery times confirmed the point.  "{F}or over [       ] of their commercial shipments, U.S. importers reported lead times that were [       ] those of U.S. producers for the vast majority of their shipments"— specifically, an average of [  ] days for importers versus [  ] days for domestic producers.  *Id.*  When asked to evaluate delivery time as a purchasing factor, again "overwhelming majorities of responding purchasers reported that domestic product was superior or comparable to imports from all 14 subject countries."  *Id.* at 24–25.

(5)  The pricing product data—on which the Commission Majority relied so significantly— showed that subject import underselling was most pervasive in 2022, Views at 81, when domestic producers were allegedly struggling with serious supply constraints.  *See id.* at 99.  The Commission Majority failed to explain why subject import underselling, according to its favored metric, would have peaked if domestic producers were unable to supply the market.  If subject imports were the only option readily available to purchasers

during this time, why would they have had to undersell domestic producers to take those sales? To the contrary, domestic producer supply constraints should have led to <u>higher</u> subject import prices. The Majority failed to grapple with this evidence detracting from its conclusion.

(6)    Testimonial evidence, including the sworn testimony of multiple hearing witnesses, confirmed that many domestic producers did not suffer supply constraints at all "and even supplied orders that U.S. importers were unable to fill" due to their own constraints. *Id.* at 25 & n.72 (quoting hearing transcript excerpts: "We met every order that we were given by our customers, and all our customers ordered more volume."; "These were extrusions that {customers} couldn't get from imports at that time because of the logistic issues they were dealing with. We invested. We brought team members on. We produced it. We produced at a very high quality and met specifications. That now has all left.").

The evidence above is undisputed. It is also virtually indistinguishable from evidence the Commission has previously cited in finding both adverse impact and material injury by reason of subject imports notwithstanding alleged post-pandemic supply constraints. *See, e.g.*, *Brass Rod from India*, Inv. No. 701-TA-686, USITC Pub. 5485 (Feb. 2024) (Final) at 57 ("USITC Pub. 5485") ("Although the domestic industry experienced supply constraints in 2021 as a result of the COVID-19 pandemic, so did importers and foreign producers, and purchasers reported that the domestic industry no longer had such supply constraints in 2022. Moreover, large majorities of purchasers reported that the domestic industry was comparable or superior to subject imports from Israel in terms of availability, delivery time, and reliability of supply."); *Truck & Bus Tires from Thailand*, Inv. No. 731-TA-1658, USITC Pub. 5562 (Dec. 2024) (Final) at 35 ("USITC Pub. 5562") ("{N}otwithstanding reported domestic industry supply constraints, the domestic industry had substantial available capacity and growing inventories to supply the U.S. market for TBTs during the POI and to the extent supply constraints reported in 2021 and 2022 affected domestic producer supply those constraints were resolved by the latter part of the POI, including in interim 2024 when subject imports gained 4.1 percentage points of market share."); *Certain Mobile Access Equipment & Subassemblies Thereof from China*, Inv. No. 701-TA-665, USITC Pub. 5242 (Dec. 2021) (Final)

at 65 ("USITC Pub. 5242") ("{D}emand reductions and supply constraints resulting from the COVID-19 pandemic did affect the U.S. industry's performance during the POI. Yet, effects of the pandemic did not explain away the increase in subject imports' U.S. market share during the POI, and are not likely to prevent substantial increases in subject import volumes in the imminent future.").

In nevertheless determining that subject imports were not a cause of the domestic industry's declining performance here, and that domestic supply constraints were, the Commission Majority was expressly impacted by its erroneous overselling determination. At the outset of its impact discussion, the Commission Majority expressed that its "analysis of the absence of significant underselling . . . is particularly probative to an assessment of the impact of the subject imports." Views at 92 n.365. In perceiving an "{a}bsence of any clear correlation between subject imports and the domestic industry's financial performance," the Commission Majority likewise cited "the pricing data showing predominant overselling by subject imports . . . ." *Id.* at 98. The false equivalency played out again and again:

–   "The record therefore shows that the domestic industry's reduced sales and shipments between 2021 and 2022 resulted from its supply constraints and extended lead times rather than subject imports underselling to gain market share. <u>Pricing data show that subject imports oversold the domestic like product</u>. . . ." *Id.* at 101.

