PUBLIC VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

No. 24-00209

U.S. ALUMINUM EXTRUDERS COALITION, UNITED STEEL, PAPER, AND
FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED
INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,

*Plaintiffs*,

v.

UNITED STATES,

*Defendant*,

and

CEDAL DURAN S.A., DANFOSS LLC, DORMAN PRODUCTS, INC., ENCLOS
CORPORATION, JOHNSON CONTROLS, INC., EAST ASIA ALUMINUM
COMPANY LIMITED, ROCKLER COMPANIES, INC., TECNOGLASS, S.A.S.,
E.S. WINDOWS LLC, C.I. ES METALS S.A.S., ERDOGANLAR ALUMINYUM
SAN. VE TIC. A.S., ISTANBUL FERROUS AND NON-FERROUS METALS
EXPORTERS' ASSOCIATION, MAHLE BEHR USA INC., ZF NORTH
AMERICA, INC., BERGSTROM CHINA GROUP PARTNERS, LLC,
BERGSTROM, INC., TESLA, INC., MAHLE BEHR CHARLESTON, INC.,
MAHLE BEHR DAYTON, L.L.C., MAHLE BEHR SERVICE AMERICA L.L.C.,
MAHLE BEHR MANUFACTURING MANAGEMENT, INC., MAHLE BEHR
MT. STERLING, INC., MAHLE BEHR RIO BRAVO, S. DE. R.L. DE C.V.,
MAHLE BEHR MEXICO, S. DE. R.L. DE C.V., MAHLE BEHR SERVICE
MEXICO, S. DE. R.L. DE C.V., DAIKIN COMFORT TECHNOLOGIES NORTH
AMERICA, COALITION FOR FAIR MEXICAN EXPORTS OF ALUMINUM
EXTRUSIONS, and AIR DISTRIBUTION TECHNOLOGIES, INC. (AND ITS
SUBSIDIARY RUSKIN),

*Defendant-Intervenors.*

DEFENDANT U.S. INTERNATIONAL TRADE COMMISSION'S
MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

MICHAEL K. HALDENSTEIN
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3041
Facsimile: (202) 205-3111
michael.haldenstein@usitc.gov

ANTHONY C. FAMIGLIETTI
Attorney-Advisor
Telephone: (202) 205-2520
anthony.famiglietti@usitc.gov

MARGARET D. MACDONALD
General Counsel
Telephone: (202) 205-2561
margaret.macdonald@usitc.gov

KARL S. VON SCHRILTZ
Assistant General Counsel for Litigation
Telephone: (202) 205-3096
karl.von-schriltz@usitc.gov

**DATED:  August 11, 2025**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................. v

I.    INTRODUCTION .................................................................................. 1

II.   STATEMENT PURSUANT TO RULE 56.2 ........................................ 1

    A.    Administrative Determinations Under Review ........................ 1

    B.    Questions Presented and Summary of Argument ................... 2

        1.    Was the Commission's Finding that Cumulated Subject
            Imports Did Not Significantly Undersell the Domestic Like
            Product Reasonable and in Accordance with Law? ................... 2

        2.    Was the Commission's Determination that Subject Imports
            did not Have Significant Adverse Price Effects on the
            Domestic Industry Reasonable and in Accordance with Law? ................. 3

        3.    Was the Commission's Determination that Subject Imports
            Did Not Have a Significant Adverse Impact on the Domestic
            Industry Reasonable and in Accordance with Law? ................... 3

        4.    Was the Commission's Determination that the Domestic
            Industry was Not Threatened with Material Injury by
            Reason of Subject Imports Supported by Substantial
            Evidence? ..................................................................................... 4

III.  STATEMENT OF FACTS ..................................................................... 4

    A.    Conditions of Competition ......................................................... 5

    B.    Volume ......................................................................................... 6

    C.    Price ............................................................................................. 6

    D.    Impact .......................................................................................... 7

    E.    Threat .......................................................................................... 8

IV.   STANDARD OF REVIEW ..................................................................... 9

V.    ARGUMENT .......................................................................................... 11

    A.    The Commission's Finding of No Significant Price Effects Was
        Supported by Substantial Evidence ......................................... 11

**TABLE OF CONTENTS (cont'd)**

                                                                              Page

1.     The Commission's Price Analysis Should Be Sustained..........................11

2.     The Commission's Reliance on Quarterly Pricing Data to
       Find No Significant Underselling Was Reasonable................................14

3.     The Commission Reasonably Considered the Other
       Evidence Argued by Plaintiffs ...................................................20

       (i)     The Commission Reasonably Explained Each of
               Plaintiff's Ten "Record Data Points" ...........................20

       (ii)    The Commission Properly Considered the Record as
               a Whole ..................................................................30

**B.     The Commission's Impact Analysis Was Reasonable and in
         Accordance with Law ..............................................................33**

1.     The Commission's Impact Analysis Should Be Sustained......................33

2.     Plaintiffs' Challenges to the Commission's Impact Analysis
       Are Without Merit ....................................................................35

**C.     The Commission's Threat Analysis Was Supported by
         Substantial Evidence and in Accordance with Law ...........................40**

1.     The Commission's Likely Volume Analysis Should Be
       Sustained..............................................................................40

2.     The Commission's Likely Price Effects Analysis Should Be
       Sustained  ............................................................................43

3.     The Commission's Likely Impact Analysis Should Be
       Sustained..............................................................................43

**D.     The Findings of a Dissenting Commissioner Do Not Affect this
         Court's Review........................................................................45**

**VI.    CONCLUSION ........................................................................46**

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page(s)**

*AK Steel Corp. v. U.S. Int'l Trade Comm'n*,
    No. 14-00220, 2016 WL 7414212 (Ct. Int'l Trade Nov. 23, 2016)........................................22

*Al Tech Specialty Steel Corp. v. United States*,
    27 CIT 1791 (2003) .........................................................................................................18

*Allegheny Ludlum Corp. v. United States*,
    287 F.3d 1365 (Fed. Cir. 2002).................................................................................24, 25

*Altx, Inc. v. United States*,
    26 CIT 709 (2002) .........................................................................................14, 15, 16, 17

*Aluminum Extrusions Fair Trade Comm. v. United States*,
    36 CIT 1370 (2012) .........................................................................................................29

*AWP Indus., Inc. v. United States*,
    35 CIT 774, 783 F. Supp. 2d 1266 (2011) ......................................................................39

*Celanese Chems., Ltd. v. United States*,
    31 CIT 279 (2007) ...........................................................................................................25

*Cleo Inc. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007).......................................................................................39

*Consol. Fibers, Inc. v. United States*,
    32 CIT 24, 535 F. Supp. 2d 1345 (2008) ........................................................................27

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966).....................................................................................................9, 45

*DAK Ams. LLC v. United States*,
    517 F. Supp. 3d 1349 (Ct. Int'l Trade 2021) .......................................................31, 32, 39

*DAK Ams. LLC v. United States*,
    456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ............................................................30, 31

*Golub v. Sec'y of Health & Hum. Servs.*,
    No. 99-51661, 2000 WL 1471643 (Fed. Cir. Oct. 3, 2000)............................................31

*Hitachi Metals, Ltd. v. United States*,
    949 F.3d 710 (Fed. Cir. 2020).........................................................................................10

*JMC Steel Grp. v. United States*,
    70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015) .....................................................................11

# TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                                      **Page(s)**

*LG Elecs., Inc. v. United States,*
    38 CIT 1562, 26 F. Supp. 3d 1338 (Ct. Int'l Trade 2014) .......................................................21

*Metallverken Nederland B.V. v. United States,*
    13 CIT 1013, 728 F. Supp. 730 (1989) ...................................................................................45

*Mexichem Fluor Inc. v. United States,*
    179 F. Supp. 3d 1238 (Ct. Int'l Trade 2016) ............................................................19, 20, 21

*Negev Phosphates, Ltd. v. Dep't of Commerce,*
    12 CIT 1074, 699 F. Supp. 938 (1988) ...................................................................................22

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) ...........................................................................................9, 10

*Nitrogen Sols. Fair Trade Comm. v. United States,*
    29 CIT 86, 358 F. Supp. 2d 1314 (2005) ...............................................................18, 20, 21, 22

*Nucor Corp. v. United States,*
    28 CIT 188, 318 F. Supp. 2d 1207 (2004) ..............................................................................10

*Nucor Corp. v. United States,*
    414 F.3d 1331 (Fed. Cir. 2005) ..............................................................................................19

*Nucor Corp. v. United States,*
    32 CIT 1380, 594 F. Supp. 2d 1320 (Ct. Int'l Trade 2008) ....................................................25

*Nucor Fastener Div. v. United States,*
    35 CIT 1074, 791 F. Supp. 2d 1269 (2011) ............................................................................15

*OCTAL Inc. v. United States,*
    539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ..........................................................................29

*PAO TMK v. United States,*
    No. 21-00532, 2023 WL 6939242 (Ct. Int'l Trade Oct. 12, 2023).........................................10

*Ryman v. Sec'y of Dep't of Health & Hum. Servs.,*
    65 Fed. Cl. 35 (2005) ..............................................................................................................31

*Siemens Energy, Inc. v. United States,*
    806 F.3d 137 (Fed. Cir. 2015)................................................................................................45

*Timken U.S. Corp. v. United States,*
    421 F.3d 1350 (Fed. Cir. 2005) ..............................................................................................11

<u>**TABLE OF AUTHORITIES (cont'd)**</u>

**Cases (cont'd)**                                                                                        **Page(s)**

*U.S. Aluminum Extruders Coal. v. United States*,
    777 F. Supp. 3d 1344 (Ct. Int'l Trade 2025) ............................................................4

*U.S. Steel Grp. v. United States*,
    96 F.3d 1352 (Fed. Cir. 1996) ............................................................... *passim*

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) ............................................................9, 10

*US Magnesium LLC v. United States*,
    36 CIT 690 (2012) ............................................................10

**Federal Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................9

19 U.S.C. § 1673b(a)(2) ............................................................30

19 U.S.C. § 1673b(e) ............................................................41

19 U.S.C. § 1677(4) ............................................................28

28 U.S.C. § 2639(a)(1) ............................................................9

Tariff Act of 1930 ............................................................9

**USITC Publications**

*Metal Lockers from China*, Inv. Nos. 701-TA-656 and 731-TA-1533 (Final),
    USITC Pub. 5218 (Aug. 2021) ............................................................19

**Legislative Materials**

National Childhood Vaccine Injury Act (1986) ............................................................31

Statement of Administrative Action accompanying the Uruguay Round
    Agreements Act, H.R. Rep. No. 103-316, vol. I (1994) ............................................10, 11

## I.    INTRODUCTION

Defendant U.S. International Trade Commission ("Commission") opposes the Motion for Judgment on the Agency Record filed by the United States Aluminum Extruders Coalition, and the United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("Plaintiffs").  The Commission respectfully requests that the Court affirm the Commission's final negative determinations regarding aluminum extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam because they are supported by substantial evidence and otherwise in accordance with law.

