UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE JOSEPH A. LAROSKI JR., JUDGE

| | |
|---|---|
| **U.S. ALUMINUM EXTRUDERS COALITION,**<br><br>**and**<br><br>**UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,**<br><br>                            **Plaintiffs,**<br><br>   v.<br><br>**UNITED STATES,**<br><br>                          **Defendant,**<br><br>   **and**<br><br>**COALITION FOR FAIR MEXICAN EXPORTS OF ALUMINUM EXTRUSIONS, et al.,**<br><br>               **Defendant-Intervenors.** | Consol. Court No. 24-00209<br><br>**PUBLIC VERSION**<br><br><br><br>Confidential Information Removed from Brackets on Pages 7-8, 10-15, 18, 22-24, and 30. |

---

**RESPONSE BRIEF
ON BEHALF OF
DEFENDANT-INTERVENORS**

---

ROCK CREEK TRADE LLP           FAEGRE DRINKER BIDDLE & REATH LLP

CLARK HILL PLC                   PILLSBURY WINTHROP SHAW PITTMAN LLP

AKIN GUMP STRAUSS HAUER & FELD LLP    ARENTFOX SCHIFF LLP

September 15, 2025

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................................... 1

II.     STATEMENT PURSUANT TO RULE 56.2(C)(1) ......................................................... 1

        A.      Administrative Determinations Under Review ..................................................... 2

        B.      Issues Presented for Review and Summary of Argument ..................................... 2

III.    STATEMENT OF FACTS ............................................................................................... 4

IV.     STANDARD OF REVIEW ............................................................................................. 4

V.      ARGUMENT ................................................................................................................... 6

        A.      The Commission's Finding that Subject Imports Did Not Have Significant
                Price Effects Was Supported by Substantial Evidence and Was Otherwise
                in Accordance with Law ....................................................................................... 6

                1.      The Commission Reasonably Relied on Quarterly Price
                        Comparisons and Lost Sales Data to Assess the Significance of
                        Any Underselling, Consistent with Its Established Practice ...................... 8

                2.      The Commission Had No Reason to Afford Reduced Weight to the
                        Quarterly Price Comparison Data ............................................................ 10

                3.      The Commission Reasonably Addressed Each Data Point Raised
                        by Plaintiffs and Explained Why They Did Not Outweigh
                        Evidence Showing Predominant Overselling ........................................... 15

        B.      The Commission's Finding that Subject Imports Did Not Have a
                Significant Adverse Impact on the Domestic Industry Was Supported by
                Substantial Evidence and Otherwise in Accordance with Law ........................... 21

                1.      The Commission Reasonably Found that There Was No Causal
                        Nexus Between Changes in the Domestic Industry's Performance
                        and Subject Imports ................................................................................. 21

                2.      The Commission Reasonably Found that Supply Constraints
                        Explained Declines in the Domestic Industry's Market Share ................ 21

        C.      The Commission's Finding that Subject Imports Did Not Threaten the
                Domestic Industry with Material Injury Was Supported by Substantial
                Evidence and Otherwise in Accordance with Law ............................................. 25

**PUBLIC VERSION**

<u>Page(s)</u>

1.  The Commission Reasonably Found that a Domestic Industry Was
    Not Threatened with Material Injury ......................................................... 25

2.  The Court Should Reject Plaintiffs' Challenges to the
    Commission's Well-Reasoned Threat Analysis ...................................... 28

VI.    CONCLUSION ................................................................................................. 32

# TABLE OF AUTHORITIES

Page(s)

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...................................................................................4

19 U.S.C. § 3512(d) ..............................................................................................5-6

19 U.S.C. § 1677(7)(C)(ii)......................................................................................6

19 U.S.C. § 1677(7)(C)(ii)(I)................................................................................16

19 U.S.C. § 1677(35)(A).......................................................................................16

19 U.S.C. § 1671d(c)(1)-(2)..................................................................................16

19 U.S.C. 1677(7)(B)(i)(III)..................................................................................24

19 U.S.C. § 1677(7)(F) .........................................................................................25

19 U.S.C. § 1677(7)(F)(i)......................................................................................25

19 U.S.C. § 1677(7)(I) ..........................................................................................31

**Court Decisions**

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
44 F.3d 978 (Fed. Cir. 1994)..........................................................................4, 31

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ...............................4, 31

*Nucor Corp. v. United States*, 318 F. Supp. 2d 1207 (Ct. Int'l Trade 2004)..................................4

*Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927 (Fed. Cir. 1984)... 4-5, 14, 29, 31

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056 (Fed. Cir. 2001) ...........................5

*United States Steel Group v. United States*, 96 F.3d 1352 (Fed. Cir. 1996)............................5, 29

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................................................5

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .......................................................................5

*DAK Ams. LLC v. United States*, 517 F. Supp. 3d 1349 (Ct. Int'l Trade 2021) ...........................9

*Mexichem Fluor Inc. v. United States*, 179 F. Supp. 3d 1238 (Ct. Int'l Trade 2016).....................9

*Celanese Chemicals, Ltd. v. United States*, 31 CIT 279 (2007) .............................................9

*BlueScope Steel, Ltd. v. United States*, 719 F. Supp. 3d 1357 (Ct. Int'l Trade 2024) .................10

*NSK Corp. v. United States*, 577 F. Supp. 2d 1322 (Ct. Int'l Trade 2008).................................14

*Int'l Indus., Ltd. v. United States*, 311 F. Supp. 3d 1325 (Ct. Int'l Trade 2018) ........................14

*Aluminum Extrusions Fair Trade Comm. v. United States*, 36 CIT 1370 (2012) ........................16

*DAK Ams. LLC v. United States*, 456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ..........................19

Page(s)

*Cleo Inc. v. United States*, 501 F.3d 1291 (Fed. Cir. 2007)..........................................................20

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
818 F. Supp. 348 (Ct. Int'l Trade 1993) .........................................................................................29

**Administrative Determinations**

*Methionine from France*, Inv. No. 731-TA-1534 (Final),
USITC Pub. 5206 (June 2021)..........................................................................................................11

*Dried Tart Cherries from Turkey*, Inv. Nos. 701-TA-622 and 731-TA-1448 (Final),
USITC Pub. 5014 (Jan. 2020)...........................................................................................................16

*Tin Mill Products from Canada, China, Germany, and South Korea*, Inv. Nos. 701-TA-685 and
731-TA-1599-1601 and 1603 (Final),
USITC Pub. 5492 (Feb. 2024) ..........................................................................................................17

*Steel Nails from India, Thailand, and Turkey*, Inv. Nos. 731-TA-1580, 1582, and 1583 (Final),
USITC Pub. 5404 (Feb. 2023) ..........................................................................................................17

*Urea Ammonium Nitrate Solutions from Russia and Trinidad and Tobago*, Inv. Nos. 701-TA-
668-669 and 731-TA-1565-1566 (Final),
USITC Pub. 5338 (Aug. 2022) .........................................................................................................17

*Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*, Inv.
Nos. 731-TA-1387-1391 (Final),
USITC Pub. 4835 (Nov. 2018) ................................................................................................... 19-20

*Truck and Bus Tires from Thailand*, Inv. No. 731-TA-1658 (Final),
USITC Pub. 5562 (Dec. 2024)..........................................................................................................23

*Brass Rod from India*, Inv. No. 701-TA-686 (Final),
USITC Pub. 5485 (Feb. 2024) ..........................................................................................................23

*Certain Mobile Access Equipment and Subassemblies Thereof from China*, Inv. No. 701-TA-665
(Final),
USITC Pub. 5242 (Dec. 2021)..........................................................................................................23

**Legislative Materials**

Uruguay Round Agreements Act, Statement of Administrative Action,
H.R. Rep. No. 103-316, vol. 1 (1994)............................................................................................5, 30