–   <u>Nor do we find a causal nexus between cumulated subject imports and any declines in the domestic industry's performance</u> in the first three months of 2024 compared to the first three months of 2023. Although cumulated subject import volume and market share were higher in interim 2024 than in interim 2023, the record does not show that the increase was driven by subject import underselling, given that <u>subject imports oversold the domestic like product</u> . . . ." *Id.* at 102–103.

–   "The record shows that the decline in domestic producers' output indicators and consequent decline in financial indicators are explained by their supply constraints from 2021 to 2022 and the decline in apparent U.S. consumption from 2022 to 2023. <u>Given this, the absence of significant underselling</u> or adverse price effects, and the lack of any clear correlation between cumulated subject imports and the domestic industry's performance during the POI, which improved by many measures when subject imports increased from

2021 to 2022, <u>we find that subject imports did not have a significant adverse impact on the domestic industry</u>." *Id.* at 104.

- "{W}e have found <u>no clear correlation between cumulated subject imports and any significant declines in the domestic industry's performance</u> after 2022. . . . While cumulated subject imports gained market share from the domestic industry in interim 2024 compared to interim 2023, they did so while <u>predominantly overselling the domestic like product</u> . . . ." *Id.* at 106.

Ultimately, the Commission Majority found that "cumulated imports did not have a significant adverse impact on the domestic industry" and thus "that the domestic industry is not materially injured by subject imports{.}" *Id.* at 107.

The Commission Majority's adverse impact and resulting negative injury determinations must be remanded for three reasons. *First*, when an erroneous finding taints other aspects of an agency determination, both the erroneous finding and the determinations that rested on it must be remanded. *DAK Americas* is instructive on this point. In that appeal, a domestic industry lost market share to subject imports and "suffered a steep decline in financial condition during the POI." 456 F. Supp. 3d at 1349. But the Commission terminated its investigation based on three related conclusions: (1) that underselling was not significant because "overselling was more prevalent," (2) that "supply shortages were the cause of domestic market share losses," and (3) that subject imports thus "did not have significant adverse impact on the domestic industry." *Id.* at 1347, 1349. Finding the first two conclusions not supported by substantial evidence and requiring remand, the Court also remanded the third "in light of the insufficiencies in {the Commission's} overselling and supply constraint findings." *Id.* at 1368; *see also OCP S.A. v. United States*, 658 F. Supp. 3d 1297, 1319 (Ct. Int'l Trade 2023) ("The centrality of the alleged oversupply to the Commission's determinations on volume, price effects, and impact compels the Court to conclude that these determinations are themselves unsupported by substantial evidence.").

*Second*, for the reasons discussed above, the Commission Majority's supply constraints analysis independently lacked substantial evidentiary support and arbitrarily departed from relevant agency precedents.  *See* USITC Pub. 5485; USITC Pub. 5562; USITC Pub. 5242.  For example, the Commission Majority opinion states that "subject imports increased during the <u>first half</u> of 2022 in response to unusual market conditions in the aftermath of the COVID-19 pandemic: a demand surge coupled with domestic producers experiencing supply constraints."  Views at 112 n.447.  Yet data presented by Petitioners showed that subject imports were actually <u>higher</u> in the <u>second half</u> of 2022 than in the first, leading to an inventory build.  Petitioners' Post-Hearing Br. at Exhibit 1, p. 46.  Moreover, as noted above, subject imports gained the most market share at the domestic industry's expense in interim 2024—when not even the respondents alleged that the domestic industry was supply constrained.  *See* Petitioners' Final Comments at 9-13.

*Third*, even if it were accurate that supply constraints contributed to the domestic industry's declining performance, that would not preclude the domestic industry from being adversely impacted "by reason of" subject imports for purposes of the statute.  The Federal Circuit has made clear that an "affirmative material-injury determination under the statute requires no more than a substantial-factor showing.  That is, the dumping <u>need not be the sole or principal cause of injury</u>.  As long as its effects are not merely incidental, tangential or trivial, the foreign product sold at less than fair value meets the causation requirement."  *Nippon Steel Corp.*, 345 F.3d at 1381; *see also Certain Ball Bearings & Parts Thereof from Japan & the United Kingdom*, Inv. Nos. 731-TA-394-A and 399-A, USITC Pub. 4082 (May 2009) (Remand) at 14, n.96 ("{T}he statutory scheme clearly contemplates that an industry may be facing difficulties from a variety of sources, including non-subject imports and other factors, but the existence of injury caused by other factors does not

compel a negative determination if the subject imports are themselves making more than a minimal or tangential contribution to injury.").