## II.    STATEMENT PURSUANT TO RULE 56.2

### A.    Administrative Determinations Under Review

Plaintiffs challenge the Commission's final determinations, by a 2-1 vote, that an industry in the United States was not materially injured or threatened with material injury by reason of imports of aluminum extrusions from the fourteen subject countries.  The Commission's Views are contained in *Aluminum Extrusions from China, Colombia, Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698, 731-TA-1643-44 and 1646-1657 (Final), USITC Pub. 5560 (Nov. 2024) (PR354).[1]  Notice of the determinations was published in the Federal Register on November 22, 2024.  88 Fed. Reg. 92,720 (PR355).

---

[1] Public record citations are indicated by "PR," referring to list number 1 on the index of the administrative record, and confidential record citations are indicated by "CR," referring to list number 2 on the index of the administrative record.  Accordingly, citations to the Commission's public views and publication are to record document PR354 ("USITC Pub. 5560"), and citations to the confidential Commission Views (hereinafter, "Views") are to record document CR915.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

**B.    Questions Presented and Summary of Argument**

**1.    Was the Commission's Finding that Cumulated Subject Imports Did Not Significantly Undersell the Domestic Like Product Reasonable and in Accordance with Law?**

Yes.  Based on the predominant and increasing overselling by subject imports during the period of investigation ("POI"), the [ ███████ ] volume of confirmed lost sales, and the importance purchasers placed on non-price factors, the Commission reasonably concluded that underselling was not significant.[2]  In challenging this finding, Plaintiffs ask the Court to reweigh evidence that was reasonably considered by the Commission.  Far from disregarding the evidence highlighted by Plaintiffs, *see* Plaintiffs' Brief 20 (ECF 83) ("PlBr."), the Commission acknowledged the relatively limited coverage of the pricing data but explained that these data, which had been carefully developed and vetted by staff, represented the best evidence of aluminum extrusions prices in the U.S. market.  In particular, the Commission explained why it found the revised pricing data submitted by importer [ ████████████ ] reliable, notwithstanding Plaintiffs' concerns.  The Commission also considered and rejected Plaintiffs' arguments that other evidence, such as the average unit value ("AUV") data based on approximations, emails, and hearing testimony that imports were lower priced, unconfirmed allegations of lost sales and revenues, subjective ratings of subject imports' pricing levels, and dumping margins, were entitled to more weight than the pricing and lost sales data.

---

[2] The POI was 2021 to 2023 and an interim period consisting of January-March of 2023 and 2024.

2.    **Was the Commission's Determination that Subject Imports Did Not Have Significant Adverse Price Effects on the Domestic Industry Reasonable and in Accordance with Law?**

Yes.  In addition to finding no significant underselling, the Commission reasonably found that subject imports did not depress or suppress prices for the domestic like product to a significant degree.  In finding no price depression, the Commission explained that the domestic industry increased its sales prices for four of five pricing products over the POI, notwithstanding declining demand.  The Commission also found that the industry was able to pass through its increased costs to purchasers through higher prices, including when subject imports increased in 2021-2022, and thus found no significant price suppression.  The Commission's findings of no significant price depression or suppression should be affirmed.

3.    **Was the Commission's Determination that Subject Imports Did Not Have a Significant Adverse Impact on the Domestic Industry Reasonable and in Accordance with Law?**

Yes.  The Commission reasonably found no causal nexus between subject imports and the domestic industry's performance because the industry's performance improved when subject imports increased from 2021 to 2022, driven by domestic supply constraints, but declined from 2022 to 2023, as subject imports declined.  In analyzing the conditions of competition, the Commission explained that most domestic producers reported supply constraints in 2021 and nearly half had reported such constraints in 2022, while relatively few importers reported supply constraints.  Subject imports did not prevent the industry from increasing its prices, recovering its increased costs through higher prices, or improving its financial performance in interim 2024 compared to 2021.  In challenging the Commission's impact analysis, Plaintiffs rely on their challenge to the Commission's finding of no significant underselling, which the Court should reject, and ask the Court to reweigh evidence the Commission reasonably considered with

respect to domestic supply constraints.  The Court should reject these arguments and affirm the Commission's impact analysis.

        **4.**      **Was the Commission's Determination that the Domestic Industry Was Not Threatened with Material Injury by Reason of Subject Imports Supported by Substantial Evidence?**

Yes.  The Commission reasonably found that subject import volume was unlikely to increase significantly because, notwithstanding the subject producers' excess capacity and third country trade barriers, subject imports had only increased during the POI from 2021 to 2022, due to domestic supply constraints, and in January-March ("interim") 2024, compared to interim 2023, influenced by Commerce's impending preliminary determinations and likely imposition of provisional measures.  It found no evidence that the pattern of predominant and increasing overselling, or the absence of significant price effects, would change in the imminent future. Based on these findings, the Commission found no evidence of any change that would cause cumulated subject imports to become injurious in the imminent future.  In challenging these findings, Plaintiffs yet again rely on misplaced challenges to the Commission's finding of no significant underselling and analysis of domestic supply constraints, and ask the Court to reweigh evidence the Commission reasonably considered pertaining to likely volume.  The Court should reject these arguments and affirm the Commission's threat analysis.

## III.     STATEMENT OF FACTS

In November 2024, the Commission determined that an industry in the United States was neither materially injured nor threatened with material injury by reason of subject imports from the fourteen subject countries.[3]  In its determinations, the Commission defined a single

---

[3] This Court affirmed the Commission's preliminary determination terminating the investigations as to subject imports from the Dominican Republic.  *U.S. Aluminum Extruders Coal. v. United States*, 777 F. Supp. 3d 1344 (Ct. Int'l Trade 2025).

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

domestic like product coextensive with the scope, defined the domestic industry as all domestic producers of aluminum extrusions, and cumulated imports from all fourteen subject countries for its present injury and threat of injury analyses. *See generally* Views at 3-55. Plaintiffs do not challenge these aspects of the Commissions' determinations.

### A.    Conditions of Competition

The Commission explained that aluminum extrusions are used in a variety of applications, including building and construction, transportation, renewable energy projects, and engineered production. While recognizing that there are seasonal trends in demand, the Commission found that demand for aluminum extrusions generally tracks the U.S. economy. Views at 61. The Commission found that apparent U.S. consumption decreased irregularly by [ ▮ ] percent from 2021 to 2023, increasing from [ ▮▮▮▮ ] short tons in 2021 to [ ▮▮ ] short tons in 2022, before decreasing to [ ▮▮▮ ] short tons in 2023; apparent U.S. consumption was [ ▮▮▮ ] short tons in January-March ("interim") 2024, compared to [ ▮▮▮ ] short tons in interim 2023. Views at 63.

The Commission found that the domestic industry was the largest supplier of aluminum extrusions to the U.S. market during the POI, although its share of apparent U.S. consumption decreased slightly from [ ▮▮ ] percent in 2021 to [ ▮▮ ] percent in 2022 and [ ▮▮ ] percent in 2023; the industry's market share was [ ▮▮ ] percent in interim 2024, compared to [ ▮▮ ] percent in interim 2023. Views at 63. The Commission found that the domestic industry's practical capacity increased 0.7 percent over the POI. The Commission found that subject imports were the second-largest supplier of aluminum extrusions to the U.S. market throughout the POI. Subject imports' share of apparent U.S. consumption increased irregularly by [ ▮ ] percentage points overall from 2021 to 2023, increasing from [ ▮▮ ] percent in 2021 to [ ▮▮ ] percent in 2022, before decreasing to [ ▮▮ ] percent in 2023. Views at 65. Subject imports'

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

market share was [ ▮ ] percent in interim 2024, compared to [ ▮ ] percent in interim 2023. Views at 66.

The Commission further found that a majority of U.S. producers reported supply constraints in 2021 and nearly a majority reported such constraints in 2022, while relatively few importers reported such constraints during the POI.  A majority of purchasers also reported supply constraints in 2021 and 2022.  Views at 66-68.

The Commission found that there was a moderate-to-high degree of substitutability between the domestic like product and subject imports when the products were made to the same specifications.  Views at 69.  While finding that price was an important purchasing factor, the Commission explained that it was often not the most important factor, as responding purchasers ranked quality as the most important factor, followed by price and availability.  Views at 70.

**B.     Volume**

Cumulated subject import volume and market share increased from 2021 to 2022 before declining in 2023 and were higher in interim 2024 compared to interim 2023.  Between 2021 and 2023, cumulated subject imports declined [ ▮ ] percent in terms of volume and increased [ ▮ ] percentage points in terms of market share.  The Commission found that the volume of cumulated subject imports was significant in absolute terms and relative to consumption in the United States.  Views at 76-77.

**C.     Price**

Based on quarterly pricing data showing pervasive and increasing overselling, the [ ▮ ] volume of cumulated subject imports that purchasers reported shifting from the domestic industry due to price, and the importance most purchasers attached to non-price factors, the Commission found that subject import underselling was not significant.  Views at 86.

The Commission addressed Plaintiffs' arguments concerning the reliability of the pricing data and other evidence allegedly showing that subject import prices were lower. In particular, the Commission explained that it found the pricing data more instructive than purchasers' subjective ratings of relative price levels. Views at 84. It also attached little weight to AUV data because these data were based on approximations and influenced by differences in product mix and changes in product mix during the POI. Views at 85.

The Commission found that the domestic industry's sales prices increased for four of five pricing products over the POI, including in 2022 when subject import volumes increased, which allowed domestic producers to more than cover their increased costs, as reflected in the industry's declining COGS-to-net-sales ratio. Views at 87-89. Having found that subject import underselling was not significant and that subject imports neither depressed nor suppressed domestic prices, the Commission concluded that subject imports had no significant price effects. Views at 90-91.