## I.        INTRODUCTION

Respondents from the underlying investigations — including the Coalition for Fair Mexican Exports of Aluminum Extrusions ("Mexican Coalition"); Cedal Duran S.A.; Danfoss LLC; Dorman Products, Inc.; Enclos Corporation; Johnson Controls, Inc.; Rockler Companies, Inc.; Tecnoglass, S.A.S.; E.S. Windows LLC; C.I. ES Metals S.A.S.; Erdoganlar Alüminyum San. ve Tic. A.S.; Istanbul Ferrous and Non-Ferrous Metals Exporters' Association; MAHLE Behr USA Inc.; ZF North America, Inc.; Bergstrom China Group Partners, LLC; Bergstrom, Inc.; MAHLE Behr Charleston Inc.; MAHLE Behr Dayton L.L.C.; MAHLE Behr Service America L.L.C.; MAHLE Behr Manufacturing Management, Inc.; MAHLE Behr Mt. Sterling, Inc.; MAHLE Behr Rio Bravo, S. de R.L. de C.V.; MAHLE Behr Service Mexico, S. de R.L. de C.V.; Daikin Comfort Technologies North America; Air Distribution Technologies, Inc. (and its subsidiary Ruskin); and Tesla, Inc. (collectively "Defendant-Intervenors") — herein oppose the Motion for Judgment on the Agency Record filed by the U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (collectively "Plaintiffs" or "Petitioners").  The Defendant-Intervenors respectfully request that the Court affirm the final negative determinations of the U.S. International Trade Commission ("ITC" or "the Commission") regarding *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*.

## II.        STATEMENT PURSUANT TO RULE 56.2(C)(1)

Pursuant to USCIT Rule 56.2 and the Court's Scheduling Order (ECF No. 76), Defendant-Intervenors submit the following response in opposition to the Motion for Judgment on the Agency Record filed by Plaintiffs in the above-captioned action.

1

**A.  Administrative Determinations Under Review**

Plaintiffs challenge the Commission's final determinations that a U.S. industry was not materially injured or threatened with material injury by reason of imports of aluminum extrusions from the fourteen subject countries.  The Commission's public views are contained in *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698, 731-TA-1643-44 and 1646-1657 (Final), USITC Pub. 5560 (Nov. 2024) ("*Publication*").[1]  Notice of the determinations was published in the Federal Register on November 22, 2024.  *See* 89 Fed. Reg. 92,720 (P.R.355).

**B.  Issues Presented for Review and Summary of Argument**

**1.  Was the Commission's Finding that Subject Imports Did Not Have Significant Price Effects on the Domestic Like Product Supported by Substantial Evidence and In Accordance with Law?**

Yes, as detailed in the Commission's Brief.  Plaintiffs' sole attack on the Commission's finding of no significant price effects rests on its self-interested view that the record supported a significant underselling finding.  While Plaintiffs do not contest that the Commission acted consistently with its well-established practice in assessing underselling through its quarterly price comparison methodology, they nevertheless argue that alleged flaws in the reported pricing data and low coverage warrant a departure from this practice — even after Plaintiffs themselves approved of the pricing data coverage.  Moreover, the Commission considered Plaintiffs' allegations regarding the credibility of reported questionnaire data and, after conducting extensive verification of the responses, reasonably explained why it relied on these data and lost sales reporting to find no significant underselling.

---

[1] Citations to the *Publication* refer to P.R.354 throughout.

Plaintiffs also request that the Court elevate their preferred weighing of the evidence over that of the Commission, claiming that the Commission solely considered quarterly price comparison data over all other record data points. Upon closer inspection, however, many of the data points raised by Plaintiffs are either largely unsupported allegations, are common to every Commission final investigation, are deeply flawed in their probative value, or actually support the Commission's finding of no significant underselling. As the Commission reasonably considered Plaintiffs' arguments, the Court should decline to reweigh this evidence.

### 2. Was the Commission's Determination that Subject Imports Did Not Have Significant Adverse Impact on the Domestic Industry Supported by Substantial Evidence and in Accordance with Law?

Yes, as explained in the Commission's Brief. In fact, Plaintiffs do not contest the vast majority of the Commission's impact analysis. Their sole impact argument is that the Commission found that supply constraints, not underselling, explain certain declines in the domestic industry's performance. The Plaintiffs' preference that the Commission more heavily weigh certain evidence — such as general purchaser impressions of availability not specific to any time period — over specific purchaser reports of domestic supply constraints during the period of investigation ("POI") is not controlling. Moreover, the Commission reasonably considered — and the record cuts against — Plaintiffs' arguments regarding the timing of limited underselling, average lead times, and market share trends. The Court should decline to reweigh this evidence.

### 3. Was the Commission's Determination that the Domestic Industry Was Not Threatened with Material Injury by Reason of Subject Imports Supported by Substantial Evidence and in Accordance with Law?

Yes, as explained in the Commission's brief, Plaintiffs' arguments concerning threat are largely a re-litigation of the Commission's findings on underselling and supply constraints,

discussed above.  While Plaintiffs point to an increase in subject import market share across the interim periods as indicating threat, the Commission addressed this argument, providing multiple reasons to the contrary.  Threat of material injury cannot simply be presumed by virtue of subject imports' presence in the U.S. market, especially in the absence of any significant price effects or evidence of future adverse impact on the domestic industry.  Thus, Plaintiffs' threat arguments also fail.

## III.     STATEMENT OF FACTS

In the interest of judicial efficiency, Defendant-Intervenors incorporate by reference the Statement of Facts contained in the Commission's Response Brief at 4-9 ("ITC Br.") (ECF No. 88).

## IV.     STANDARD OF REVIEW

The standard of review requires that the Court uphold an agency determination as lawful unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commission "is presumed to have considered all of the evidence on the record," and is "not required to explicitly address every piece of evidence presented by the parties" during an investigation.  *Nucor Corp. v. United States*, 318 F. Supp. 2d 1207, 1247 (Ct. Int'l Trade 2004).

In addition, a plaintiff may not ask the Court to reweigh the evidence and decide the case for the Commission.  *See Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) ("*Matsushita*").  A plaintiff must do more than simply point to contradictory

evidence in the record to overturn an agency's decision as "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Matsushita,* 750 F.2d at 933 (citations omitted). To the extent that a plaintiff claims the evidence before the Commission "could be open to multiple interpretations, its argument does not require, or even allow, reversal." *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001) (*citing Matsushita*, 750 F.2d at 933). The role of the Court is not to question the agency's decisions about the weight or quality of the evidence. *See United States Steel Group v. United States*, 96 F.3d 1352, 1356-57 (Fed. Cir. 1996) (it is the agency's task to evaluate and assign weight to the evidence); *see also Matsushita*, 750 F.2d at 933 (it is not the weight of the evidence, but whether it reasonably supports a rational decision, that is evaluated by a reviewing court). Thus, the Court may not substitute its judgment or its interpretation of the evidence for that of the agency. *See Matsushita*, 750 F.2d at 936.

In contrast to questions of fact, questions of statutory interpretation are "the province and duty of the judicial department." *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) ("*Loper Bright*") (internal citation omitted). At the same time, agency expertise concerning a particular and often technical subject matter "has always been one of the factors which may give an Executive Branch interpretation particular 'power to persuade, if lacking power to control.'" *Loper Bright* 603 U.S. at 402 (quoting *Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944)).

Lastly, the Statement of Administrative Action to the Uruguay Round Agreements Act ("SAA") represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements." H.R. Rep. No.