Here, "as domestic industry supply constraints maintained their consistent downward trajectory in 2023, the domestic industry did not gain back <u>any</u> of the market share it lost to cumulated subject imports in 2022 notwithstanding the predominance of spot sale transactions in both U.S. producers' and U.S. importers' reported commercial shipments." Minority Views at 27 n.75. Moreover, the domestic industry's capacity utilization rate "fell consistently over the POI, decreasing from 83.5 percent in 2021 to 81.4 percent in 2022 and further to 70.1 percent in 2023 and was down across interim periods at 67.7 percent interim 2024 compared to 73.2 percent in interim 2023." *Id.* at 27 n.76. Thus, even as supply constraints waned and then disappeared entirely, the domestic industry faced continued dramatic drops in capacity utilization, as subject imports took more of its market share—foreclosing the conclusion that supply constraints "fully explain the injury" observed. *Cf.* USITC Pub. 5562 at 36. Because subject imports were plainly a substantial factor in the domestic industry's performance declines, and the Commission Majority's determination to the contrary was expressly tainted by its erroneous overselling determination, the Commission's impact determination must be remanded.

*       *       *       *       *

As demonstrated above, two of three components of the Commission Majority's injury analysis (price effects and adverse impact) were unsupported and contrary to law. Because the Commission Majority ultimately determined "that cumulated subject imports did not have a significant adverse impact on the domestic industry" on those bases specifically, Views at 107, its negative injury determination, along with those component findings, must be remanded.

**B.      The Commission Majority's Negative Threat Determination Was Not Supported by Substantial Record Evidence or in Accordance with Law**

For similar reasons, the Commission Majority's threat determination[3] must be remanded as well.  In finding no threat of material injury by reason of subject imports, the Commission Majority remained heavily and expressly influenced by its erroneous overselling and supply constraints determinations and failed to consider record evidence and arguments, resulting in further conclusions unsupported by substantial evidence and not in accordance with law.

With regard to the likely volume of subject imports, subject imports undisputedly increased over the POI and in interim 2024 as compared with interim 2023.  *See* Petitioners' Prehearing Br. at 113; Views at 111–112.  But the Commission Majority disregarded that growth as predictive of future trends based in large part on its erroneous supply constraints determination.  The Commission Majority acknowledged, for example, that "subject imports increased absolutely and gained market share from 2021 to 2022," but disregarded that evidence because it arose "when the domestic industry faced <u>supply constraints</u>."  Views at 111–112.[4]  The Commission Majority also acknowledged that "{s}ubject producers increased their production capacity and production from 2021 to 2023 and in interim 2024 compared to interim 2023, and project increased capacity and production in 2024 and 2025."  *Id.* at 114.  But, in a footnote, the Commission Majority asserted "{t}hese trends did not result in increased exports to the United States except in 2022 when <u>U.S.</u>

---

[3]      Having found material injury, the Commission Minority did not separately address the threat of material injury posed by subject imports, but expressly did not join in the Commission Majority's threat determination.  *See* Minority Views at 1 (joining in Sections I through VI.C of the Views of the Commission).

[4]      The Commission Majority likewise recognized that "subject imports' market share was higher in interim 2024, at [     ] percent, than in interim 2023, at [     ] percent," but dismissed that growth as aberrant and likely "influenced by Commerce's impending preliminary determinations and possible provisional measures, as well as the seasonality of demand" without adequate explanation.  Views at 112–113.

market conditions led purchasers to turn to imports." *Id.* at 118 n.469.  Accordingly, the

Commission Majority concluded this evidence "does not indicate that such circumstances are

likely to recur in the imminent future." *Id.*

The Commission Majority also failed to meaningfully acknowledge the substantial

increase in subject import market share at the end of the period—[    ] percentage points of growth

at the domestic industry's expense in interim 2024.  Such growth could not possibly have been

explained by domestic industry supply constraints, which undisputedly had dissipated by 2024.

The Commission Majority's explanation that the interim 2024 increase was largely attributable to

a single month, March 2024, and "would have been influenced by Commerce's impending

preliminary determinations and possible imposition of provisional measures," does not support its

threat determination.  *See id.* at 113.  That subject imports would have rushed into the market at

extremely high volumes to beat the imposition of duties does not indicate that such imports are not

a threat to the domestic industry.  To the contrary, such a surge demonstrates the extent of subject

producers' interest in and dependence on the U.S. market, as well as their ability to export huge

volumes of extrusions to the United States within a very short timeframe, indicating that such a

threat does in fact exist.