### D. Impact

Although many of the domestic industry's indicators declined over the POI, the Commission explained that the declines stemmed from the domestic industry's persistent supply constraints in 2021 and 2022 and the decline in apparent U.S. consumption from 2022 to 2023. Views at 92-93. The Commission found that the domestic industry's financial performance strengthened in 2021 to 2022 when apparent U.S. consumption increased, and weakened when apparent U.S. consumption declined from 2022 to 2023 and in interim 2024 compared to interim 2023. Views at 93. The Commission found no causal nexus between cumulated subject imports and the industry's performance. As the Commission explained, the industry's financial performance improved from 2021 to 2022 when subject imports increased, driven by increasing demand and domestic supply constraints that increased prices in the U.S. market, and weakened

from 2022 to 2023 as subject imports declined and nonsubject imports captured market share from the industry.  Views at 97.  During the 2021-2023 period, subject imports did not prevent the industry from increasing its capacity, increasing its sales prices, or recovering its increased costs through higher prices, despite declining demand.  Views at 97-98.  The industry's financial performance was stronger in interim 2024 than in 2021, though slightly weaker than in interim 2023, despite higher subject import volume and market share in interim 2024 compared to interim 2023.  Views at 98.  The Commission accordingly found that subject imports did not cause a significant adverse impact to the domestic industry.  Views at 104.

      **E.**     **Threat**

    The Commission also found no threat of material injury.  Specifically, the Commission found that there was not a likelihood of substantially increased subject imports in the imminent future given the decline in import volumes over most of the POI, limited volumes of arranged imports, and the fact that subject producers generally focused on home market shipments and had limited ability to shift production from other products or increase exports from their inventories.  Views at 118.  While recognizing that subject producers possessed excess capacity and the existence of third country trade measures, the Commission explained that these factors had not caused subject import volume to increase significantly during the POI, with subject import volume only increasing from 2021 to 2022 due to domestic supply constraints, and in interim 2024 compared to interim 2023 in anticipation of Commerce's preliminary determinations and imposition of provisional measures.  Views at 112-13.

    The Commission found that the absence of significant price effects during the POI was likely to continue based on the absence of significant price effects during the POI, the predominant and increasing overselling by subject imports, its finding that cumulated subject import volumes were unlikely to significantly increase in the imminent future, and the absence of

any evidence that subject import pricing patterns were likely to change significantly in the imminent future. Views at 119.

Finally, the Commission found that subject imports were unlikely to have a significant impact on the domestic industry given its findings that subject imports were unlikely to increase significantly in volume or have significant price effects. Based on these factors, among others, the Commission found no threat of material injury. Views at 121.

## IV.    STANDARD OF REVIEW

Under the Tariff Act of 1930, this Court reviews the Commissions' final antidumping and countervailing duty determinations to assess whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The Commission's determinations are presumed to be correct, and the burden is on the party challenging the determinations to demonstrate otherwise. *See* 28 U.S.C. § 2639(a)(1).

Under the substantial evidence standard, the reviewing courts defer to the Commission's reasoned fact-finding and analysis in injury investigations. *See, e.g.*, *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1354-55 (Fed. Cir. 2006). Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Nor does the fact that Plaintiffs can point to an alternative view of the same factual record by a dissenting Commissioner establish that the Commission's views were not supported by substantial evidence. *U.S. Steel Grp. v. United States,* 96 F.3d 1352, 1362 (Fed. Cir. 1996). Thus, under the substantial evidence standard, a court may not, "even as to matters not requiring expertise . . . displace the {agency's} choice between two fairly conflicting views, even though the court

would justifiably have made a different choice had the matter been before it de novo." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). "{T}he question is not whether the court would have reached the same decision on the same record –rather, it is whether the administrative record as a whole permits the Commission's conclusion." *PAO TMK v. United States*, No. 21-00532, Slip Op. 2024-119, 2023 WL 6939242, at *2 (Ct. Int'l Trade Oct. 12, 2023). A court "must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 716 (Fed. Cir. 2020).

In injury investigations, the Commission is the trier of fact. As such, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." *U.S. Steel Grp.*, 96 F.3d at 1357. Accordingly, the Commission has "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis." *US Magnesium LLC v. United States*, 36 CIT 690, 692 (2012). As the Federal Circuit has stated, if "the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert fact-finder— here the majority of the Presidentially-appointed, Senate-approved Commissioners—to decide which side's evidence to believe." *Nippon Steel*, 458 F.3d at 1359.

Since the Commission "is presumed to have considered all of the evidence on the record," it is "not required to explicitly address every piece of evidence presented by the parties" during an investigation. *Nucor Corp. v. United States*, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004). Instead, the Commission need only address the "issues material to {its} determination" so that the "path of the agency may reasonably be discerned." Statement of

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. I at 892 (1994) ("SAA"); *see also Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354–57 (Fed. Cir. 2005). "When evaluating challenges to the ITC's choice of methodology," this Court "will affirm the chosen methodology as long as it is reasonable." *JMC Steel Grp. v. United States*, 70 F. Supp. 3d 1309, 1316 n.4 (Ct. Int'l Trade 2015).

## V.    ARGUMENT

### A.    The Commission's Finding of No Significant Price Effects Was Supported by Substantial Evidence

#### 1.    The Commission's Price Analysis Should Be Sustained

The quarterly pricing data showed that subject imports predominantly and increasingly oversold the domestic like product during the POI. Views at 79-81. The quarterly pricing data were based on responses of 17 U.S. producers and 18 importers that provided usable data for sales of the requested products. Views at 78-79. While acknowledging the limited coverage of these data, [ ■ ] percent of U.S. producers' U.S. shipments and [ ■ ] percent of importers' U.S. shipments in 2023, the Commission explained that given that "aluminum extrusions are produced to order for purchasers in a large variety of shapes and sizes for many different applications, we would expect the pricing products to provide relatively limited coverage of U.S. shipments of subject imports and the domestic product." Views at 79. Further, the Commission explained that these data were "carefully developed to ensure apples-to-apples price comparisons" and were especially probative in the absence of published prices or price leaders reported for the industry. Views at 79-80. Moreover, the Commission noted that Plaintiffs "in their comments on the draft questionnaires argued that the pricing products provide sufficient coverage and data representative of the aluminum extrusions market." Views at 80 n.319. Regarding Plaintiffs' concerns over revised pricing data reported by [ ■■■■■■■■■ ], the

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Commission noted that the importer had provided a reasonable explanation for the revisions, that it had inadvertently reported sales of products that did not meet the pricing product definitions. Views at 83-84 n.334.

The Commission found that cumulated subject imports undersold the domestic like product in 107 of 274 quarterly comparisons, or 39.1 percent of the time, with an average underselling margin of 26.6 percent, while overselling the domestic like product in the remaining 167 quarterly comparisons, or 60.9 percent of the time, with an average overselling margin of 45.3 percent.  Views at 80.  The quarters in which there was underselling accounted for 36.7 percent of total reported subject import sales volume (22.0 million pounds), and the quarters in which there was overselling accounted for 63.3 percent of reported total subject import sales volume (37.9 million pounds).  Views at 80.  The Commission found that the extent of underselling decreased irregularly during the POI, with the share of reported subject import sales volume in quarters of underselling increasing from 37.9 percent in 2021 to 41.7 percent in 2022 before declining to 33.1 percent in 2023 and 19.2 percent in interim 2024.  Views at 81.

The Commission also considered lost sales information in its price analysis.  The Commission recognized that 36 of 55 responding purchasers reported purchasing subject imports instead of the domestic like product during the POI and that 31 of these purchasers reported that subject import prices were lower.  As the Commission explained, however, only 11 purchasers reported purchasing subject imports instead of the domestic like product due to their lower price and the volume that these purchasers reported shifting from the domestic industry, [ ▮ ] short tons, was equivalent to only [ ▮ ] percent of the reported purchases and imports of subject merchandise during the POI ([ ▮ ] pounds).  Views at 81-82.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

The Commission then considered each of the factors that Plaintiffs argued supported a finding of significant underselling, as discussed in section V.2 below.  It explained why those factors did not outweigh quarterly pricing data, lost sales information, and other record evidence that indicated that underselling was not significant.  Given the predominant and increasing overselling, the [ ███████ ] volume or lost sales due to price, and the importance of non-price factors in purchasing decisions, the Commission concluded that subject imports did not significantly undersell the domestic like product.  Views at 86.

The Commission then found no significant price depression by subject imports.  It explained that the domestic sales prices between the first quarter of 2021 and the first quarter of 2024 had increased for products 1, 3, 4 and 5, by [ ████ ] to [ ████ ] percent, and declined for only product 2.  Views at 86. Sales prices for subject imports of pricing products 1-4 had all increased over the POI from between [ ███ ] percent and [ ███ ] percent.  Views at 86.  The Commission also considered that only two of 25 responding purchasers indicated that domestic producers reduced their prices to compete with lower-priced subject imports during the POI. Views at 86.

Finally, the Commission found no significant price suppression by subject imports.  The Commission noted that although apparent U.S. consumption declined overall during the POI, the pricing data indicated that the domestic industry's sales prices increased for four of the five pricing products over the POI.  Views at 87.  The Commission observed that the domestic industry's net sales value between 2021 and 2023 increased more than its unit cost-of-goods sold ("COGS") over that period, which caused the domestic industry's COGS-to-net-sales ratio to decrease.  While recognizing that the industry's COGS-to-net-sales ratio increased slightly to 86.1 percent in interim 2024 from 85.9 percent in interim 2023, the Commission found that the

increase occurred as apparent U.S. consumption declined, causing the industry's net sales value to decrease more than its unit COGS, and that the industry's COGS-to-net-sales ratio remained lower in interim 2024 than it had been in 2021. Views at 87-89. Because the domestic industry was able to increase its sales prices and pass through its increased costs to purchasers through higher prices during the POI, even in 2022 when subject imports increased in volume and market share, the Commission found no significant price suppression. Views at 89-90. The Commission declined to rely on preliminary phase data, as the Petitioners argued, because they did not establish that the more thoroughly-vetted final phase data were inaccurate or incomplete. Views at 90; *see also* Staff Report at V-7 n.6 (CR885) ("Staff Report") (noting importers who submitted revised questionnaires in response to staff). It also explained why importers' pricing data from the preliminary phase could not be used in the final phase. Views at 83 n.333.

Because the Commission's price effects analysis was supported by substantial evidence and in accordance with law, the Court should affirm it.

### 2. The Commission's Reliance on Quarterly Pricing Data to Find No Significant Underselling Was Reasonable

Plaintiffs argue that the Commission's price effects analysis is flawed because it relied on quarterly pricing data that Plaintiffs assert was of "inherently limited probative value" because of low data coverage. *See* PlBr. 10, 16. The Commission, however, explained why the quarterly pricing data was probative of the relative prices of domestic and subject imported aluminum extrusions in the U.S. market. Views at 79-80. Essentially, Plaintiffs disagree with the weight the Commission afforded to the pricing data and mistakenly invite the Court to reweigh the evidence in favor of other information allegedly more favorable to them. Furthermore, this Court has held that the "Commission is not precluded from relying on available pricing data simply because the pricing data does not encompass the entire or even a majority portion of the

market." *Altx, Inc. v. United States*, 26 CIT 709, 720-21 (2002).  In fact, the Federal Circuit has

recognized that there are situations where "{s}ampling, like averaging, is a necessary statistical

technique without which the Commission's task would be virtually impossible." *U.S. Steel Grp.*,

96 F.3d at 1366 (upholding Commission's price effects analysis in final determinations based on

pricing data covering four percent of subject imports from the Netherlands).  Indeed, this Court

has affirmed the Commission's reliance on pricing data accounting for even lower shares of U.S.

shipments where the resulting price comparisons were nevertheless representative of competition

in the U.S. market.