103-316, Vol. I at 656 (1994); *see also* 19 U.S.C. § 3512(d) ("The statement of administrative action approved by the Congress ... shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

## V.    ARGUMENT

### A. The Commission's Finding that Subject Imports Did Not Have Significant Price Effects Was Supported by Substantial Evidence and Was Otherwise in Accordance with Law

In its assessment of whether subject imports had significant price effects, the statute directs the Commission to consider whether:

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and
>
> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).  In the underlying investigations, the Commission complied with its statutory directive to consider whether subject imports undersold or otherwise depressed or suppressed prices of the domestic like product.  Plaintiffs now challenge the Commission's finding that subject imports did not significantly undersell the domestic like product.  *See* Plaintiffs' Motion for Judgement on the Agency Record at 18-27 ("Pls.' Br.") (ECF No. 83).[2]

With respect to underselling, background on the development of the underselling record is illuminating.  Petitioners proposed four pricing products used by the Commission in the preliminary investigations.  *See* Petitions, Vol. I. at 43-44, P.R.1.  The Commission observed that

---

[2] Plaintiffs do not argue on appeal that the record warranted a finding of significant price depression or suppression.

quarterly pricing data for four pricing products — which accounted for "6.2 percent of U.S. producers' U.S. commercial shipments … and 4.9 percent of importers' U.S. commercial shipments" — oversold the domestic like product in just over half of the available comparisons. *See Aluminum Extrusions from China, Colombia, Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1657 (Preliminary), USITC Pub. 5477 (Nov. 2023) at 63, P.R.170.

Following its preliminary determinations, the Commission invited parties to comment on draft final-phase questionnaires. Petitioners took the opportunity to submit comments on the draft questionnaires, stating:

> In the preliminary phase, the pricing product data collected represented approximately 6 percent of domestic producers' commercial shipments and 5 percent of importers' commercial shipments. Given the nature of aluminum extrusions and the large variety and volume of products covered by these investigations, this coverage was representative of the market and adequate to convey that 'subject imports predominantly undersold the domestic product by volume in each year of the {period of investigation ("POI")}.'
>
> …Thus, Petitioners agree with the four pricing products included in the draft questionnaires, including new pricing product 3, and requests that the Commission maintain these pricing products in the final questionnaires.

Plaintiffs' Comments on Draft Questionnaires at 5, P.R.184. Thus, Petitioners endorsed the pricing products as being "representative … and adequate to convey {the relative pricing of subject imports and the domestic product}." *Id.*

In the final investigations, the aggregate pricing product coverage of U.S. producers' and importers' U.S. shipments [            ]. *See Confidential Views of the Commission (Final)*

("*Views*") at 79.[3]  Subject imports **oversold** the domestic like product in 60.9 percent of available quarterly comparisons, or 63.3 percent of the total reported subject import sales volume.  *See Publication* at 61.  The Commission found that these data evidenced a lack of significant underselling, which was corroborated by the [        ] volume of purchaser-confirmed lost sales.  *See Views* at 81-82, 86.  Because the record indisputably did not reflect any price suppression or depression by reason of subject imports, the Commission found that subject imports did not have significant price effects.  *See Publication* at 69.

Having initially proposed and later endorsed the Commission's pricing products for the final investigations, Plaintiffs now attack the results generated from the pricing data, *see* Pls.' Br. at 23-26, and invite the Court to reweigh ten data points duly considered by the Commission. *See id.* at 18-22.  The Court should refuse that invitation.

> 1.  *The Commission Reasonably Relied on Quarterly Price Comparisons and Lost Sales Data to Assess the Significance of Any Underselling, Consistent with Its Established Practice*

For a discussion of the Commission's underselling analysis and the pertinent conditions of competition in the U.S. aluminum extrusions market, *see* ITC Br. at 5-7, 11-14.  As the Commission has aptly demonstrated in its *Views* and its brief*,* its finding that subject imports did not significantly undersell the domestic like product was reasonable, supported by substantial evidence, and should be upheld.  *See Views* at 78-86.  Moreover, as discussed further below, the Commission reasonably addressed every contention raised by Plaintiffs concerning its underselling analysis.  *See Views* at 82-85.

---

[3] Citations to the *Views* refer to C.R.915 throughout.

At the outset, it is important to note that Plaintiffs do not claim that the Commission somehow departed from its well-established agency practice of relying on quarterly price comparisons to assess the significance of underselling.  *See Publication* at 61; *see also DAK Ams. LLC v. United States*, 517 F. Supp. 3d 1349, 1357 (Ct. Int'l Trade 2021) ("*DAK II*") (recognizing that the Commission's focus on quarterly price comparison data was "{c}onsistent with {its} well-established practice"); *Mexichem Fluor Inc. v. United States*, 179 F. Supp. 3d 1238, 1250-51 (Ct. Int'l Trade 2016) ("The Commission has historically measured … subject import underselling by comparing the number of quarterly price comparisons in which subject import underselling occurred to the number of quarterly comparisons in which subject import overselling occurred.  The court has sustained this approach in the past."); *Celanese Chemicals, Ltd. v. United States*, 31 CIT 279, 296 (2007) ("{T}he substantial deference accorded the Commission in its selection of methodologies to analyze price effects is even greater when, in regards to weighted-average {quarterly} price {comparison} analysis, the methodology selected by the Commission represents its normal practice.").

Rather, in an effort to cast the Commission's underselling analysis as unreasonable, Plaintiffs claim that the Commission's reliance on quarterly price comparison data conflicts with "every other piece of record evidence" showing underselling.  *See* Pls.' Br. at 20 (contending that the Commission "elevat{ed} … pricing product data above all else"), 22 (claiming that the Commission selected "one piece of evidence from among all record data"), 23 (describing the Commission's quarterly price comparison data as "the Commission's lone, outlier data point"), 26 (arguing that "every other piece of record data demonstrated underselling to a significant and injurious degree").  These claims ignore that the Commission explicitly relied on quarterly price comparison data (which is not a unitary data point but a substantial amount of quarterly quantity

and value data), purchaser responses concerning lost sales, and purchaser responses regarding the relative importance of non-price factors (such as quality, availability, and reliability of supply) in finding no significant underselling.  *See Publication* at 60-63, 65.

Thus, on its face, the Commission's price effects analysis undercuts any claim that it relied exclusively on a single piece of evidence in finding no significant underselling.  In addition, the Commission had no reason to depart from its established practice placing substantial weight on its quarterly price comparison data and reasonably explained why Plaintiffs' factual assertions did not undermine its findings.

2.    *The Commission Had No Reason to Afford Reduced Weight to the Quarterly Price Comparison Data*

Under the guise of concerns over the "accuracy" of quarterly price comparison data, Plaintiffs provide four misguided reasons why they believe the Commission should have departed from its established practice of relying on quarterly price comparison data and confirmed reports of lost sales for assessing relative prices in the U.S. market: (1) the coverage of these data was low; (2) they did not include pricing data from the preliminary investigations; (3) they included a revision that was submitted [        ] before the record closed; and (4) they were impacted by flawed pricing product reporting.  *See* Pls.' Br at 23-26.

Before addressing the substance of these arguments, it is worth highlighting that Plaintiffs' arguments represent an implicit acknowledgement that, while the Commission has the discretion to depart from its established practice of relying on quarterly price comparison data for assessing relative prices in the U.S. market, it must articulate a sufficient reason for doing so. *See BlueScope Steel, Ltd. v. United States*, 719 F. Supp. 3d 1357, 1367 (Ct. Int'l Trade 2024).  In some cases, this departure might be due to a condition of competition that renders the quarterly

price comparison methodology less useful for assessing relative pricing,[4] while in others it may be due to *well-founded* concerns regarding the reliability of the pricing data itself.[5]  Having failed to convince the Commission of the latter — *i.e.*, that there were errors in the reported pricing data — Plaintiffs now invite the Court to substitute its judgment for that of the Commission concerning the credibility of questionnaire responses and the probative value of the quarterly price data.  The Court should decline such an invitation for several reasons, as discussed below.

*First*, as noted above, the Plaintiffs endorsed the re-use of pricing products from the preliminary investigations, and the data coverage in the final investigations turned out to be [          ].[6]  *See* Pls.' Br. at 23-24.  The Court should reject Plaintiffs' attempt to recant their endorsement of the pricing products and the attendant adequacy of their coverage.