The Commission Majority's unsupported assertion that "the seasonality of demand" would

also have impacted the March 2024 increase is similarly misplaced.  March 2021 and March 2023

occurred during the same season as March 2024; seasonality does not explain why subject imports

were so much greater at the end of the period than in either of those prior years.  *See* Staff Report

at Table IV-13.  Yet the Commission also stated in its threat analysis that, because demand for

aluminum extrusions is seasonal, interim 2024 data should be given less weight than other data,

which cover full-year periods.  Views at 113 n.449.  This conclusion is unreasonable and

unsupported.  Again, seasonality does not impact a comparison of <u>the same seasons</u> (*e.g.*, first quarter 2023 to first-quarter 2024).

Contrary to the Commission Majority's analysis, the "significant and increasing volume and market share of cumulated subject imports during the POI, the large and increasing capacity of the subject industries, including substantial excess capacity, the subject industries' large inventories, and the subject industries' demonstrated ability to supply export markets generally and the United States in particular"—which the Commission found instructive in making an affirmative threat finding at the preliminary phase—all remained in the final phase, and supported a final affirmative determination of threat as well.  USITC Pub. 5477 at 75.

With regard to the likely price effects of subject imports, the Commission Majority's one-page discussion opened, "As explained in section VI.D above, pricing data indicate that there was <u>predominant overselling</u> by cumulated subject imports that increased over the POI."  *Id.* at 118.  It continued to rely on the Commission Majority's erroneous overselling finding throughout, stating, for example: "we further find that <u>the lack of significant underselling</u> and price effects observed during the POI will likely continue in the imminent future."  *Id.* at 119.

The Commission Majority's likely-impact discussion turned on its erroneous overselling and related supply constraints determinations as well.  *See id.* ("As discussed in section VI.E above, the domestic industry's declines in production and shipments, which resulted in some declines in financial performance, <u>stemmed from supply constraints</u>, declines in apparent U.S. consumption, and increased nonsubject import market share, rather than subject import competition."); *id.* at 120 ("Subject imports increasingly <u>oversold the domestic like product</u> throughout the POI . . . ."); *id.* ("Although the domestic industry's trade indicators declined during the period, the declines resulted from <u>supply constraints in 2021 and 2022</u> and {other factors}."); *id.* at 121 ("On balance,

we conclude that the industry is not vulnerable.  The industry's reduced <u>sales and shipments</u> <u>resulted from supply constraints</u> . . . ."); *id.* ("As noted, much of the domestic industry's declining production and shipments resulted not from cumulated subject imports, but from <u>supply constraints</u> <u>that have resolved</u> . . . .").

Because these analyses, and the Commission Majority's ultimate negative threat determination, were unsupported by the record and turned expressly on the Commission Majority's erroneous overselling and supply constraint determinations, they must be remanded.  *See, e.g.*, *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. United States*, 348 F. Supp. 3d 1328, 1339 (Ct. Int'l Trade 2018) ("Because the court remands the final determination to reconsider the present price effects finding, as explained *supra*, the court directs the Commission to reconsider the negative threat determination on this basis as well."); *Altx, Inc. v. United States*, 25 CIT 1100, 1373, 167 F. Supp. 2d 1353, 1373 (2001) ("The Commission must therefore undertake its threat determination anew based on its reconsidered present material injury determination.").

## VI.     <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court remand the Commission's final determination.

Consol. Ct. No. 24-00209                                    NON-CONFIDENTIAL VERSION

Respectfully submitted,

*/s/ Robert E. DeFrancesco, III*
Robert E. DeFrancesco, III, Esq.
Alan H. Price, Esq.
Laura El-Sabaawi, Esq.
Enbar Toledano, Esq.
Elizabeth S. Lee, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the U.S. Aluminum Extruders*
*Coalition and the United Steel, Paper and*
*Forestry, Rubber, Manufacturing, Energy,*
*Allied Industrial and Service Workers*
*International Union*

Dated: May 12, 2025

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Memorandum in Support of Rule 56.2 Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 12,066 words.

*/s/ Robert E. DeFrancesco, III*
(Signature of Attorney)

Robert E. DeFrancesco, III, Esq.
(Name of Attorney)

U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union
(Representative Of)

May 12, 2025
(Date)