        For example, this Court upheld the Commission's reliance on quarterly pricing data when

the pricing products that the plaintiff had proposed resulted in coverage of 3.6 percent of

reported U.S. commercial shipments of the domestic like product, and 1.1 percent and 2.4

percent of subject imports from China and Taiwan, respectively.  *Nucor Fastener Div. v. United

States*, 35 CIT 1074, 1094-95, 791 F. Supp. 2d 1269, 1288 (2011).[4]  In *Nucor*, the Commission

in its determinations explained that "{h}igher coverage levels would be difficult to obtain in an

industry such as this (cold rolled steel) involving so many product permutations and thus at least

tens of thousands of {stock-keeping units}." *Id.* at 1094, 791 F. Supp. 2d at 1288.  The Court

concluded that "{b}oth {the Commission} and Plaintiff may desire greater coverage, but

representative sampling for the purpose of assessing price effects is not inherently unreasonable

or otherwise unlawful." *Id.*, 791 F. Supp. 2d at 1288.

---

[4] The Court remanded the Commission's negative preliminary determination on other grounds,
but determined that the Commission's reliance on the pricing data in its price effects analysis
was permissible.  *See Nucor*, 35 CIT at 1094, 1088-89, 1099, 791 F. Supp. 2d 1288-89, 1283-84,
1292.

- 15 -

In *Altx*, the Court determined that the Commission's use of pricing data that accounted for one to four percent of sales of relevant cold-rolled steel products, and seven percent of hot-rolled steel products, was reasonable and supported by substantial evidence.[5]  *Altx*, 26 CIT at 720-21.  On appeal, the respondent Japanese producers asserted that the pricing data coverage was too low to be representative to analyze general trends in the U.S. steel market.  *Id.* at 709.  Nevertheless, the Court found that the Commission's "assessment that the data were 'broadly representative'" was supported by substantial evidence.  *Id.* at 720-21.  The Court noted that the Commission had sought price information regarding nine products that were "relatively generic" and "standardized products."  The Japanese producers had an opportunity to comment on the selected products and did not propose other products that they believed would be more representative of general trends in the U.S. market.  *Id.* at 720.  The Commission attributed the low data coverage due to the wide variety of specifications for cold and hot-rolled steel products, and because a few domestic steel producers specialized in less common steel product specifications.  *Id.*  The Court noted, however, that the "Japanese Producers neither dispute the accuracy of these explanations for the paucity of useable data, nor present any alternative method or data sample from which the Commission could determine more accurately the extent of underselling."  *Id.*

Here, in their comments before the issuance of the final phase questionnaires, Plaintiffs agreed with the pricing products that the Commission proposed in the draft questionnaires.  Views at 80 n.319.  As the Commission noted, Plaintiffs affirmed that the coverage obtained by these pricing products in the preliminary phase was representative of competition in the U.S.

---

[5] The Court remanded the Commission's remand determination of affirmative injury on other grounds to consider the correlation between the Commission's findings of underselling and the domestic industry's performance and several other factors.  *Altx*, 26 CIT. at 735.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

market given "the nature of aluminum extrusions and the large variety of products covered by these investigations{.}" Views at 80 n.319.  In the preliminary phase, pricing product data covered "approximately 6 percent of domestic producers' commercial shipments and 5 percent of importers' commercial shipments," and in the final phase, the pricing data was similar for the exact same products, covering approximately [ ■ ] percent of U.S. producers' U.S. shipments of cumulated subject imports, and [ ■ ] percent of importers' U.S. shipments of cumulated subject imports in 2023.  Views at 79-80.  Plaintiffs do not explain why they now assert the quarterly pricing data are not representative of competition in the aluminum extrusions market, other than that the pricing data collected in the final phase do not support their preferred outcome.

Furthermore, like in *Nucor* and *Altx*, the Commission acknowledged the relatively low data coverage, but adequately explained why it found the quarterly pricing data to be representative of domestic and subject import pricing of aluminum extrusions in the domestic market.  *See Altx,* 26 CIT at 709 ("{I}f the data sample is admittedly small, as here, the court must examine the Commission's reasons for finding the data representative of the entire market.").  As the Commission explained, "{g}iven that aluminum extrusions are produced to order for purchasers in a large variety of shapes and sizes for many different applications, we would expect the pricing products to provide relatively limited coverage of U.S. shipments of subject imports and the domestic like product."  Views at 79.  Moreover, the Commission observed that the quarterly pricing data were "carefully developed to ensure apples-to-apples price comparisons . . . {and} probative of the relative prices of domestic and subject aluminum extrusions in the U.S. market, particularly given the absence of published prices or price leaders."  Views at 79-80.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Plaintiffs are also incorrect that the Commission erred by accepting an importer's revised pricing data two days before the record closed. PlBr. 24-25. The Commission staff issued a revision memo on October 30, 2024 that revised the pricing data after an importer contacted the Commission to report an error in its questionnaire response. *See* Revisions to Confidential Staff Report (Oct. 30, 2024) (CR913). The Commission removed data from the importer because it "explained that it had inadvertently reported data for sales of products that did not meet the pricing product definitions." Views at 84 n.334. Contrary to Plaintiffs' assertion that these revised data were somehow "dubious," the Commission found that the importer, [ ████████ ], had provided a reasonable explanation for the revisions. As the Commission explained, [ ██████████ ] had originally reported sales of products that did not meet the pricing product definitions based on its misapprehension that it was to report all of its sales under the pricing products that most closely resembled its sales. Views at 84 n.334. As this Court has recognized, "{t}he credibility of sources is largely a matter within the province of the Commission, as the trier of fact." *Al Tech Specialty Steel Corp. v. United States*, 27 CIT 1791, 1802 (2003); *see also Nitrogen Sols. Fair Trade Comm. v. United States*, 29 CIT 86, 90-93, 358 F. Supp. 2d 1314, 1320-23 (2005) (Commission reasonably accepted certified questionnaire pricing data it received during the investigation). Given this, as well as the importer's certification that its revised pricing data were accurate, the Commission reasonably relied on the data.

Finally, contrary to Plaintiffs' argument that certain importers reported inaccurate data for downstream articles at different levels of trade, PlBr. 24, the "Commission staff confirmed that pricing data do not include data for products not matching the pricing products or prices derived from sales of downstream products that contain aluminum extrusions." Views at 83.

The Commission also explained that staff excluded data provided by certain importers and continued verifying the data were correct after the Commission issued the staff report. Views at 83 n. 334.

Overall, Plaintiffs do not point to any "quantitative evidence to indicate that the sample data relied on by the Commission was not representative." *See U.S. Steel Grp.,* 96 F.3d at 1366 ("General allegations that the cold-rolled steel market is not homogenous and that small samples consequently yield skewed results are insufficient to meet this burden {of showing that the sample relied on by the Commission was not representative}."). Here, the Commission reasonably relied on the quarterly pricing data to consider the significance of subject import underselling, as the most representative data available concerning domestic and subject import sales prices, consistent with its traditional price comparison methodology. *See Mexichem Fluor Inc. v. United States*, 179 F Supp. 3d1238, 1246-47 (Ct. Int'l Trade 2016) (sustaining as reasonable the Commission's reliance on its "typical underselling methodology").[6] The Court should therefore affirm this aspect of the Commission's analysis.

---

[6] Plaintiffs cite *Metal Lockers from China* Inv. Nos. 701-TA-656 and 731-TA-1533 (Final), USITC Pub. 5218 (Aug. 2021), to argue that the Commission should have discounted the pricing data. But the Commission explained that in the final phase of *Metal Lockers* the parties agreed the pricing products were not sufficiently defined, and there was a wide variation in prices that suggested the pricing products were too broadly defined." Views at 83 n. 333 (citing *Metal Lockers from China*, USITC Pub. 5218 at 28-29). Here, in contrast, the Commission noted, Plaintiffs themselves argued that the "pricing products generally provide pricing data representative of the market." Views at 83 n.333. The Commission explained that unlike in *Metal Lockers*, prices for "the domestic product and subject imports generally tracked each other during the POI" and there was no "'unusually wide range of quarterly sales price.'" *Id*. (quoting *Metal Lockers*). Nor does the Commission's treatment of pricing data in *Metal Lockers* bind its analysis in *Aluminum Extrusions* because "each injury investigation is *sui generis,* involving a unique combination and interaction of many economic variables; and consequently, a particular circumstance in a prior investigation cannot be regarded by the {Commission} as dispositive of the determination in a later investigation." *Nucor Corp. v. United States*, 414 F.3d 1331, 1340 (Fed. Cir. 2005). In any event, the Commission addressed Plaintiffs' concerns with respect to claimed deficiencies in the pricing data. Views at 83-84.

### 3. The Commission Reasonably Considered the Other Evidence Argued by Plaintiffs

In challenging the Commission's reliance on the traditional pricing methodology comparing quarterly pricing data, Plaintiffs argue that the Commission disregarded ten "record data points" that, in their view, show significant subject import underselling, and failed to account for discrepancies in the quarterly pricing data. PlBr. 18-19. These arguments, however, are misplaced because the Commission considered each category of evidence Plaintiffs highlight and reasonably explained why these factors were outweighed by other evidence showing that underselling was not significant, namely pervasive and increasing overselling, the absence of significant confirmed lost sales, and the importance of non-price factors to purchasing decisions. Views at 86. Plaintiffs do not acknowledge, much less challenge, the Commission's analysis of most of these factors. Instead, Plaintiffs ask the Court to reweigh evidence that the Commission reasonably considered because they prefer a different outcome.