*Second*, Plaintiffs argue that the final-phase quarterly price comparison data were "highly flawed" because responses from importers submitted in the preliminary phase were not included in the final phase.  *See* Pls.' Br. at 24.  The Commission explained why it declined to include preliminary-phase responses — involving a different time period — in its quarterly price comparison data set.  *See Publication* at 63 n.333; *see also* ITC Br. at 14, 29-30.  Notably, the instructions for reporting import pricing values for ex-works sales had changed from the

---

[4] For example, in *Methionine from France*, <u>a minority</u> of Commissioners found that subject imports undersold the domestic like product despite the pricing data showing predominant overselling.  *See* Inv. No. 731-TA-1534 (Final), USITC Pub. 5206 (June 2021) at 34 n.147. Yet the two Commissioners who found underselling in *Methionine from France* reference a condition-of-competition-based reason for weighing other record evidence more heavily than quarterly price comparison data.  *See id*. at 36 (discussing "meet or release" clauses allowing domestic producers an opportunity to lower their price to win sales).  Plaintiffs do not claim that such a condition of competition exists on the current record.

[5] *See generally* ITC Br. at 19 n.6 (discussing *Metal Lockers from China*).

[6] For full refutation of this argument, *see* ITC Br. at 14-17; *see also Publication* at 61 n.319.

preliminary to final-phase questionnaires, ensuring that any reported data pulled forward from the preliminary investigations would ***inherently be distorted*** by the exclusion of transportation costs in ex-works sales. *See Publication* at 63 n.333. Moreover, these preliminary-phase data were collected within just 12 days (October 6-18, 2023), with less than a month's time to incorporate such information into a preliminary-phase staff report. *See* INV-VV-097: Staff Report (November 13, 2023), C.R.336. In demanding that these data be pulled forward into the final investigations, the Plaintiffs seem unconcerned about whether such data were subjected to robust vetting.

*Third*, and in a somewhat contradictory light, Plaintiffs fault the Commission for correcting its pricing dataset to account for clear and specific information provided by an importer prior to the close of the administrative record. *See* Pls.' Br. at 24-25. Specifically, the importer had explained that "it mistakenly believed it was required to report all of its sales under the pricing products that most closely matched its products" regardless of whether they fit the pricing product definitions. *See Publication* at 64 n.334. The importer then proceeded to detail exactly [



]. *Views* at 83 n.334. Plaintiffs do not provide any elaboration as to why such a clear-cut revision is "dubious," especially given that it is far from irregular for the Commission to receive revised questionnaire responses throughout the course of the investigatory process. *See, e.g.*, C.R.315-333, 337-339, 341, 346-350, 352-354. Again, Plaintiffs are advocating that the Commission incorporate incorrect information into the final pricing dataset — a results-oriented request that would objectively render the Commission's underselling analysis ***less accurate*** and unsupported by substantial evidence.

*Fourth*, Plaintiffs claim they had "demonstrated below" that certain firms inaccurately reported pricing data for downstream articles and products sold at a different level of trade, and that "many inaccuracies remained {unresolved}." *See* Pls.' Br. at 24 (*citing* Pls.' Final Comments at 6–7 (alleging outstanding "flaws" in the pricing data), C.R.909). This statement is incorrect; Plaintiffs' "demonstrations" were, in reality, mere factual assertions. Nevertheless, the Commission engaged in extraordinary efforts to investigate potential inaccuracies and largely confirmed them to be either unfounded or, where warranted, obtained corrections. For example, Plaintiffs pointed to pricing data reported by a [

]. Pls.' Final Comments at 6, C.R.909; *see also* Economist Prehearing Correspondence with [                                    ], C.R.808 ([

]). It is not surprising that, given the impressive scope of the verification measures undertaken by the Commission, Plaintiffs neglected to note that the Commission's industrious Staff actually contacted this [

].[7] *See* Economist Prehearing Correspondences with [                                    ], C.R.890. As another "demonstration" of uncorrected data errors, Plaintiffs noted that "[

] suffered from numerous flaws" in that [

]. *See* Pls.' Final Comments at 6-7, C.R.909. However, the Commission's Staff diligently contacted [      ] and clarified that "its pricing data were correctly reported" and that the "[

---

[7] For details on additional verification measures, *see* ITC Br. at 18-19; *see also Staff Report* at V-7 n.6, C.R.885.

].” *Views* at 83

n.332.  Plaintiffs stubbornly continued in their refusal to accept the verified record evidence,

highlighting an example of [

], but their allegation came with an important qualifier — [                    ] —

*i.e.*, much like the [     ] allegations, with no direct evidence of any actual misreporting.  *See*

Pls.' Final Comments at 6-7, C.R.909.

At bottom, whether to accept questionnaire responses (or amendments thereto) is a

question of credibility squarely within the Commission's discretion.  "As the principal fact-

finder, the ITC is afforded considerable discretion in evaluating information obtained from

questionnaires."  *NSK Corp. v. United States*, 577 F. Supp. 2d 1322, 1336-37 (Ct. Int'l Trade

2008); *see also Int'l Indus., Ltd. v. United States*, 311 F. Supp. 3d 1325, 1333 (Ct. Int'l Trade

2018) (declining "to second guess the ITC's evaluation of the credibility of the questionnaire

responses.").  Given the Commission's extensive verification of the data utilized in its quarterly

price comparisons, Plaintiffs' allegations do not provide a basis for disturbing the Commission's

reliance on these robust data.

In sum, Plaintiffs provide no basis for the Court to disturb the Commission's established

and well-reasoned underselling analysis.  The fact that one Commissioner assigned lesser weight

to the quarterly price comparison data (*see* Pls.' Br. at 20), as was within her discretion, does not

undermine the Commission's reasoned decision to find this evidence to be credible and

supportive of its finding of no significant underselling.  *See Matsushita,* 750 F.2d at 933

(citations omitted).

3.    *The Commission Reasonably Addressed Each Data Point Raised by Plaintiffs and Explained Why They Did Not Outweigh Evidence Showing Predominant Overselling*

In a final attempt to escape the "apples-to-apples" quarterly price comparisons they once countenanced, Plaintiffs list ten factors they claim cut against a finding of no significant underselling.  Pls.' Br. at 18-23.  A closer look at these factors, however, serves to highlight the relative weakness of any evidence supporting Plaintiffs' preferred interpretation of the underselling record.[8]

Indeed, as was the case with their alleged "flaws" in the pricing data, many of these pieces of evidence are actually allegations, which, in the end, were not corroborated by purchaser reporting.  Specifically, points (6) and (9) of Plaintiffs' list of supposedly helpful data points consist of lost sale and lost revenue allegations submitted by U.S. producers.  *See* Pls.' Br. at 19 (detailing that 28 producers reported price reductions and that producers alleged [

] in lost sales).  When the Commission queried U.S. purchasers to corroborate these accounts, only two of 35 reported that any domestic producer had reduced prices due to pricing pressure of subject imports and that only **[          ]** *percent* of the reported subject import purchases over the POI were lost sales due to price.  *See Views* at 81-82; *see also October 30, 2024 Revisions to Confidential Staff Report* at V-47-48, C.R.913.  Thus, as observed by the Commission, purchaser reporting on "the [          ] volume of confirmed lost sales" cut against a finding of significant underselling and corroborated the quarterly price comparison data.  *See Views* at 86 (emphasis added).

---

[8] Point (10) relates to preliminary-phase data concerning underselling, which is discussed above. For a thorough discussion of points (1)-(4) of Plaintiffs' list, *see* ITC Br. at 21-25.