### (i) The Commission Reasonably Explained Each of Plaintiffs' Ten "Record Data Points"

Contrary to Plaintiffs' argument that ten of eleven "data points" showed underselling, the Commission reasonably explained how the factors argued by Plaintiffs did not outweigh the other evidence establishing that underselling was not significant. As an initial matter, Plaintiffs' self-serving tabulation conflicts with this Court's recognition that the Commission "has broad discretion in analyzing and assessing the significance of evidence on price undercutting." *Nitrogen Sols.*, 29 CIT at 95, 358 F. Supp. 2d at 1324 (quotation omitted). The Commission did not rely on a single "data point", as Plaintiffs incorrectly claim but rather on the two factors it traditionally relies upon when assessing the significance of subject import underselling: its "typical underselling methodology," comparing quarterly sales prices on representative pricing products reported by domestic producers and importers, and lost sales information. *See*

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

*Mexichem*, 179 F. Supp. 3d at 1246-47; *LG Elecs., Inc. v. United States*, 38 CIT 1562, 1581, 26 F. Supp. 3d 1338, 1355 (2014) ("In prior investigations, the Commission has considered lost sales and revenue as an indication that subject imports negatively impacted prices for the domestic like product").  The Commission also relied on its finding, uncontested by Plaintiffs, that price was an important factor in purchasing decisions, but often not the most important factor.  Views at 70.  Based on pricing data showing pervasive and increasing overselling and the [          ] volume of confirmed lost sales, as well as the importance of non-price factors to purchasing decisions, the Commission reasonably concluded that underselling was not significant.  Views at 86.  This Court has affirmed Commission findings of no significant underselling based on pricing data showing overselling and the paucity of confirmed lost sales.  *See Nitrogen Sols.*, 29 CIT at 88, 358 F. Supp. 2d at 1318 (sustaining the Commission's finding of no significant underselling based on pricing data showing that subject imports were generally priced higher and the fact that none of plaintiff's lost sales or revenue allegations had been confirmed).  It should do so here as well.

The Commission also explained why this evidence that underselling was not significant was not outweighed by the factors argued by Plaintiffs.  First, the Commission considered the lost sales and revenue information, including the number of purchasers reporting that subject imports were lower priced, contrary to Plaintiffs' argument that the Commission overlooked this information.  PlBr. 18-19 (factors 1, 6, 9).  The Commission explained the "tally of 31 of 36 purchasers only indicates that 31 purchasers indicated that they made a purchase when subject imports were lower priced, but it does not indicate what fraction of their purchases were lower priced."  Views at 82 n.329.  It noted that the tally accounted for purchasers' imports or purchases from single country sources, as opposed to multiple subject sources.  Views at 82

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

n.329.  Thus, the Commission reasoned that "imports from one source may have been lower priced according to the purchaser, yet the tally counts the response as indicating the purchaser reported subject imports are generally lower priced."  Views at 82 n.329.  Indeed, the [ ██████ ██ ] volume of *confirmed* lost sales supports the Commission's finding that subject imports were not significantly underselling the domestic product during the POI, notwithstanding purchaser responses that subject imports were lower priced.  *See* PlBr. 18.

The Commission also found that the purchasers' questionnaire responses did not corroborate the volumes of lost sales and revenues that Plaintiffs alleged, contrary to Plaintiffs' argument that these allegations somehow demonstrated underselling.  PlBr. 19 (factor 6).  As this court has held, "{t}he Commission has the right to make credibility determinations and to resolve conflicts in the evidence," and "this Court lacks authority to interfere with the Commission's discretion as trier of fact to interpret reasonably evidence collected in the investigation."  *Negev Phosphates, Ltd. v. Dep't of Commerce*, 12 C.I.T. 1074, 1092, 699 F. Supp. 938, 953 (1988).  Indeed, the court has affirmed as reasonable the Commission's "requirement of explicit agreement {from a purchaser} in order to count a {lost sales} allegation 'confirmed.'"  *AK Steel Corp. v. U.S. Int'l Trade Comm'n*, No. 14-00220, Slip Op. 16-108, 2016 WL 7414212 at *15 (Ct. Int'l Trade Nov. 23, 2016); *see also Nitrogen Sols.*, 29 CIT at 95, 358 F. Supp. 2d at 1324 (the Court "{would} not disturb" the Commission's decision to "reasonably {choose} to rely on the evidence developed by its staff, rather than {p}laintiff" "which had "made 45 specific allegations of lost sales and lost revenues—none of which could be confirmed by the {Commission}" despite "submit{ing} anecdotal evidence of underselling later in the investigation") .  Accordingly, the Commission reasonably attached weight to the eleven of 56 responding purchasers that reported purchasing [ ████ ] short tons of subject imports instead of

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

the domestic like product due to price, rather than to Plaintiffs' unsubstantiated lost sales allegations. Views at 81-82. Likewise, the Commission found that only two of the 25 responding purchasers confirmed that domestic producers reduced their prices to make a sale against low-priced subject import competition, reasonably attaching no weight to Plaintiffs' unconfirmed lost revenue allegations. These data supported the Commission's finding that underselling was not significant.

Second, the Commission did not disregard that most purchasers reported that domestically produced extrusions were inferior to subject imports with respect to price (*i.e.*, higher priced), as Plaintiffs suggest. *See* PlBr. 18 (factor 2). Rather, the Commission explained that it found "the pricing data a more instructive measure of relative prices than purchasers' subjective ratings of relative price levels." Views at 84. It concluded that the pricing product data provided objective evidence of actual prices paid in specific quarters of the POI and explained that the purchasers' subjective price ratings did not illustrate trends over the POI, and Commission staff took further steps in the final phase of the investigations "to ensure both that they do not reflect the assessments of aluminum extrusion products outside the scope and that they reflect apples-to-apples comparisons of the same type of product." Views at 84. The Commission also observed that 16 of 28 purchasers indicated that subject imports from Mexico, which was the largest source of subject merchandise, were comparably or higher priced than the domestic like product. Views at 84-85.[7] The Commission did not disregard purchasers' subjective perceptions of subject imports' pricing levels; the Commission simply found that the objective pricing data were entitled to more weight.

---

[7] Subject imports from Mexico accounted for between [ ██ ] and [ ██ ] percent of apparent U.S. consumption by quantity during the POI. Staff Report at Table IV-14.

Third, the Commission considered the "purchase cost data" that Plaintiffs had "constructed" and explained that it did "not find these yearly AUV data probative given the limited quantities involved and changes in prices over the POI." Views at 81 n.324.[8]  Thus, the Commission reasonably attached no weight to these data, contrary to Plaintiffs' argument that they somehow showed underselling.  PlBr. 18 (factor 3).

The Commission also considered the data showing that the AUVs of U.S. shipments of subject imports were generally lower than those of U.S. shipments of the domestic like product and explained why these data did not outweigh the other evidence showing that underselling was not significant.  *See* PlBr. 18 (factor 4).  Specifically, it attached "little weight to these AUV comparisons because they are based on approximations of the value of the aluminum extrusions in annual shipments of window wall units and heat exchangers,[9] and would be influenced by differences in product mix and changes in product mix over time."  Views at 85.  The Federal Circuit and this Court have acknowledged that AUV data have limited probative value in cases involving a broad range of product types, such as aluminum extrusions, in which the relative AUVs of U.S. shipments of the domestic like product and subject imports may be influenced by differences in product mix and changes in product mix over time, rather than actual differences in the sales prices of comparable products.  *See Allegheny Ludlum Corp. v. United States,* 287

---

[8] Although Plaintiffs do not contest the Commission's decision not to collect purchase cost data in the final phase investigations, the Commission explained that it did not do so because Plaintiffs commented on the draft questionnaires that pricing data were representative, it was unclear the extent to which importers imported aluminum extrusions for their own use, and the additional burden such data collection would impose on importers.  Views at 80 n.319.

[9] The Commission reasonably found that AUV data based on approximations were less probative that pricing data based on actual sales prices to unrelated customers.  As the Commission explained, "{d}omestic producers and importers reported average unit values for their annual shipments of CR extrusions and all other aluminum extrusions, as well as aluminum extrusions embodied in window wall units and heat exchangers."  Views at 85 n.337.  Such derived values for aluminum extrusions were removed from the pricing data.  Staff Report at V-7, V-8 n.6.

F.3d 1365, 1373-74 (Fed. Cir. 2002) (noting "significant product differences" undermined utility of AUV data); *see also Nucor Corp. v. United States*, 32 CIT 1380, 1424, 594 F. Supp. 2d 1320, 1363 (2008) ("AUV data is not dispositive proof of underselling because this data is only reliable if the product mix is constant over time."). Plaintiffs merely disagree with the Commission's methodology choice to consider quarterly pricing data as opposed to AUV data in its price effects analysis, and that is not a basis for this Court to overturn the Commission's price effects determinations. *See Celanese Chems., Ltd. v. United States*, 31 CIT 279, 294 (2007) (acknowledging Commission's "great discretion in its selection of a methodology to analyze and assess the evidence of underselling, as long as the choice is supported by substantial evidence").

The Commission also considered the evidence of lost sales and underselling provided by the Plaintiffs, and reasonably explained why the evidence did not demonstrate significant underselling or pricing pressure by subject imports. PlBr. 18-19 (factor 5). As an initial matter, contrary to Plaintiffs' arguments, the Commission is not required to give dispositive weight to anecdotal evidence when pricing data cover a small portion of importers' sales. PlBr. 19. In *U.S. Steel Group*, the Federal Circuit upheld the Commission's price effects determination based on pricing data representing less than 4 percent of the total quantity of imports of Dutch cold-rolled steel. *See* 96 F.3d at 1365-66. Rejecting the argument that the Commission could not find the quarterly pricing data as representative given other qualitative evidence in the record regarding import pricing, the Federal Circuit reasoned that a Dutch foreign producer had submitted affidavits that made "passing references to quantities of steel purchased and the size of premiums paid," but they did not "provide the type of specific quantitative information necessary to weigh the affidavits against the other evidence of record in order to determine whether the sample {quarterly pricing} data was not representative." *Id*. at 1366. The Federal Circuit

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

determined that "anecdotal evidence of this type is simply insufficient to show that the data relied on by the Commission was not representative." *Id.* Here, the Commission reasonably placed more weight on the pricing data it collected rather than anecdotal evidence proffered by Plaintiffs.