Plaintiffs also highlight in point (7) of their list that Petitioners' witnesses at the Commission's hearing testified that subject imports were low-priced. *See* Pls.' Br. at 19. We are not aware of any Commission investigation wherein Petitioners testify to the absence of subject import pricing pressure. Moreover, this testimony was not uncontested, as Respondents highlighted statements from the parent company of Bonnell Aluminum, Petitioners' front-row witness, which admitted that the "'unprecedented spike{} in backlog' was 'caused by global supply chain and labor shortages that started in 2021,' and its 'customers started expanding their imports,' resulting in import share growth in 2022." Mexican Coal.'s PostHr'g Br. at I-1-3, C.R.812; *see also* Jt. Respts.' Witness Testimony and Hr'g Exhs. at Exh. Q, P.R.273. Moreover, as the Commission notes, it was not required to explicitly discuss witness testimony, whether supporting or detracting from its finding of no significant underselling. *See* ITC Br. at 28-29 (*citing Aluminum Extrusions Fair Trade Comm. v. United States*, 36 CIT 1370, 1373 (2012)).

Plaintiffs also highlight, in point (8) of their list, that the U.S. Department of Commerce ("Commerce") made final affirmative dumping determinations. *See* Pls.' Br. at 19. While a discussion of this point can be found in the Commission's Brief (*see* ITC Br. at 29), to be clear, every Commission final determination necessarily follows a final affirmative determination of either dumping and/or subsidization by Commerce.[9] *See*, *e.g.*, 19 U.S.C. § 1671d(c)(1)-(2). Indeed, a brief review of recent Commission investigations makes it clear that a dumping finding by Commerce, even those with relatively high rates, in no way necessitates that the Commission find significant underselling. *See e.g., Dried Tart Cherries from Turkey*, Inv. Nos. 701-TA-622

---

[9] The question of whether subject imports are unfairly traded is distinct from whether subject imports undersold the domestic like product to a significant degree. *Compare* 19 U.S.C. § 1677(7)(C)(ii)(I) *with* 19 U.S.C. § 1677(35)(A).

and 731-TA-1448 (Final), USITC Pub. 5014 (Jan. 2020) at 27 n.156 (considering dumping margins of 541.29 to 648.35 percent but finding no significant underselling); *Tin Mill Products from Canada, China, Germany, and South Korea*, Inv. Nos. 701-TA-685 and 731-TA-1599-1601 and 1603 (Final), USITC Pub. 5492 (Feb. 2024) at 47 n.241 (considering dumping margins of up to 122.52 percent but finding no significant underselling); *Steel Nails from India, Thailand, and Turkey*, Inv. Nos. 731-TA-1580, 1582, and 1583 (Final), USITC Pub. 5404 (Feb. 2023) at 6 n.13 (considering dumping margins of up to 118.20 percent but finding no significant underselling); *Urea Ammonium Nitrate Solutions from Russia and Trinidad and Tobago*, Inv. Nos. 701-TA-668-669 and 731-TA-1565-1566 (Final), USITC Pub. 5338 (Aug. 2022) at 33-34 n.167 (considering dumping margins of up to 111.71 percent but finding no significant underselling). As the Commission considered the dumping margins in its analysis, this does not provide a basis for disturbing the Commission's underselling analysis.

Lastly, point (5) of Plaintiffs' list relates to its purportedly "uniquely significant" amount of contemporaneous documentation reflecting underselling by subject imports.[10] *See* Pls.' Br. at 18-19, 21-22. But as reflected in the Commission's *Views*, the Commission generally finds informative (but not dispositive) communications that: (1) are prepared contemporaneously in the ordinary course of business, (2) identify pricing pressure, (3) identify subject imports as the source of that pricing pressure, and (4) relate to the POI. *See Views* at 85 n.339. The reason for these requirements is self-evident, as it allows the Commission to link pricing pressure experienced by the domestic industry to the pricing behavior of subject imports for a period during when they may have data concerning the domestic industry's performance.

---

[10] For discussion of the Commission's treatment of this evidence, *see* ITC Br. at 26-28.

In their Prehearing Brief, Plaintiffs submitted documentation that largely failed in one or more of these respects. *See Views* at 85 n.339 (noting these infirmities); *see also* ITC Br. at 26-28; Mexican Coal.'s PostHr'g Br. at II-18-21, C.R.812.  In fact, only one of seven exhibits submitted for that purpose, [          ], can be construed to [

          ], even under the most favorable interpretation of these communications.

At the Commission's hearing, Commissioner Kearns stressed the importance of strong contemporaneous documentation for supporting a significant price effects finding, in the event that Plaintiffs were able to convince the Commission that the quarterly pricing data were somehow flawed:

> If we come around to thinking that the pricing data is unreliable, I think that {documentation of purchasers sharing competing subject import prices with you} would be really critical … if you all can provide as much of that as you have, that would be helpful.

Hr'g Tr. at 102-103 (Kearns), P.R.289.  Tel<span>lingly, in their Posthearing Brief, Plaintiffs provided eleven examples of communications purportedly documenting pricing pressure from subject imports, ***four of which were reproductions of exhibits submitted in their prehearing brief***.  *See* Pls.' Posthr'g Br. at Exhs. 3-13, C.R.814.  Of the remaining seven of these exhibits, again, [

   ].  *See* Mexican Coal.'s Final Comments at Att. 2, C.R.914.  Indeed, recognizing the weakness of these exhibits, Plaintiffs include no other discussion of their "uniquely significant" amount (*i.e.*, [     ]) of contemporaneous documentation of subject import pricing pressure.  *See* Pls.' Br. at 21-22 (*citing* Pls.' PreHr'g Br. at Exh. 25 (C.R.789) & Pls.' PostHr'g Br. at Exh. 3 (C.R.814)).

One would think that, given the broad scope of the underlying investigations, the three-and-one-quarter-year POI, and the allegedly pervasive underselling by imports from fourteen subject countries, Plaintiffs would have been able to muster additional ***probative*** examples of subject import pricing pressure — especially after the Commission stressed the importance of better documentation for Plaintiffs' case. Instead, their documentation is consistent with what is shown in both the quarterly price comparison data and the low volume of confirmed lost sales: predominant — but not 100% — overselling by subject imports.

In sum, of Plaintiffs' "ten data points," four (1, 6, 7, & 9) relate to lost sales and revenues reporting, which the Commission explained weighed ***against*** a finding of significant underselling; two (7 & 8) are unremarkably present in virtually every Commission investigation; and one (10) is a request to recycle data from the 45-day preliminary phase. All of this evidence was considered by the Commission. *See Views* at 81-83. Of the remaining four points, the Commission reasonably explained why it found the "apples-to-apples" comparisons from the pricing data, corroborated by purchaser reporting on lost sales, to be more probative than AUV data, general narrative purchaser impressions, a self-interested purchase-cost analysis, and a handful of largely flawed communications. *See Views* at 84-86.

Realizing that their supposed mountain of evidence is more of a molehill, Plaintiffs attempt to re-write the Commission's determinations, characterizing the price comparison data as showing "mixed" or "pervasive" underselling and, shockingly, invoking *DAK Ams. LLC v. United States*, 456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ("*DAK I*"). Pls.' Br. at 19-20. We urge the Court to review the *DAK* line of cases (both *DAK I* and *DAK II* as well as the underlying investigations), as they demonstrate that the Commission has been ***extremely consistent*** in its weighing of underselling evidence. The facts and circumstances of the underlying investigations

of *Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*, Inv.

Nos. 731-TA-1387-1391 (Final), USITC Pub. 4835 (Nov. 2018), are illuminating[11]:

- Overselling in 68 percent of quarterly price comparisons. The rate of overselling increased over the POI. *Id*. at 23.

- Nineteen of 25 purchasers purchased subject imports but ***only four*** reported it was due to imports being lower priced. The low volume of lost sales weighed against an underselling finding. *Id*. at 25.

- More purchasers reported a perception that subject imports were lower priced than the domestic like product than reported the opposite. *Id*. at 26 n.150.

- Contemporaneous documentation submitted by petitioners suffered flaws in identifying subject imports as a source of competition. *Id*. at 26 n.149.

- A purchase-cost analysis was conducted, indicating the cost of importation was relatively low. The Commission found it was of limited coverage and probative value compared to quarterly price comparison data. *Id* at 24-25.