Furthermore, the Commission examined the contemporaneous documents submitted by Plaintiffs, PlBr. 18-19, and found that it did not show significant underselling or pricing pressure by subject imports. *See* Views at 85-86 n.339 (citing Petitioners' Prehearing Br. at 73-74 and Exhibits 19-25) (CR789). The Commission explained that Exhibit 19 did not contain contemporaneous communications with purchasers, but rather an email from the president of [████████████████] to [████████████████] indicating that [████████████████████████████████████ ████████████████████████████] in these investigations. Views at 85 n.339. It found that Exhibit 20 consisted of [██████████████████████████████████████████ ██████████████████████████████████], and Exhibit 21 contained information from after the POI regarding [████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████]. Views at 85-85 n.339. Similarly, it found that the e-mail exchange in Exhibit 22 made no contemporaneous mention of subject imports, domestic prices, or lost sales; Exhibit 23 referenced a sale lost to subject imports from Mexico due not only to price but also a domestic producer's long lead times; and Exhibit 24 failed to identify pricing pressure from subject imports. Views at 86 n.339. While acknowledging that an email in Exhibit 25 included [████████████████████████████████████████ ████████████████████], the Commission found that Plaintiffs' exhibits, as a whole, did not "demonstrate a pattern of significant underselling or lost sales that undermines the pricing data

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

and lost sales information collected in these investigations." Views at 86 n.339. This assessment was within the Commission's purview as the finder of fact charged with determining the credibility and weight of evidence. *See Consol. Fibers, Inc. v. United States*, 32 CIT 24, 40, 535 F. Supp. 2d 1345, 1357-58 (2008).

None of Plaintiffs' complaints about the Commission's consideration of its contemporaneous documents withstand scrutiny. The Commission did not discount Plaintiffs' contemporaneous documents because they were "collected for purposes of these investigations," as Plaintiffs mistakenly argue. PlBr. 21. Rather, the Commission correctly observed that certain documents were not contemporaneous business documents at all; rather they were documents expressly prepared for submission in the investigations (including the list of lost sales allegations in Exhibit 19 and the description of pricing in Exhibit 22). Views at 85-86 n.339. The Commission also reasonably discounted the pricing information from after the POI in Exhibits 20 and 21, notwithstanding Plaintiffs' argument to the contrary, because such prices could have had no impact on the domestic industry during the period for which data on the industry's performance were collected.

Nor did the Commission conclude that Plaintiffs' communications did not demonstrate a pattern of significant underselling or lost sales based on [ ████████████████████████ ████████████████████████ ] in Exhibit 25, as Plaintiffs insinuate. PlBr. 21-22. While acknowledging [ ██████ ], the Commission found the exhibits as a whole did not reflect any pattern of significant underselling or lost sales. Indeed, another email included in Exhibit 25 showed that [ ████████████████████████ ████████████████████████████████ ].

In the email dated November 11, 2021, the purchaser's representative stated "[ ██████

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████ ].”  Petitioners' Prehearing Brief, Exhibit 25 (CR789).

Plaintiffs' argument that the Commission overlooked two other exhibits does not detract

from the Commission's conclusion that the contemporaneous documents as a whole do not

demonstrate a significant pattern of underselling or lost sales.  PlBr. 22.  The contemporaneous

evidence from a customer allegedly showing [███████████████████████████

███████████ ] does not establish a significant pattern of underselling, particularly in light of the

pricing data showing pervasive and increasing overselling during the POI.  Likewise, [███

███████████████████████████████████████████████

███████████████████████ ] does not establish a pattern of lost sales, particularly in light

of the [" ███████ ] volume of confirmed lost sales and most purchasers reporting that subject

imports from Mexico were comparably or higher priced than the domestic like product.  Views at

84-86.  The Commission must consider whether imports have injured the domestic industry,

defined as domestic producers as a whole.  19 U.S.C. § 1677(4).  For the aluminum extrusions

industry, comprising innumerable domestic producers, evidence that an individual domestic

producer was undersold would shed little light on whether subject import underselling was

significant with respect to domestic producers as a whole.  For this reason, the Commission

reasonably found that Plaintiffs' anecdotal information did not establish a significant pattern of

underselling or lost sales, and instead relied on the pricing data reported by 17 domestic

producers and 18 importers showing pervasive and increasing overselling.

Equally misplaced is Plaintiffs' argument that the Commission disregarded witness

testimony stating that subject imports were unfairly priced.  PlBr. 19 (factor 7).  The

Commission explained that it found the pricing data showing pervasive and increasing overselling as a more instructive measure of relative prices than subjective assessments of relative price levels, which would extend to witness testimony concerning relative price levels. Views at 84.  To the extent the Commission did not address each specific witness statement that the Plaintiffs cited before the Commission, that is not a reasonable basis for the court to find that the Commission's determinations are not supported by substantial evidence.  As this Court has recognized, "{t}he ITC is not required to explicitly address every piece of evidence presented by the parties, and absent a showing to the contrary, the ITC is presumed to have considered all of the evidence on the record." *Aluminum Extrusions Fair Trade Comm. v. United States*, 36 CIT 1370, 1373 (2012).

The Commission also considered the dumping margins found by Commerce, consistent with the statute.  *See* PlBr. 19 (factor 8).  As the Commission explained, "{w}e take into account in our analysis the fact that Commerce has made final findings that subject producers in all subject countries are selling subject imports in the United States at less than fair value."  Views at 92, n.365.  It stated that in "addition to this consideration, our impact analysis has considered other factors affecting domestic prices."  Views at 92 n.365.  The Commission explained that the absence of significant underselling or adverse price effects was particularly probative in assessing the impact of subject imports.  Views at 92 n.365.  This Court has upheld determinations in which the Commission made similar explanations regarding the dumping margins in its material injury analysis.  *See OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1315 (Ct. Int'l Trade 2021).

Finally, the Commission considered Plaintiffs' arguments that the Commission should have used or given more weight to preliminary phase pricing data in the final phase, PlBr. 19, 24

- 29 -

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

(factor 10), and explained that there was not a compelling reason to rely on pricing data from the preliminary phase as opposed to the more comprehensive pricing data collected in the final phase. This decision was reasonable because preliminary phase data are subject to far less verification by staff given the time constraints imposed by the 45-day statutory deadline for preliminary determinations. *See* Views at 83-84 n.334; Staff Report at V-7 n.6 (noting that final phase pricing data from [ ███ ] importers were either removed or adjusted); 19 U.S.C. § 1673b(a)(2). By contrast, the four- to six-month durations of final phase investigations enable the Commission to develop a more comprehensive and thoroughly vetted dataset for purposes of its final determinations. The Commission also noted that the datasets were not comparable, as thirty-one domestic producers provided data in the final phase as opposed to only 29 producers that provided information in the preliminary phase. Views at 90 n.363. The Commission noted that, unlike in the preliminary phase of the investigations, importers' questionnaires in the final phase instructed importers to include transportation costs to the United States in their reported prices when the U.S. sales are valued on an ex works basis in the country of export. Views at 83, n.333. For these reasons, the Commission reasonably declined Plaintiffs' request that the Commission rely on pricing data from the preliminary phase.

Because the Commission considered each factor argued by Plaintiffs and reasonably explained that it did not outweigh the other evidence showing that underselling was not significant, the Court should reject Plaintiffs' invitation to reweigh the same evidence and affirm the Commission's finding that underselling was not significant.

### (ii)      The Commission Properly Considered the Record as a Whole

The Commission is required to "take into account whatever {evidence} in the record fairly detracts from its weight." *DAK Ams. LLC v. United States,* 456 F. Supp. 3d 1340, 1358 (Ct. Int'l Trade 2020) ("*DAK I*"). That does not mean, however, that the Commission is required

to accept at face value, and rely on, every piece of evidence in the record even after explaining why specific categories of evidence are of limited probative value.  The Commission considered each "record data point" argued by Plaintiffs and explained why they did not outweigh the other evidence showing that underselling was not significant, including the pricing data and small volume of confirmed lost sales.

Plaintiffs' reliance on *DAK I* is misplaced because the Court did not remand the Commission's overselling determination because it "elevated one data source over others" as Plaintiff argues.  PlBr. 26.[10]  Rather, the Court found that the Commission failed to explain why it did not rely on certain data that contradicted the Commission's determinations.  *See DAK I*, 456 F. Supp. 3d at 1368.  As the *DAK I* Court noted:

> "{There is a} difference, however, between contesting the relative weight afforded a piece of evidence and contesting its complete and utter exclusion from the evidence on which the Commission predominantly relied.  The court finds that the latter demands a somewhat stronger rationale, particularly where the excluded data . . . …would have represented a substantial portion of comparisons.

*Id*. at 1358.  The Court remanded the determinations for the Commission to explain why it did not rely on the evidence that "seemed to undermine its conclusion that there was no significant underselling by imports" in the domestic market.  *DAK Ams. LLC v. United States*, 517 F. Supp.

---

[10] Similarly misplaced is Plaintiffs' reliance (PlBr. 26) on *Golub v. Secretary of Health & Human Services*, No. 99-51661, 2000 WL 1471643, at *4 (Fed. Cir. Oct. 3, 2000).  In *Golub*, the Federal Circuit remanded a National Childhood Vaccine Injury Act ("Vaccine Act") case to the Court of Federal Claims because it determined that a special master abused her discretion in finding that "the petitioner had not established by a preponderance of evidence a causal connection between the petitioner's illness and the administration of the vaccination."  *Id.* at *14.  This is a non-precedential decision limited to the facts at issue under the Vaccine Act.  *See Ryman v. Sec'y of Dep't of Health & Hum. Servs.*, 65 Fed. Cl. 35, 40 n.9 (Ct. Fed. Cl. 2005) (noting that *Golub* "is an unpublished opinion, which cannot be cited or accorded precedential weight before the Federal Circuit").

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

3d 1349, 1357 (Ct. Int'l Trade 2021) ("*DAK II*").  Here, in contrast, the Commission explained why it found the quarterly pricing data probative, and why it attached little weight to the evidence that Plaintiffs allege the Commission overlooked.

This Court's opinion affirming the Commission's remand determinations in *DAK II* is more instructive.  *Id.* at 1357.  In *DAK II*, the Court determined that the Commission adequately explained its reliance on the same price data in finding no significant underselling because the Commission also explained that factors other than price, including availability and quality, affected the domestic market for PET resin, "indicating that factors other than price were influencing purchasing decisions."  *Id*.  The Court also stated that the Commission's findings were "{c}onsistent with {its} well-established practice" to focus its underselling analysis on a comparison of the number of instances of underselling to the number of instances of overselling as reflected in the quarterly pricing data" and thus was sufficient to sustain the Commission's underselling analysis.  *Id*. (quotations omitted).