- The Commission declined to elevate AUV data over quarterly price comparison data. *Id*. at 24 n.139.

On remand, the Commission's result did not change, but it elaborated why it weighed the

price comparison data, the low volume of lost sales, and the relative importance of non-price

factors more heavily than other record evidence — just as the Commission has ***already done*** in

these underlying investigations. *See Views* at 81-86; *see also* ITC Br. at 32. As the Commission

acted consistently with its longstanding practice, explained why it had placed greater weight on

certain pieces of evidence, and reasonably addressed Plaintiffs' arguments, the Court should

decline to reweigh this evidence in favor of Plaintiffs' preferred outcome.

---

[11] This comparison is provided for illustrative purposes and is not controlling as "prior determinations by the Commission with regard to one industry typically provide little guidance for later determinations with regard to different industries." *Cleo Inc. v. United States*, 501 F.3d 1291, 1299 (Fed. Cir. 2007).

**B. The Commission's Finding that Subject Imports Did Not Have a Significant Adverse Impact on the Domestic Industry Was Supported by Substantial Evidence and Otherwise in Accordance with Law**

      1.    *The Commission Reasonably Found that There Was No Causal Nexus Between Changes in the Domestic Industry's Performance and Subject Imports*

In its impact analysis, the Commission observed that, while certain measures of the domestic industry's trade performance declined during the POI, these declines were due to the domestic industry's own production constraints from 2021 to 2022 and due to a decline in apparent U.S. consumption from 2022 to 2023. *See Publication* at 70-71. The Commission noted that certain measures of the domestic industry's financial performance improved as demand increased early in the POI — ***as subject import volume and market share increased*** — and declined later in the POI as apparent U.S. consumption decreased. *See id.*; *see also Staff Report* at Table C-1, C.R.885. The Commission further noted that the domestic industry was able to increase its prices, increase its capacity, and increase its profitability over the POI, despite the presence of subject imports and generally declining demand. *See Publication* at 71-74. Thus, the Commission did not find a causal nexus between subject imports and declines in the domestic industry's performance during the POI. *See id.* at 74-78.[12]

      2.    *The Commission Reasonably Found that Supply Constraints Explained Declines in the Domestic Industry's Market Share*

Plaintiffs' challenges to the Commission's impact analysis are largely derivative of their challenge to the Commission's underselling analysis in that they claim that underselling — not their own supply constraints — was responsible for any declines in the domestic industry's performance. *See* Pls.' Br. at 27-34. In support of this contention, Plaintiffs advance a host of

---

[12] For a comprehensive discussion of the Commission's impact analysis, *see* ITC. Br. at 33-35.

arguments including: (1) as domestic supply constraints lessened, the domestic industry was unable to recapture market share from subject imports; (2) supply constraints were generally reported for both domestic producers and importers of subject merchandise; (3) subject imports had [        ] average lead times than the domestic like product; and (4) the rates of underselling (while still in the minority) were highest in 2022 while supply constraints would tend to lead to price premiums.  *See* Pls.' Br. at 29-30.  Much like their arguments concerning the relative price of subject imports and domestically produced extrusions, these arguments largely ignore the analysis the Commission actually conducted.  Instead, Plaintiffs choose to focus on general reporting rather than specific reports of domestic supply constraints from the purchasers ***that were actually the focal point of the domestic industry's market share loss***.  In other words, Plaintiffs impermissibly encourage the Court to reweigh the evidence underpinning the Commission's no adverse impact finding.

*First*, it is worth clarifying that, while the domestic industry's market share declined from 2021 to 2023, subject imports' market share increased from 2021 to 2022 and declined from 2022 to 2023.  *See Staff Report* at Table C-1, C.R.885.  The domestic industry's share of apparent U.S. consumption [                    ] from 2022 to 2023 [        ] an increase in nonsubject imports' market share.  *Id.*  Moreover, as explained by the Commission, overselling by subject imports [                ] in interim 2024 and therefore could not explain the domestic industry's loss of market share during this period.[13]

*Second*, Plaintiffs direct the Court's focus to general reports that subject imports and the domestic like product were "comparable" in terms of availability and reliability of supply —

---

[13] For additional analysis of why the domestic industry's market share did not fully recover after its supply constraints lessened, *see Publication* at 77-78; *see also* ITC Br. at 38-39.

reports not relating to any specific time period and which were provided nearly two years after the resolution of the worst of the domestic industry's supply constraints. *See Staff Report* at II-37-49, Table II-15, C.R.885. We instead highlight the Commission's focus on the more specific reporting by large purchasers that accounted for [          ] of domestic purchases during the POI. *See Views* at 100-101 & n.413; *see also* ITC Br. at 36-37. [      ] of these purchasers [                                        ] supply constraints. *See Views* at 100 nn.403-411. Additionally, of the nine purchasers who increased their purchases of subject imports from 2021 to 2022 in lieu of domestic product, [

                         ]. *See Views* at 101 n.413; *see also* Mexican Coal.'s PostHr'g Br. at II-30-35, C.R.812 (excerpting the relevant quotes directly from the purchaser questionnaires). While the Commission has, in other investigations, not been persuaded that supply constraints explain a domestic industry's loss of market share (*see* Pls.' Br. at 30-31), particularly if the quarterly price comparison data reflect significant underselling,[14] here the Commission reasonably found specific purchaser reports [                    ] probative of the relative availability of domestic and imported extrusions on a year-by-year basis.

    *Third*, while Plaintiffs highlight that subject imports had [      ] average lead times than the domestic industry, it should be noted that (1) the relevant question asks U.S. producers and importers to report "typical lead times" (*i.e.*, these responses do not reflect lead times impacted by supply constraints), and (2) the average lead time for subject imports is just that —

---

[14] *See Truck and Bus Tires from Thailand*, Inv. No. 731-TA-1658 (Final), USITC Pub. 5562 (Dec. 2024) at 27 (universal underselling in 82 of 82 comparisons); *see also Brass Rod from India*, Inv. No. 701-TA-686 (Final), USITC Pub. 5485 (Feb. 2024) at 37 (underselling in 86 of 87 comparisons); *Certain Mobile Access Equipment and Subassemblies Thereof from China*, Inv. No. 701-TA-665 (Final), USITC Pub. 5242 (Dec. 2021) at 51 (underselling in 47 of 59 comparisons).

an average — and therefore conceals that the lead time of imports from the largest subject import source, Mexico, were [                              ] than those from a more distant source such as China.  *See, e.g.*, *Blank Importer Questionnaire* at Question III-8, P.R.173.  This does not undermine the specific reporting the Commission relied upon in finding that supply constraints explained the domestic industry's loss of market share from 2021 to 2022.

*Fourth*, while Plaintiffs argue that the period of peak underselling in 2022 stands opposite to the existence to supply shortages, this ignores the fact that ***both domestic and subject import prices largely*** [                              ] ***during this period*** — supporting the view that supply constraints, not underselling, drove the increase in subject import market share.[15]  The increase in the rate of underselling (which still only sat at 41.7 percent during this period) is explained by the domestic industry [                                              ], than those of subject imports during certain quarters in 2022.  *See Staff Report* at Figures V-3, V-5, V-7, & V-9, C.R.885.  In other words, consistent with Plaintiffs' assertion, supply constraints [                              ] during this period.  Thus, in accordance with Plaintiffs' own logic, this weighs in favor, not against, supply constraints as explaining the domestic industry's loss of market share.