Here, the Commission acknowledged the limitations of the pricing data and explained why it found such evidence to be probative of relative domestic and subject prices in the U.S. market.  Furthermore, in its consideration of the significance of underselling, the Commission addressed the "[ ███████ ] volume of confirmed lost sales by reason of price," as well as the "importance most purchasers attach to non-price factors in purchasing decisions."  Views at 86. As in *DAK II*, the Commission adequately explained its finding that underselling was not significant and the Court should likewise sustain that finding.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

**B.    The Commission's Impact Analysis Was Reasonable and In Accordance with Law**

**1.    The Commission's Impact Analysis Should Be Sustained**

The Commission reasonably found that subject imports had no significant adverse impact on the domestic industry.  As the Commission explained, although subject import volume and market share increased from 2021 to 2022, it was due to the domestic industry's supply constraints as U.S. demand for aluminum extrusions increased during the COVID-19 pandemic. Views at 100-101.  Subject imports oversold the domestic like product in a majority of quarterly comparisons accounting for a majority of reported subject import volume during the period. View*s* at 101.  Furthermore, the Commission found no correlation between subject imports and the domestic industry's financial performance during the period, given that the industry's financial performance strengthened as it passed on higher costs through higher prices.  Views at 101-102.[11]

While the domestic industry's financial performance declined from 2022 to 2023, and in interim 2024 compared to interim 2023, subject imports also decreased during this time, as apparent U.S. consumption declined.  The Commission found that from 2022 to 2023, as the post-pandemic demand surge subsided, apparent U.S consumption declined [ ▮ ] percent. Views at 102.  Consequently, the Commission found that between 2022 and 2023, subject imports declined by [ ▮ ] percent and the domestic industry's U.S. shipments declined by 14.2 percent, whereas nonsubject imports declined by only [ ▮ ] percent and took market share from the domestic industry and subject imports.  *Id.*  The Commission thus concluded that the

---

[11] From 2021 to 2022, the domestic industry's gross profit increased from $868.0 million in 2021 to $1.1 billion in 2022, its operating income increased from $452.3 million in 2021 to $614.3 million in 2022, and its net income increased from $415.0 million in 2021 to $581.0 million in 2022.  Views at 95-96.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

domestic industry's decreased sales and shipments from 2022 to 2023 resulted from declining demand, and its decreased market share resulted from increased nonsubject imports.  Views at 102.

The Commission also found no causal nexus between domestic industry performance and subject imports over the interim periods.  Although cumulated subject import volume and market share was higher in interim 2024 than in interim 2023, the Commission found the record did not show that the increase was due to subject import underselling.  Views at 102.  In fact, subject imports oversold the domestic like product in 13 of 21 quarterly comparisons, corresponding to 80.8 percent of reported subject import sales volume, in interim 2024.  Views at 102-03.  The record also indicated that non-price factors were important in purchasing decisions, and there was no evidence of significant confirmed lost sales.  Views at 102-03.  Contrary to Plaintiffs' argument, *see* PlBr. 34, the Commission also recognized that the domestic industry did not gain back the market share it lost in 2022 but found that it would not have expected the domestic industry to quickly regain this market share.  Views at 103.  Given that importers made [ ███ ] percent of their sales though contracts and that most aluminum extrusions are made-to-order to a purchaser's exacting specifications, the Commission explained, purchasers that entered into contracts to purchase subject imports in 2022 "would have continued to purchase subject imports pursuant to such contracts and would not have the reason to switch suppliers during the duration of contracts."  Views at 103.  The Commission also found that increased subject imports in interim 2024 compared to interim 2023 did not prevent the domestic industry from continuing to recover its costs, with a COGS to net sales ratio that was almost the same as in interim 2023 and financial performance that was weaker than in interim 2023 but stronger than in any year of the 2021-2023 period.  Views at 103-104.

The Commission addressed Plaintiffs' argument that subject imports caused the domestic industry's increasing excess capacity and inventories and declining production and shipments, even after resolution of supply problems.  The Commission explained that purchaser responses that the domestic like product was comparable to subject imports with respect to availability did not outweigh the more specific evidence of domestic supply constraints in 2021 and 2022.  It found that "notwithstanding the domestic industry's declining capacity utilization rate, domestic producers reported several expansion projects and new plants during the POI that resulted in an overall increase to their production capacity."  Views at 105.  The Commission reiterated its finding that there was no clear correlation between subject imports and any declines in the industry's performance after 2022, with declining demand and increasing nonsubject imports accounting for the industry's declines from 2022 to 2023, when subject imports declined, and the industry performing better in interim 2024 than in any full year of the 2021-2023 period despite higher subject imports relative to interim 2023.  Views at 106.  Finally, the Commission explained that because domestic industry inventories consisted of extrusions produced and held for specific customers, the domestic industry's 1.1 percent increase in inventories from 2021 to 2023 followed by a decline in interim 2024 compared to interim 2023 did not support an affirmative injury finding.  Views at 106.

   Because the Commission reasonably found that cumulated subject imports had no significant adverse impact, the Court should affirm the finding.

### 2. Plaintiffs' Challenges to the Commission's Impact Analysis Are Without Merit

Plaintiffs argue that the Court should remand the Commission's impact analysis for three reasons.  First, Plaintiffs argue that the analysis was predicated on the Commission's finding that underselling was not significant.  PlBr. 32.  Because the Commission reasonably found that

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

subject import underselling was not significant, for the reasons discussed above, the Court should reject this argument. Second, Plaintiffs argue that the Commission's reliance on domestic supply constraints was unsupported by substantial evidence, and third, that other evidence, including the industry's inability to regain the market share lost in 2022 and declining capacity utilization rates, warranted affirmative determinations. *Id.* at 33-34. Plaintiffs' arguments are nothing more than an invitation for the Court to reweigh evidence reasonably considered by the Commission.

First, contrary to Plaintiffs' argument, the Commission reasonably found that subject import volume and market share increased from 2021 to 2022 as supply constraints significantly curtailed the domestic industry's ability to supply the increasing demand in the U.S. market. As the Commission explained, four of the five largest domestic producers, [ ████████ ████████████████████████████████ ], which accounted for more than [ ███ ] of the industry's sales by quantity in 2023, reported supply constraints in 2021 and 2022. Views at 99. The record also showed that in 2021, [ ███████████████████████████ ████████████████████ ] reported supply constraints. Views at 99 n.395. The Commission noted that the largest domestic producer, which accounted for over [ ██████ ] of the industry's sales in 2023, [ █████████████████████████████ ████████████████████████████ ] and [ █████████████████████ ████████████████████ ]. Views at 99. The record also showed that most domestic producers and purchasers reported a change in lead times in 2021 and 2022, with purchasers generally indicating that lead times changed in both years. Views at 99-100, & n.401.

The Commission also found that in 2021 and 2022, responding U.S. purchasers reported that "domestic producers were unable or unwilling to supply aluminum extrusions, placed them

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

on allocation, or had unacceptable lead times." Views at 100. Nine large purchasers of domestically produced aluminum extrusions that accounted for [ ██████████ ] of the [ ██ ██████ ] short tons of reported purchases of the domestic like product reported supply problems. Views at 100-101. The Commission also considered the questionnaire responses from nine purchasers that from 2021 to 2022 increased their purchases of subject imports while decreasing their purchases from domestic producers. Views at 101. Eight of those nine purchasers reported supply constraints in 2021 and 2022, increased lead times, or other supply problems such as being put on allocation, declined orders, or domestic producers not accepting new customers. Views at 101. The Commission reasonably found that these supply constraints were primarily from domestic producers, explaining that "only small minorities of importers reported supply constraints during 2021 (19 versus 68 reporting no supply constraints), 2022 (13 versus 75), or 2023 (6 versus 83 in the pre-petition period)" and that importers did not report changing lead times as often as domestic producers in 2021 and 2022. Views at 101 n.414. The Commission did not disregard the fact that importers also reported supply constraints but rather reasonably found that supply constraints were more prevalent amongst domestic producers. Views at 101 & n.414. Because the Commission reasonably found that the domestic industry's supply constraints as apparent U.S. consumption increased accounted for the increase in cumulated subject import volume and market share from 2021 to 2022, the Court should reject Plaintiffs' argument and sustain this aspect of the Commission's determinations.

Plaintiffs also argue unpersuasively that pricing data showing that underselling peaked in 2022 somehow conflicts with the Commission's finding that domestic industry supply constraints caused the increase in subject imports. PlBr. 29-30. The Commission recognized that the share of reported subject import sales volume in quarters of underselling increased from

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

37.9 percent in 2021 to 41.7 percent in 2022. Views at 81. Based on the evidence discussed above, however, the Commission reasonably found that the domestic industry's inability to satisfy increasing demand from 2021 to 2022 drove increased subject import volume and market share over the period. Views at 101-102. Furthermore, the Commission found that the increase in subject imports from 2021 to 2022 did not prevent the domestic industry from covering its increased costs through higher prices and improving its financial performance, which is consistent with supply constraints, not underselling, driving the increase in subject imports. Views at 102.

Nor does hearing testimony that many domestic producers did not suffer supply constraints warrant a different result, as Plaintiffs argue. PlBr. 30. The Commission did not find that *all* domestic producers experienced supply constraints in 2021 and 2022; it found, instead, "a majority of responding domestic producers" in 2021 and "nearly half" of responding producers in 2022 reported such constraints, including four of the five largest domestic producers accounting for over [ ▇ ] of the industry's sales in 2023. Views at 99-100. As this and other evidence supports the Commission's analysis of domestic supply constraints, the Court should reject Plaintiffs' alternative weighing of the same facts.

The Commission also reasonably explained that the domestic industry's inability to recoup its lost market share in 2022 after its supply constraints had eased was unrelated to subject imports, contrary to Plaintiffs' argument that subject imports were to blame. PlBr. 29, 33. "Having entered into contracts to purchase subject imports in 2022 due to domestic supply constraints," the Commission explained, "purchasers would have continued to purchase subject imports pursuant to such contracts and would not have reason to switch suppliers during the duration of the contracts." Views at 103. As support, the Commission relied on hearing

testimony from several witnesses that finding qualified suppliers was time-consuming and expensive, and that existing supplier contracts can last for several years.  Views at 103 n.423.  Thus, the Commission reasonably determined that "even after the domestic industry's supply constraints eased, would not have expected the industry to rapidly regain market share lost in 2022."  Views at 103.

Finally, Plaintiffs' reliance on three post-COVID determinations in which the Commission did not find that domestic supply constraints explained the domestic industry's declining performance is misplaced.  Prior Commission decisions are not "relevant agency precedents," as Plaintiffs' mistakenly suggest, PlBr. 33, as it is well-established that each Commission determination is *sui generis*.  *See, e.g.*, *Cleo Inc. v. United States*, 501 F.3d 1291, 1299 (Fed. Cir. 2007).  The fact that the Commission did not find that domestic supply constraints explained the domestic industry's declining performance in other investigations regarding other products with different market conditions in no way precluded the Commission from finding that domestic supply constraints accounted for increased subject imports from 2021 to 2022 based on the record of the investigations at issue here.  *See AWP Indus., Inc. v. United States*, 35 CIT 774, 790, 783 F. Supp. 2d 1266, 1282 (2011) ("Just because the Commission found a decline in demand to be insufficient to explain the industry condition in a previous case does not mean that it must do so here.").  This Court has upheld the Commission in other investigations finding no material injury based in part on the domestic industry's supply constraints.  *See DAK II*, 517 F. Supp. 3d at 1369-70 ("{A}s the Commission explained, the domestic industry's inability to supply domestic demand caused increased purchases of imports, even in instances where the imports were higher priced.").  Given the substantial evidence

supporting the Commission's analysis of domestic supply constraints in this case, discussed above, the Court should likewise affirm this aspect of the Commission's determinations.