In essence, Plaintiffs' attempt to reweigh evidence already considered by the Commission errantly reads out the causation requirement from the statute.  *See* 19 U.S.C. 1677(7)(B)(i)(III) (requiring that the Commission consider "the impact of imports of such merchandise on domestic producers").  It is not enough that subject imports simply be present in the U.S. market — their behavior in the U.S. market must be linked to an adverse impact in the domestic

---

[15] The Commission also identifies that, while it considered underselling trends, the fact that the domestic industry was able to increase prices and improve its financial performance is consistent with market share shifts driven by supply constraints, not underselling.  *See Publication* at 76-77; *see also* ITC Br. at 37-38.

industry's performance. In these investigations, the trends in the domestic industry's

performance prevented the Commission from finding such a causal nexus, as they simply did not

align with subject import pricing or volume trends. As such, the Court should decline to reweigh

evidence already reasonably considered by the Commission and uphold its material injury

determinations.

### C. The Commission's Finding that Subject Imports Did Not Threaten the Domestic Industry with Material Injury Was Supported by Substantial Evidence and Otherwise in Accordance with Law

#### 1. *The Commission Reasonably Found that a Domestic Industry Was Not Threatened with Material Injury*

As discussed further below, Plaintiffs proffered several arguments against the

Commission's well-reasoned analysis of the statutory factors in determining that the domestic

industry was not threatened with material injury by reason of subject imports. *See* 19 U.S.C.

§ 1677(7)(F). As background, we first provide a summary of the Commission's findings.

***Likely Volume.*** In its determination, the Commission concluded that the volume of

subject imports was not likely to be significant in the imminent future, considering each of the

factors enumerated under 19 U.S.C. § 1677(7)(F)(i). The Commission determined that "subject

imports increased absolutely and gained market share from 2021 to 2022 when the domestic

industry faced supply constraints," but "{w}hen apparent U.S. consumption weakened in 2023,

subject imports declined to a greater extent that apparent U.S. consumption and their market

share declined." *Publication* at 83-84. The Commission concluded that "{b}ecause cumulated

subject imports entered in response to domestic producers' supply problems, their increase from

2021 to 2022 does not indicate that there is a likelihood of a significant increase in … subject

imports in the imminent future absent relief." *Id*. at 84. The Commission acknowledged that

subject imports' market share was higher in interim 2024 but stated that "{t}he increase reflects

elevated subject imports during one month, March 2024, when subject imports were higher than in any month since August 2022, and would have been influenced by Commerce's impending preliminary determinations and possible imposition of provisional measures, as well as the seasonality of demand." *Id.* As a result, according to the Commission, it "d{id} not find that the increase in subject imports in interim 2024 relative to interim 2023 indicates that substantially increased subject imports are likely." *Id.*

The Commission found other evidence that inventory levels did not point to any significant increase in imports in the imminent future, citing projected "declining volumes of subject imports in the second quarter of 2024 through the first quarter of 2025." *Id.* U.S. importer inventory levels did not portend threat given that "aluminum extrusions are usually made-to-order as opposed to sold from inventory and inventories are generally produced an{d} held for specific customers." *Id.* at 84-85. Foreign producers' inventories accounted for only a small share of subject imports during the POI and foreign producers projected declining inventories in 2024 and 2025. *Id.* at 85.

The Commission found that projected increases in capacity and production did not suggest threat, given that similar increases during the POI did not result in a significant increase in subject imports during the POI. *Id.* at 85-86. Further, "{e}xcess capacity is projected to increase in 2024 before decreasing in 2025." *Id.* at 86. Moreover, the Commission observed that subject producers' ability to shift production from out-of-scope to in-scope merchandise was limited. *Id.*

According to the Commission, "{a}lthough the subject producers are export oriented, they made the vast majority of their shipments to home market customers and the share of their total shipments exported to the United States fluctuated within a narrow band during the POI and

is projected to decline." *Id.* Similarly, the Commission observed that while there were certain third-country trade barriers in place for subject imports, "{m}ost of these trade barriers were in place during the POI … and did not result in increased subject import volume from 2021 to 2023." *Id.* at 87-88.

   ***Likely Price Effects.*** The Commission pointed to pricing data showing "predominant overselling … that increased over the POI." *Id.* at 89. Further, "domestic sales prices generally increased over the POI" and "subject imports did not depress domestic prices to a significant degree." *Id.* The domestic industry "pass{ed} through its increased costs to purchasers notwithstanding weak market conditions." *Id.* The Commission stated that, despite an increase in subject imports' market share in interim 2025, "the industry's {cost of goods sold ("COGS")} to net sales ratio was almost unchanged." *Id.* From this the Commission reasoned as follows:

> Given our finding that cumulated subject import volumes are not likely to increase significantly in the imminent future, the absence of significant underselling or adverse price effects during the POI, the fact that subject imports increasingly oversold the domestic like product over the POI … and the absence of any evidence that subject import pricing patterns are likely to change significantly in the imminent future, we further find that the lack of significant underselling and price effects observed during the POI will likely continue in the imminent future.

*Id.* The Commission thus concluded that "cumulated subject imports are unlikely to enter at prices that would be likely to have a significant depressing or suppressing effect on domestic prices or are likely to increase demand for such imports." *Id.* at 90.

   ***Likely Impact.*** The Commission recounted its impact findings from its present material injury analysis that the domestic industry's declines in production and shipments, and resulting financial performance issues, "stemmed from supply constraints, declines in apparent U.S. consumption, and increased nonsubject import market share, rather than subject import competition." *Id.* "Over the interim periods," according to the Commission, "despite an increase

in cumulated subject import volume and market share, the domestic industry COGS to net sales ratio increased only slightly, and the domestic industry's financial performance in interim 2024 was stronger than during any full year of the POI, though slightly weaker than in interim 2023." *Id*. From this the Commission drew the conclusion "that any declines in the domestic industry's performance during the POI resulted from factors other than cumulated subject imports." *Id*.

The Commission next addressed the Petitioners' claim that the domestic industry is in a "highly vulnerable" condition. *Id*. The Commission concluded that "{t}he record is mixed as to the vulnerability of the domestic industry," noting certain improvements in the domestic industry's performance and profitability, while acknowledging a decline in the domestic industry's capacity utilization. *Id*. On balance, it found that the domestic industry was not vulnerable. *Id*.

Based on the foregoing, the Commission determined that "{w}hen cumulated subject imports increased during the POI, they were not injurious. There is no evidence of any change in conditions of competition that would cause cumulated subject imports to become injurious in the imminent future." *Id*. at 91.

2.   *The Court Should Reject Plaintiffs' Challenges to the Commission's Well-Reasoned Threat Analysis*

In its opening brief, the Plaintiffs dwell primarily on arguments that subject imports increased over the POI and in interim 2024 compared to interim 2023. *See* Pls.' Br. at 35-36. But this is insufficient in and of itself to mandate affirmative threat determinations. In essence, Plaintiffs invite the Court to read out the causation element from the statute. Even if the record had supported that increasing subject imports were imminent — which it does not, as discussed in the Commission's opinion and its response brief to this Court, *see Views* at 111-118; *see also* ITC Br. at 40-42 — the mere presence of subject imports in the market is insufficient for an

affirmative threat determination.  To the contrary, a causal nexus between subject imports and declining domestic industry performance is needed.  *See Suramerica de Aleaciones Laminadas, C.A. v. United States*, 818 F. Supp. 348, 360 (Ct. Int'l Trade 1993) (finding projected increase in subject imports alone was insufficient to support affirmative threat determination in light of evidence of shortages in U.S. market, thus increase in subject imports would serve merely to fill excess demand, not cause injury to the U.S. industry).  Thus, given the substantial record evidence showing no significant price effects of subject imports (either during the POI or projected in the imminent future), Plaintiffs' challenges to the Commission's threat analysis fail. The Commission provided a reasonable basis for its findings that the Court should not disturb. *See United States Steel Group*, 96 F.3d at 1356-57 (it is the agency's task to evaluate and assign weight to the evidence); *see also Matsushita*, 750 F.2d at 933 (it is not the weight of the evidence, but whether it reasonably supports a rational decision, that is evaluated by a reviewing court).