C.    **The Commission's Threat Analysis Was Supported by Substantial Evidence and in Accordance with Law**

Plaintiffs' challenge to the Commission's negative threat determinations is largely derivative of their challenges to the Commission's findings concerning overselling and domestic supply constraints.  PlBr. 35-38.  Because the Commission's analysis of these issues was reasonable and in accordance with law, as discussed above, the Court should reject Plaintiffs' arguments and sustain the Commission's negative threat determinations.

1.    **The Commission's Likely Volume Analysis Should Be Sustained**

The Commission reasonably found no likelihood of substantially increased cumulated subject import volumes in the imminent future.  Considering subject import volume during the POI, the Commission found that because subject import volume and market share increased from 2021 to 2022 due to domestic industry supply constraints, and declined from 2022 to 2023 as apparent U.S. consumption declined, the increase from 2021 to 2022 did not indicate any likelihood of significantly increased imports in the imminent future.  Views at 112.  Plaintiffs' challenge to this finding is derivative of their challenge to the Commission's analysis of domestic supply constraints and should be rejected for the reasons discussed above.  PlBr. 35.

While recognizing that subject import market share was higher in interim 2024 than in interim 2023, the Commission explained that the increase reflected elevated imports in one month, March 2024, which would have been influenced by Commerce's impending preliminary determinations and likely imposition of provisional measures, as well as the seasonality of demand.  Views at 112.  The Commission also noted that the influence of seasonality on import patterns suggested that interim 2024 data should be given less weight than full year data.  Views

at 112-13 & n.449.  For this reason, the Commission did not find the increase indicative of a

likely significant increase in subject imports in the imminent future.

In challenging these findings, Plaintiffs ask the Court to reweigh evidence reasonably

considered by the Commission.  Plaintiffs ask the Court to substitute their view of the seasonality

of demand, which is that it cannot explain why subject imports were higher in March 2024 than

in March 2021 and March 2023, for that of the Commission.  The Commission reasonably found

that the elevated level of subject imports in March 2024 did not make it likely that subject

imports would continue to increase in the imminent future because demand for aluminum

extrusions, and thus subject imports, typically increased in the spring and summer of each year.

Views at 61, 113 n.449.  The table and staff report cited by the Commission show that subject

import volume increased irregularly during the first several months of each year of the 2021-

2023 period before fluctuating within a narrow band or declining irregularly through the end of

the year.  *See* Staff Report at Table IV-13 & Fig. IV-8 (cited in Views at 113 n.449).

Similarly, Plaintiffs acknowledge that subject imports increased in March 2024 due to the

pendency of Commerce's preliminary determinations, "to beat the imposition of duties," but

would have the Court interpret the increase differently than the Commission.  PlBr. 36.  Indeed,

the critical circumstances provision of the statute is designed to combat this very phenomenon.

*See* 19 U.S.C. § 1673b(e).  Because the Commission reasonably found that this increase in

subject imports was due to a factor that would not recur in the imminent future, namely the

impending imposition of provisional measures, the Court should sustain the Commission's

finding that the increase did not indicate that a significant increase in subject imports was likely

in the imminent future.

The Commission also found that other evidence indicated that subject import volumes were unlikely to significantly increase in the imminent future. The Commission found that U.S. importers reported declining volumes of arranged imports from the second quarter of 2024 through the first quarter of 2025. Views at 113. While recognizing that U.S. importers' inventories increased during the POI, the Commission observed that aluminum extrusions are generally made-to-order as opposed to being sold from inventories, and inventories are generally produced and held for specific customers. Views at 113. The Commission also found that inventories held by foreign producers accounted for only a small share of subject imports during the POI, and that foreign producers projected that their inventories would decrease in 2024 and 2025. Views at 113 The Commission explained that while subject imports' production and capacity increased during the POI, those increases did not result in a significant increase in subject imports during the POI, noting that the 41.4 percent increase in their excess capacity from 2022 to 2023 was accompanied by a 10.9 percent decline in their exports to the United States. Views at 114-15. Furthermore, the Commission found that subject producers had limited ability to shift production from out-of-scope products to subject merchandise because nearly all their production was dedicated to subject merchandise. Views at 115. Finally, while recognizing that subject producers were export oriented, the Commission noted that they made the vast majority of their shipments to home market customers, while the share of their total shipments exported to the United States fluctuated within a narrow band during the POI and was projected to decline in 2025 and 2026. Views at 115-16. Plaintiffs challenge none of these findings, which support the Commission's reasonable conclusion that no significant increase in subject import volume was likely.

### 2.    The Commission's Likely Price Effects Analysis Should Be Sustained

The Commission found that the absence of significant price effects during the POI was likely to continue based on the absence of significant price effects during the POI, the predominant and increasing overselling by subject imports, which had declined irregularly over the period to just 19.2 percent by volume in interim 2024, its finding that cumulated subject import volumes were unlikely to significant increase in the imminent future, and the absence of any evidence that subject import pricing patterns were likely to change significantly in the imminent future.  Views at 119.  Plaintiffs' challenge to this finding is derivative of their challenge to the Commission's analysis of underselling and should be rejected for the reasons discussed above.  PlBr. 37.

### 3.    The Commission's Likely Impact Analysis Should Be Sustained

The Commission's likely impact analysis is similarly supported by substantial evidence. It noted that the declines in the domestic industry's production and shipments, and some decline in financial performance, were due to supply constraints, decline in U.S. demand for aluminum extrusions, and nonsubject imports' increasing their market share.  Views 119.  The Commission explained that from 2022 to 2023, subject imports declined absolutely and as a share of apparent U.S. consumption as the domestic industry's supply constraints eased.  Views at 119-20.  The Commission further stated that subject imports increasingly oversold the domestic like product throughout the POI and had no significant price effects on the domestic industry.  Views at 120. The Commission also explained that the domestic industry's financial performance improved from 2021 to 2022 when cumulated subject imports increased, and the domestic industry's trade indicators decreased during the period due to supply constraints in 2021 and 2022, and then decreased demand and increased nonsubject imports from 2022 to 2023.  Views at 120.

- 43 -

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

The Commission explained why the apparent market share shift from interim 2024 compared to interim 2023 was not indicative of any imminent threat of material injury.  The Commission found that

> {O}ver the interim periods, despite an increase in cumulated subject import volume and market share, the domestic industry COGS to net sales ratio increased only slightly, and the domestic industry's financial performance in interim 2024 was stronger during any full year of the POI, though slightly weaker than in interim 2023.

Views at 120.

The Commission found that, on balance, the domestic industry was not in a vulnerable condition.  Views at 120-21.  While acknowledging that the domestic industry's capacity utilization had declined significantly, the Commission found that its operating and net margins in interim 2024 were better than at the beginning of the POI and that the industry had increased its investments.  Views at 120-21.  The Commission explained that the "industry's reduced sales and shipments resulted from supply constraints, declining demand, and increased nonsubject import market share."  Views at 121.  It also found that while demand was projected to remain weak in 2024 and 2025, the domestic industry was profitable in 2023, despite apparent U.S. consumption declining [█████] percent from 2022 to 2023.  Views at 121.  Furthermore, despite the reportedly poor demand conditions in 2024, the domestic industry was more profitable in interim 2024 than in any full year of the POI.  Views at 121. Noting that cumulated subject imports had not been injurious when they increased during the POI, the Commission found no evidence of any change in conditions of competition that would make them injurious in the imminent future and therefore made negative threat determinations.  Because the Commission's threat analysis was reasonable, the Court should sustain it.

Plaintiffs' challenge to this finding is derivative of their challenge to the Commission's analysis of domestic supply constraints and overselling and should be rejected for the reasons discussed above.  PlBr. 38.

**D.  The Findings of a Dissenting Commissioner Do Not Affect this Court's Review**

Plaintiffs' reliance throughout their brief on Chair Karpel's dissenting views in support of their challenge to the Commission's determinations is misplaced.[12]  PlBr. 11-12, 20, 25, 29-30.  That a dissenting Commissioner, Plaintiffs, or even this Court, may have weighed the evidence differently, does not provide grounds to overrule the Commission's reasonable consideration of the same evidence.  Although "individual Commissioners reach{} divergent conclusions, '{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1372 (Fed. Cir. 2015) (quoting *Consolo* 383 U.S. at 607); *see also U.S. Steel Grp.*, 96 F.3d at 1362 (noting "each commissioner is free to attach different weight to factual information and . . . commissioners may ultimately reach different factual conclusions on the same record").  By asking the Court to remand the Commission's determinations based on the findings of the dissenting Commissioner, Plaintiffs are "in essence, asking the Court to reweigh the evidence."  *See Metallverken Nederland B.V. v. United States*, 13 CIT 1013, 1077, 728 F. Supp. 730, 734 (1989).

---

[12] Similarly, Commissioner Schmidtlein's hearing question about the probative value of the pricing data should have no bearing on this Court's review of the Commission's findings.  PlBr. 23.  Commissioner comments during a hearing do not constitute the Commission's, or necessarily even the individual Commissioner's views on an issue.  Moreover, Commissioner Schmidtlein recused herself from the vote in these investigations.

- 45 -

VI.     **CONCLUSION**

For all the foregoing reasons, the Court should affirm the Commission's final negative

determinations for aluminum extrusions from the fourteen subject countries.


Respectfully submitted,

Margaret D. MacDonald
General Counsel

Karl S. von Schriltz
Assistant General Counsel for Litigation

*/s/  Anthony C. Famiglietti*
Anthony C. Famiglietti
Michael K. Haldenstein
Attorney-Advisors
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-2520
anthony.famiglietti@usitc.gov

*Attorneys for Defendant*
*U.S. International Trade Commission*

Dated: August 11, 2025

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached

**DEFENDANT U.S. INTERNATIONAL TRADE COMMISSION'S PUBLIC**

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTION FOR**

**JUDGMENT ON THE AGENCY RECORD** contains 13,997 words, according to the word-

count function of the word processing system used to prepare this brief (Microsoft Word 2010).

Dated: August 11, 2025

/s/  *Anthony C. Famiglietti*
Anthony C. Famiglietti
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-2520
anthony.famiglietti@usitc.gov