Plaintiffs attack the Commission's finding that the increase in interim 2024 imports was due to an anomalous spike in March 2024, Pls.' Br. 36-37, but this challenge also fails.  Plaintiffs complain that "March 2021 and March 2023 occurred during the same season as March 2024" but "seasonality does not explain why subject imports were so much greater at the end of the period than in either of those prior years."  Pls.' Br. 36.  Plaintiffs misunderstand the Commission's findings.  The Commission found that ***two separate phenomena*** were occurring during the interim period, supporting the Commission's decision that "interim 2024 data should be given less weight than other data"; (1) a "bunching" of subject imports by importers attempting to enter imports before the anticipated imposition of provisional measures; *and* (2) seasonality of demand.  *Publication* at 84 & n.449.  Thus, comparing March 2024 import levels

to March 2021 and March 2023 does not render the Commission's conclusions unreasonable because the pending imposition of provisional measures was an event unique to March *2024*. The seasonality of demand addresses the separate issue of why subject imports increased in the first quarter of 2024 compared to the third or fourth quarter of 2023.

Notably, the increased market share of subject imports was based on reported import data — not reported U.S. shipments of imports — and, therefore, the apparent increase in subject import market share in interim 2024 reflected a "bunching" of imports to beat the imposition of preliminary duties, while the associated shipments were spread into the second quarter of 2024. *See* Mexican Coal.'s Final Comments at 10-11, C.R.914; *see also* Mexican Coal.'s PostHr'g Br. at Att. 1 (showing an [

], C.R.812; *Staff Report* at Table C-1 (showing an increase in subject import inventories between the interim periods), C.R.885. The Commission discussed as much in finding that the increase in subject imports during this period was impacted by pendency of the investigation and the potential imposition of preliminary duties. *See Publication* at 84.

In short, the Court should reject the Plaintiffs' assertion that increases in subject imports' market share (based on import volumes, not shipments) necessarily indicates that "a threat does in fact exist." Pls.' Br. at 36. The Commission explicitly explained that, in addition to seasonality, these volumes were "influenced by Commerce's impending preliminary determinations and possible imposition of provisional measures." *Publication* at 84.[16] Indeed,

---

[16] *See* SAA at 943 ("when the Commission finds evidence on the record of a significant change in data concerning the imports or their effects subsequent to the filing of the petition or the imposition of provisional duties, the Commission may presume that such change is related to the pendency of the investigation").

the statute goes so far as to grant the Commission the discretion to discount post-petition data in recognition of this very phenomenon. *See* 19 U.S.C. § 1677(7)(I).

Here again, Plaintiffs ask this Court to reweigh the evidence already considered by the Commission to find this increase in subject imports — completely divorced from any trend in the underselling data — portends increased future import volumes. Yet, the Commission provided a reasonable explanation that importers were simply trying to beat the imposition of preliminary duties. The Court should decline this invitation. *See Matsushita*, 750 F.2d at 933.

Even if the Court were to accept the Plaintiffs' argument at face value and impose their interpretation of interim-period subject import volume trends, this still does not require the Court to disturb the Commission's ultimate threat determinations. The Commission also found that "the lack of significant underselling and price effects observed during the POI will likely continue in the future" and therefore "cumulated subject imports are unlikely to enter at prices that would be likely to have a significant depressing or suppressing effect on domestic prices or are likely to increase demand for such imports." *Publication* at 89-90. The Commission further found that "{w}hen cumulated subject imports increased during the POI, they were not injurious" and that "{t}here is no evidence of any change in conditions of competition that would cause cumulated subject imports to become injurious in the imminent future." *Id*. at 91. The Commission then concluded that "cumulated subject imports are not likely to have a significant adverse impact on the domestic industry in the imminent future." *Id*. Accordingly, the Court should hold that, even if it were to agree with the Petitioners' slant on likely import volume, the Commission's overall negative threat determinations are nevertheless supported by substantial evidence. *See Suramerica*, 44 F.3d at 985 (quoting *Consolidated Edison*, 305 U.S. at 229

(defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion")).

## VI.     CONCLUSION

For the foregoing reasons, the Commission's determinations are supported by substantial evidence and otherwise in accordance with law.  Accordingly, Defendant-Intervenors ask the Court to affirm the Commission's determinations in their entirety.

Sincerely,

/s/ Jack A. Levy
ROCK CREEK TRADE LLP
*Counsel to the Coalition for Fair Mexican Exports of Aluminum Extrusions*

/S/ JESSICA R. DIPIETRO
ARENTFOX SCHIFF LLP
*Counsel to Istanbul Ferrous and Non-Ferrous Metals Exporters' Association ("IDDMIB"), Erdoğanlar Alüminyum San. ve Tic. A.Ş., ZF North America, Inc., and Bergstrom, Inc. and Bergstrom China Group Partners, LLC (collectively "Bergstrom")*

/S/ DANIEL L. PORTER
PILLSBURY WINTHROP SHAW PITTMAN LLP
*Counsel to C.I. ES Metals S.A.S., E.S. Windows LLC, and Tecnoglass, S.A.S.*

/s/ Douglas J. Heffner
FAEGRE DRINKER BIDDLE & REATH LLP
*Counsel to CEDAL Duran S.A., Danfoss LLC, Dorman Products, Inc., Enclos Corporation, Johnson Controls, Inc., Rockler Companies, Inc., Daikin Comfort Technologies North America, Air Distribution Technologies, Inc. (and its subsidiary Ruskin)*

/s/ Kelsey Christensen
CLARK HILL PLC
*Counsel to MAHLE Behr Dayton L.L.C., MAHLE Behr Manufacturing Management, Inc, MAHLE Behr Mexico S. de R.L. de C.V., MAHLE Behr Mt. Sterling, Inc., MAHLE Behr Rio Bravo, S. de. R.L. de C.V., MAHLE Behr Service America L.L.C., MAHLE Behr Service Mexico, S. de R.L. de C.V., and MAHLE Behr USA, Inc. (collectively "MAHLE")*

/s/ Matthew R. Nicely
AKIN GUMP STRAUSS HAUER & FELD LLP
*Counsel to Tesla, Inc.*

<u>**Certificate of Compliance with Chambers Procedures 2(B)(1)**</u>

The undersigned hereby certifies, pursuant to Chambers Procedures 2(B)(1) and (2) and the Courts' Scheduling Order (ECF No. 76), the foregoing brief contains 9,955 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, and therefore complies with the 10,000 maximum word count limitation set forth Court's Scheduling Order.

By:     <u>/s/ Jack A. Levy</u>
        Jack A. Levy

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **U.S. ALUMINUM EXTRUDERS COALITION,** )<br><br>**and** )<br><br>**UNITED STEEL, PAPER AND FORESTRY,** )<br>**RUBBER, MANUFACTURING, ENERGY,** )<br>**ALLIED INDUSTRIAL AND SERVICE** )<br>**WORKERS INTERNATIONAL UNION,** )<br><br>**Plaintiffs,** )<br>**v.** )<br>**UNITED STATES,** )<br><br>**Defendant,** )<br>**and** )<br><br>**COALITION FOR FAIR MEXICAN** )<br>**EXPORTS OF ALUMINUM** )<br>**EXTRUSIONS, et al.,** )<br><br>**Defendant-Intervenors.** )<br>) | Before:  Joseph A. Laroski, Jr., Judge<br>Consol. Court No. 24-00209 |

## <u>ORDER</u>

Upon consideration of the Rule 56.2 motion of Plaintiffs by the U.S. Aluminum

Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy,

Allied Industrial and Service Workers International Union, for judgment on the agency record,

and upon consideration of the memorandums in opposition to that motion filed by Defendant

U.S. International Trade Commission and Defendant-Intervenors, it is hereby

**ORDERED**, that Plaintiff's motion for judgment on the agency record is denied; and it is

further

**ORDERED**, that this case be terminated consistent with this Court's opinion.

**SO ORDERED**.

_____
Joseph A. Laroski Jr.,
Judge

Dated: _____
          New York, New York