NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **U.S. ALUMINUM EXTRUDERS COALITION,**<br><br>   **and**<br><br>**UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,**<br><br>     **Plaintiffs,**<br><br>  **v.**<br><br>**UNITED STATES,**<br><br>     **Defendant,**<br><br>  **and**<br><br>**COALITION FOR FAIR MEXICAN EXPORTS OF ALUMINUM EXTRUSIONS, et al.,**<br><br>     **Defendant-Intervenors.** | **Before: Hon. Joseph A. Laroski, Jr. Judge**<br><br>**Court No. 24-00209**<br><br><u>**NON-CONFIDENTIAL VERSION**</u><br><br>**Business Proprietary Information Removed from Pages 2, 4-5, 8, 10-15, 18, 20** |

<u>**U.S. ALUMINUM EXTRUDERS COALITION'S AND THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION'S REPLY BRIEF**</u>

**Robert E. DeFrancesco, III, Esq.**
**Laura El-Sabaawi, Esq.**

**WILEY REIN LLP**
**2050 M Street, NW**
**Washington, DC 20036**
**(202) 719-7000**

*Counsel to the U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union*

**Dated: October 27, 2025**

Ct. No. 24-00209                                          NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ...............................................................................................1

II.   ARGUMENT .....................................................................................................1

     A.    The Commission's Determination that Subject Imports Did Not
          Significantly Undersell the Domestic Like Product Was
          Unsupported by Substantial Evidence and Otherwise Not in
          Accordance with Law .................................................................................2

           1.    The Pricing Product Data Were Low Coverage, Flawed and
                   Unrepresentative of the Market, and the Commission
                   Majority Thus Erred in Elevating the Data Above the Record
                   as a Whole ..........................................................................................2

           2.    The Commission Erred in Elevating the Pricing Product
                   Data and Disregarding Substantial Additional Evidence on
                   the Record that Demonstrated Significant Underselling .............................6

     B.    The Commission's Determination that Subject Imports Did Not
          Have an Adverse Impact on the U.S. Industry Was Unsupported by
          Substantial Evidence and Otherwise Not in Accordance with Law .......................17

     C.    The Commission's Negative Threat Determination Was Not
          Supported by Substantial Evidence nor in Accordance with Law ..........................20

III.   CONCLUSION.................................................................................................23

Ct. No. 24-00209                                          NON-CONFIDENTIAL VERSION

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Altx, Inc. v. United States,*
    25 CIT 1100, 167 F. Supp. 2d 1353 (2001) ...................................................................22

*Altx, Inc. v. United States,*
    26 CIT 709 (2002) .............................................................................................................3

*Chr. Bjelland Seafoods A/S v. US,*
    19 C.I.T. 35 (1995) .........................................................................................................15

*DAK Ams. LLC v. United States,*
    456 F. Supp. 3d 1340 (CIT 2020) ..........................................................................16, 17, 19

*DAK Ams. LLC v. United States,*
    517 F. Supp. 3d 1349 (Ct. Int'l Trade 2021) ..................................................................16, 19

*Golub. v. Sec'y of Health & Hum. Servs.,*
    243 F.3d 561, No. 99-5161, 2000 WL 1471643 (Fed. Cir. 2000) ...........................................16

*Nippon Steel Corp. v. Int'l Trade Comm'n,*
    345 F.3d 1379 (Fed. Cir. 2003)........................................................................................20

*Nucor Fastener Div. v. United States,*
    35 CIT 1074 (2011) ...........................................................................................................4

*Tropicana Prods., Inc. v. United States,*
    31 C.I.T. 548 (2007) ........................................................................................................23

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv.*
    *Workers Int'l Union, AFL-CIO, CLC v. United States,*
    348 F. Supp. 3d 1328 (Ct. Int'l Trade 2018) .......................................................................22

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951)........................................................................................................10

*US Synthetic Corp. v. ITC,*
    128 F.4th 1272 (Fed. Cir. 2025) ......................................................................................23

Ct. No. 24-00209                                          NON-CONFIDENTIAL VERSION

**Administrative Materials**

*Aluminum Extrusions From China, Colombia, Ecuador, India, Indonesia, Italy,*
    *Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab*
    *Emirates, and Vietnam*, 89 Fed. Reg. 92,720
    (Int'l Trade Comm'n Nov. 22, 2024) ..........................................................................................1

**Other Authorities**

*Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy,*
    *Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab*
    *Emirates, and Vietnam,*
    Inv. Nos. 701-TA-695-698, USITC Pub. 5560 (Nov. 2024) (Final) ....................................1, 8

*Brass Rod from India*,
    Inv. No. 701-TA-686, USITC Pub. 5485 (Feb. 2024) (Final) .................................................19

## I.    INTRODUCTION

On behalf of Plaintiffs the U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("Plaintiffs"), we respectfully submit the following reply to the response briefs of Defendant United States and Defendant-Intervenors ("Defendant").  *See* Def. U.S. Int'l Trade Commission's Mem. in Opp'n to Pls.' Rule 56.2 Mot. for J. on the Agency R. (Aug. 11, 2025), ECF No. 88 ("Def. Brief"); Resp. Br. on Behalf of Def.-Intervenors (Sept. 15, 2025), ECF No. 99 ("Def.-Int. Brief"); Resp. Br. of Def.-Intervenor East Asia Aluminum Co., Ltd. (Sept. 15, 2025), ECF No. 97.

## II.    ARGUMENT

This appeal arises from the Commission's final negative determination in the antidumping and countervailing duty investigations of aluminum extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam.  *See Aluminum Extrusions From China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, 89 Fed. Reg. 92,720 (Int'l Trade Comm'n Nov. 22, 2024) (deters.), P.R. 355; *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1657, USITC Pub. 5560 (Nov. 2024) (Final), P.R. 354.

Ct. No. 24-00209                                          **NON-CONFIDENTIAL VERSION**

A.    **The Commission's Determination that Subject Imports Did Not Significantly Undersell the Domestic Like Product Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law**

The Commission Majority's determination that subject imports did not significantly undersell the domestic like product was not supported by substantial evidence and was otherwise unlawful.

1.    **The Pricing Product Data Were Low Coverage, Flawed and Unrepresentative of the Market, and the Commission Majority Thus Erred in Elevating the Data Above the Record as a Whole**

Defendant appears to acknowledge that the Commission Majority relied largely, if not completely, on quarterly "pricing product" data in its assessment of subject import underselling, while effectively rejecting the probative value of the evidence as a whole.  Defendant defends the Commission's reliance on the pricing product data even though it reflected "limited coverage" of the aluminum extrusions pricing in the market.  Def. Brief at 11, 14-19.  Indeed, the data on which the Commission Majority based its underselling determination accounted for only [    ] % of U.S. producers' U.S. shipments and [    ] % of U.S. importers' U.S. shipments.[1]  Views of the Commission (Final) (Nov. 20, 2024), C.R. 915 at 79 ("Views").

Defendant first notes that the Commission acknowledged the limited coverage, but explained that such limited coverage was expected, given the variety of products falling within the aluminum extrusions scope.  Def. Brief at 11; Views at 79.  That the limits to coverage may have been *expected* due to the nature of the product does not change that the data were in fact limited, and should have been treated as such by the Commission Majority.  Plaintiffs do not argue that the

---

[1]    Plaintiffs again emphasize that this [    ] % coverage figure reflects the percentage of reported import shipments.  *See* Pls.' Rule 56.2 Mot. for J. on the Agency R. (May 13, 2025), ECF No. 83, at 23 (Pls.' Br.").  Importers that responded to the Commission's questionnaire represented less than [    ] % of total extrusion imports during the POI and less than [    ] % of subject import shipments.  If subject importers had provided more comprehensive responses to the Commission to more accurately represent the total U.S. market, it is likely that the [    ] % figure would be much smaller.

Commission Majority's error was in the failure to select additional or different pricing products to gain greater coverage of the market. *See also* Def.-Int. Brief at 7-8. Plaintiffs argue that, particularly given the coverage issues (in addition to significant other discrepancies), the Commission Majority erred in disregarding the clear weight of the total evidence and in elevating just pricing product data – with extremely limited market coverage – above all else.

Defendant's arguments that the Court has upheld other cases where pricing product coverage was relatively low are inapposite. For example, Defendant cites *Altx, Inc. v. United States*, 26 CIT 709, 720-21 (2002), where the Court stated that the "Commission is not precluded from relying on available pricing data simply because the pricing data does not encompass the entire or even a majority portion of the market." *See* Def. Brief at 14-15. Putting aside that the pricing product data here did not represent anything *close* to a majority of the market, it is also essential to consider the immediately following sentence of the opinion. The Court continued: "Nevertheless, if the data sample is admittedly small, as here, the court must examine the Commission's reasons for finding the data representative of the entire market." *Altx*, 26 CIT at 720-21. While the Court in that case did find the Commission's finding reasonable, that was based in part on the Commission's corroboration of the data with other data. The Court explained: "recognizing the limited coverage of its data sample, the Commission sought to bolster its findings of underselling by checking pricing trends against another set of data." *Altx*, 26 CIT at 721. Here, the Commission Majority did quite the opposite. Despite the limited coverage of the pricing product data, the Commission relied on it to the exclusion of the preponderance of the other data, which did *not* corroborate the pricing product data but contradicted it, in indicating that there was indeed majority subject import underselling in the U.S. aluminum extrusions market.

Ct. No. 24-00209                                                    NON-CONFIDENTIAL VERSION

*Nucor Fastener* is similarly unhelpful to Defendant, as it stands for the contention that pricing product data with low coverage levels *may* be useable <u>when it is representative</u>. *Nucor Fastener Div. v. United States*, 35 CIT 1074, 1094-95 (2011).  *See also* Def. Brief at 15.  Again, the problem here is not that the Commission Majority collected pricing product data that resulted in low coverage; it is that such low-coverage (and otherwise flawed) data was not adequately representative of the market and that the overwhelming record evidence indicated significant underselling.  As Commissioner Karpel noted in her dissenting opinion: "Although these coverage figures are not atypical for an investigation with a broad scope covering a continuum of products, nevertheless, I take into account the relatively limited view of the U.S. market provided by the quarterly price comparisons as a result when evaluating these data and weighing them against the balance of the record, which generally indicates that cumulated subject imports were priced below the domestic like product throughout the POI."  Dissenting Views of Chair Amy A. Karpel (Nov. 20, 2024), C.R. 916, at 8 ("Minority Views").

In addition, Defendant attempts to downplay the last-minute revision of the pricing product dataset as a mere run-of-the-mill data correction.  *See* Def. Brief at 18.  But Defendant misses the main point of this eleventh-hour, unsolicited revision, which unilaterally "changed the quarterly price comparisons from showing majority <u>underselling</u> by volume to showing majority <u>overselling</u> by volume." Minority Views at 11 (emphasis added).  The fact that [

], could alone change the results of the underselling analysis entirely demonstrates the dataset's inherent limitations and shows just how unrepresentative it was of the market as a whole.

As outlined in Plaintiffs' opening brief, the pricing product data was not only low coverage, it was also highly flawed, further rendering the data unrepresentative.  For example, the Final Staff

Ct. No. 24-00209                                              NON-CONFIDENTIAL VERSION

Report did not include pricing product data submitted in the preliminary phase by importers that failed to respond to the Commission in the final phase, even though the Commission has included such data in past cases.  *See* Letter from Wiley Rein, LLP to Sec'y Int'l Trade Comm'n, re: *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam: Final Comments* (Oct. 25, 2024) at 6, C.R. 909, 911, P.R. 341 ("Petitioners' Final Comments").  Defendant-Intervenor's contention that this data "involve{ed} a different time period" is incorrect.  *See* Def.-Int. Br. at 11.  Petitioners argued that the Commission should have used the preliminary phase data that overlapped with the final phase POI in the final phase – i.e., data covering the same time period as the POI.  It is unreasonable to allow U.S. importers whose data showed underselling in the preliminary phase to simply not respond in the final phase, thus rendering the resulting (less comprehensive) dataset more beneficial to their interests.  The lack of this data in the final pricing product dataset further rendered it unrepresentative of the market as a whole.

Further demonstrating the flaws in the data, certain importers reported data for inaccurate products and for downstream articles at different levels of trade than the pricing products.  Defendant points to a sentence in the Commission's opinion that simply states, without analysis, that there were no such flaws.  *See* Def. Brief at 18 (quoting Views at 83).  But the evidence indicates otherwise.  For example, U.S. importer [

], and  U.S.  importer  [

], yet this data was not removed.  *See* Letter from Wiley Rein, LLP to Sec'y Int'l Trade Comm'n, re:

*Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam: Post-Hearing Brief* (Oct. 9, 2024) at Exhibit 1, pp 3-4, P.R. 307 ("Petitioners' Post-Hearing Br.").  Defendant has not and cannot explain how data so limited in coverage and flawed on its very face can reasonably be considered representative of the market, and the Court should remand the Commission Majority's near-exclusive reliance on such data in finding that subject imports did not significantly undersell the domestic like product during the period of investigation.

> 2.    <u>The Commission Erred in Elevating the Pricing Product Data and Disregarding Substantial Additional Evidence on the Record that Demonstrated Significant Underselling</u>

In relying nearly exclusively on the flawed pricing product data, the Commission Majority failed to fully consider the overwhelming record data showing that subject imports pervasively undersold U.S. extrusions.

> a.    **The Data Allegedly Supporting the Pricing Product Data in fact Contradicted the Commission Majority's Conclusion**

Defendant initially argues that the Commission Majority did not rely on pricing product data alone, but also on evidence that price was an important factor in purchasing decisions but often not the most important factor, and on lost sales information.  *See* Def. Brief at 20-21. However, both pieces of evidence actually undermined, not supported, the Commission Majority's conclusion.

First, the Commission Majority disregarded evidence that responding purchasers reported subject imports to be lower-priced than U.S. extrusions, dismissing this evidence as "purchasers' subjective ratings of relative price levels," rather than objective evidence.  Views at 84; Def. Brief at 23.  Yet to support its reliance on the pricing product data, it notes that purchasers identified factors other than price as important to purchasing decisions.  Def. Brief at 21 and 32.  Defendant

does not explain how purchasers' ratings of relative price levels are subjective and thus unpersuasive, yet purchasers' identification of important purchasing factors other than pricing is somehow <u>not</u> similarly subjective and thus unpersuasive. Both are reports from purchasers based on their experiences and behavior in the market.

Moreover, to the extent that such "subjective" reports are in fact important – and Plaintiffs believe they are, like the Commission traditionally has – purchaser reports in fact indicated that price was a <u>very</u> important purchasing factor, contrary to the Commission Majority's conclusion. Responding purchasers frequently ranked price as a top-three most important purchasing factor (more frequently than any other factor except for quality, for which respondents overwhelmingly found subject imports and U.S. product comparable[2]), and the majority of purchasers (38 of 55) reported that price was a <u>very important</u> purchasing factor. Views at 70. Thus, to the extent that these "subjective" purchaser reports are an important piece of evidence, that evidence does not support the Commission Majority's conclusion.

Second, Defendant argues that the Commission Majority also focused on lost sales information in reaching its underselling finding. The lost sales evidence on the record is as follows, as explained by the Commission Majority:

> Of 55 responding purchasers, 36 reported that, since January 1, 2021, they had purchased or imported aluminum extrusions from subject sources instead of purchasing domestically produced aluminum extrusions. Thirty-one of these purchasers reported that the price of subject imports was lower than the price of the domestically produced product. Eleven of those purchasers reported that price was a primary reason for their decision to obtain aluminum extrusions from the subject countries rather than the domestic like product.

---

[2]    "With the exception of pricing, most responding purchasers rated domestically produced aluminum extrusions as comparable to aluminum extrusions imported from each country with respect to 16 factors that influence purchasing decisions." Views at 69.

Ct. No. 24-00209                                                    NON-CONFIDENTIAL VERSION

Views at 81.  In other words, of the [    ] purchasers that purchased subject imports instead of U.S. extrusions, [                                        ] reported that the subject imports were lower priced that U.S. extrusions.  Confidential Final Report to the Commission, *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1657 (Final) (Oct. 17, 2024), ECF No. 69-3, at V-47-V-48 ("Final Staff Report").  Yet the Commission chose to focus on the fact that only [    ] of those purchasers – in fact a significant number – reported that price was a primary reason for those purchasers.  In other words, the Commission disregarded <u>objective</u> evidence about the <u>actual prices</u> of subject and U.S. extrusions, and instead emphasized <u>subjective</u> evidence about a purchaser's <u>reasoning</u> for such lower-priced purchases.  Again, this is inconsistent with the Commission Majority's finding that "purchasers' subjective ratings of relative price levels" is less instructive than flawed pricing product data.  *See* Views at 84.

    **b. The Commission Erred by Rejecting Additional Probative Evidence of Underselling on the Record**

   While leaning on those two unsupported and internally inconsistent rationales to support its main emphasis on the pricing product data, the Commission Majority also failed to properly consider significant additional pieces of evidence supporting a finding of significant underselling.  Defendant unsuccessfully attempts to defend the Commission Majority's rejection of such evidence.

        1. Purchase Cost Data Analysis

   For example, Defendant merely repeats the Commission's one sentence, footnoted rejection of Petitioners' purchase cost data analysis, noting that the Commission "explained that it did 'not find these yearly AUV data probative given the limited quantities involved and changes

in prices over the POI.'"  Def. Brief at 24 (citing Views at 81, n. 324).  Yet, particularly in conjunction with the substantial additional underselling evidence on the record, it was unreasonable for the Commission to wholly disregard (*i.e.*, to admittedly give "<u>no</u> weight" to, Def. Brief at 24 (emphasis added)) this evidence.

In the underlying investigation, Petitioners repeatedly requested that the Commission collect purchase cost data from importers – in the preliminary phase, in their comments on the draft questionnaires, and to Commission Staff in the final phase – yet the Commission failed to gather such evidence.  *See, e.g.,* Letter from Wiley Rein, LLP to Sec'y Int'l Trade Comm'n, re: *Aluminum Extrusions from China, Colombia, the Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam: Post-Conference Brief* (Oct. 31, 2023) at 25, n.130, C.R. 274, 300, P.R. 132 ("Petitioners' Post-Conference Brief"); Letter from Wiley Rein LLP to Sec'y Int'l Trade Comm'n, re: *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam: Comments on Draft Questionnaires* (Feb. 2, 2024) at 5-6, P.R. 184.  This data was critical because U.S. producers were often reporting the price of the basic extrusion before fabrication and assembly, and the importers were often reporting the sale of downstream extrusions that were incorporated with other products (and thus had undergone value-adding processes of fabrication and assembly). As a result, Petitioners explained that purchase cost data would more often reflect purchases of the extrusions themselves and result in a direct head-to-head pricing comparison at the point of purchase between the imported extrusion or the U.S. produced extrusion.

Because the Commission failed to gather this evidence, Petitioners compiled the most comprehensive purchase cost analysis that was possible on the record.  For accuracy, Petitioners

**Ct. No. 24-00209**                                              **NON-CONFIDENTIAL VERSION**

used only data from the six importers whose pricing product data accounted for 100% of their commercial shipments.  This allowed for a comparison of their direct import AUVs (which were not available for the pricing products specifically) with U.S. producers' reported pricing product data (*i.e.*, an underselling analysis based on purchase cost data).  The results showed underselling in nearly every single available comparison, at substantial margins.  *See* Letter from Wiley Rein, LLP to Sec'y Int'l Trade Comm'n, re: *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam: Prehearing Brief* (Sept. 25, 2024) at 81-82 and Exhibit 91, C.R. 789, 797, P.R. 267 ("Petitioners' Prehearing Br."); Petitioners' Post-Hearing Br. at Exhibit 1, pp. 57-58 and Exhibit 37.  To be conservative, Petitioners even added an additional amount to the importers' direct import AUVs to account for additional estimated costs associated with importing activities.  *See* Petitioners' Post-Hearing Br. at Exhibit 37.  Yet the Commission, having deprived Petitioners of the data to do this analysis for all importers or on a quarterly basis, then unreasonably rejected the analysis because it only covered a subset of imports and was done annually.  *See* Views at 81, n. 324.  That does not render the resulting analysis meaningless, yet the Commission inexplicably and erroneously gave it "no weight" at all.  *See* Def. Brief at 24. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight").

2.        Product-Specific AUV Data

Next, Petitioner showed that subject import AUVs were [     ] lower, [     ] lower, and [     ] lower than U.S. producer AUVs in 2021, 2022, and 2023, respectively, and [     ] lower in interim 2024.  Prehearing Report to the Commission, *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand,*

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00209                                                    NON-CONFIDENTIAL VERSION

*Turkey, United Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698, 731-TA-1643-1644, and 1646-1657 (Final) (Sept. 17, 2024) at C-1–C-5 (Table C-1), C.R. 776, 784, P.R. 238 ("Prehearing Report"); Petitioners' Post-Hearing Br. at 5.    Defendant responds that the courts have acknowledged that AUV data have limited probative value in cases involving a broad range of product types.    Def. Brief at 24.    But that is why Petitioners also did this analysis on a <u>product-specific basis</u>.    New, product-specific AUV data in the Final Staff Report showed that, in [       ] of available comparisons, subject imports were priced lower than U.S. product for the categories of crash relevant extrusions, extrusions for window wall units, extrusions for heat exchangers, and all other types of extrusions.    Petitioners' Final Comments at 6; Final Staff Report at M-3–M-6 (Figures M-1–M-4).

Yet even still, the Commission attached "little weight" to these AUV comparisons for two reasons: (1) because they were "based on approximations of the value of the aluminum extrusions in annual shipments of window wall units and heat exchangers"; and (2) because they would be "influenced by differences in product mix and changes in product mix over time."    These reasons are flawed and unsupported by the record.

First, the ITC questionnaires did not ask respondents to "approximate" the value of extrusions in these products.    It directed respondents to, *e.g.*, "Report only the quantity and value of the aluminum extrusion components of any window wall units in the fields requested."    *See e.g.,* [

].    The Commission Majority unreasonably assumed that this data was an "approximation," while at the same time inexplicably considering the pricing product data to be exact data and *not* approximated.

11

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

**Ct. No. 24-00209**                                                        **NON-CONFIDENTIAL VERSION**

Defendant is also wrong that "{s}uch derived values for aluminum extrusions were removed from the pricing {product} data." Def. Brief at 24, n. 9. For example, the Final Staff Report included data for [

], which [                                                                                ]. *See* Petitioners' Post-Hearing Br. at Exhibit 1, Section I. [

]. Taking the price of [      ], which includes additional variable costs and backing out a price for the extrusion was not comparable to the price of the standalone extrusion covered by the definition (and it was unclear how such allocation was done), yet the Commission Majority considered *that* data to be probative. It cannot justify disregarding the product-specific AUV data as an alleged "approximation" at the same time.

Second, the Commission's statement that the product-specific AUV data would be "influenced by differences in product mix and changes in product mix over time" is unfounded. Surely the Commission collected this product-specific data and defined the product categories as it did because it found that such data would be valuable and probative. In fact, the definition of specific product categories was designed specifically to address this problem of product mix. If AUVs for all imported extrusions as a whole were not probative due to product mix issues, then the product-specific AUVs should carry weight. Moreover, there is no record evidence indicating that, for example, the "extrusions embodied in window wall units" or "extrusions embodied in certain heat exchangers" would have undergone significant product mix changes during the POI of three years and one quarter. These are standard products that do not involve significant variation. As such, the Commission Majority erred in disregarding the product-specific AUV data.

Ct. No. 24-00209                                                         NON-CONFIDENTIAL VERSION

        3.      Documented Lost Sales and Revenues Evidence from Customers

Defendant next turns to the Commission's finding that Plaintiffs' contemporaneous documentation, including directly from customers, did not demonstrate a pattern of significant underselling or lost sales. Def. Brief at 26-27. *See also* Def.-Int. Br. at 17-18. As an initial matter, Defendant's statement that "the Commission is not required to give dispositive weight to anecdotal evidence" is misplaced. *See id.* at 25. Plaintiffs do not argue that the Commission was required to find this evidence <u>dispositive</u>. Rather, the evidence is extremely persuasive, and when combined with the other record evidence, requires a conclusion that substantial evidence does not support the Commission's determination regarding a lack of underselling.

In an attempt to support its argument, Defendant cites the Federal Circuit for the proposition that "affidavits that made 'passing references'" to the subject product could not demonstrate that the sample pricing product data was unrepresentative. *Id.* at 25 (citing *U.S. Steel Group*, 96 F.3d at 1366). This is irrelevant, because Plaintiffs' evidence was not comprised of mere "passing references." They were direct and contemporaneous communications demonstrating significant underselling and the resulting lost sales and revenues.

Defendant does not address much of Petitioners' evidence. For example, it does not reference Exhibit 3 to Petitioners' Post-Hearing Br., which provides, directly from a customer to a U.S. producer, a price quote from a [                    ], in which [


          ]. Petitioners' Post-Hearing Br. at 5, Exhibits 3-4. Defendant similarly does not mention Exhibit 8, providing [

                                        ] lower than the U.S. price. Petitioners' Post-Hearing Br. at 6, Exhibit 8. Nor does Defendant mention Exhibit 21 to Petitioners' Post-

Ct. No. 24-00209                                          NON-CONFIDENTIAL VERSION

Conference Brief,[3] which includes a signed declaration from a U.S. producer, explaining that one month prior, a U.S. customer stated that the U.S. producer [

], to obtain business.  The U.S. producer could not do that and did not receive the business, which it understood went to [                    ].  Petitioners' Post-Conference Br. at Exhibit 21.  Defendant was silent as to Exhibit 9 to Petitioners' Post-Hearing Br., which showed a U.S. customer switching its business away from a U.S. producer for reasons that were [                    ], demonstrating the central importance of price to purchasing decisions.  Petitioners' Post-Hearing Br. at 6, Exhibit 9.  Defendant also does not reference Exhibit 12 to Petitioners' Post-Hearing Br., wherein a customer [

].  *Id.* at 6, Exhibit 12.

    Defendant does not rebut Exhibit 11 to Petitioners' Post-Hearing Br., in which a U.S. producer is told, directly by its customer, that its quotes to supply extrusions were priced up to [                    ].  *Id.* at 6, Exhibit 11.  Rather, Defendant notes that the Commission acknowledged that this email "included [

]."  Def. Brief at 26.

    For the pieces of evidence that Defendant does address, the Commission Majority's reasons for finding fault with the evidence are often unfounded.  For example, with regard to Exhibit 23 to Petitioners' Prehearing Br. (Exhibit 10 to Petitioners' Post-Hearing Br.), Defendant notes that it

---

[3]     Defendant refers to an Exhibit 21, which appears to be the exhibit to another brief, Petitioners' Prehearing Br.  *See* Def. Br. at 26.  While Defendant notes the Commission Majority's finding that this exhibit made [

].  Petitioners' Post-Conference Br. at Exhibit 21.

Ct. No. 24-00209                                                    NON-CONFIDENTIAL VERSION

"referenced a sale lost to subject imports from Mexico due not only to price but also a domestic

producer's long lead times." *Id.* While the customer does provide two reasons for switching its

sourcing, price was the first: "[



]."

Petitioners' Prehearing Br. at Exhibit 23; Petitioners' Post-Hearing Br. at Exhibit 10. Moreover,

on the critical question of whether subject imports undersell the domestic like product, this is a

clear customer statement that "[                                    ]" – this goes directly to

underselling, and the [                                    ] does not invalidate the evidence as to

pricing. *See* Petitioners' Post-Hearing Br. at Exhibit 10 (emphasis added).

        Moreover, Defendant states that some of the anecdotal evidence provided by Petitioners

was dated post-POI. But the Court has recognized that post-POI evidence can be relevant, given

that "a finding of 'present' injury must reference a time period which is as nearly contemporaneous

to vote day as possible and for which reliable record evidence is available." *Chr. Ejelland Sea foods

A/S v. US*, 19 C.I.T. 35 (1995).

        In sum, the Commission Majority was wrong to disregard this evidence, directly from the

market, regarding underselling and lost sales, which, in conjunction with additional record

evidence, demonstrated significant underselling by subject imports.

                    4.    Witness Testimony, Dumping Margins, and Preliminary
                          Phase Data, and the Totality of the Evidence

        Defendant further argues that the Commission adequately considered witness testimony,

the dumping margins calculated by Commerce, and preliminary phase pricing product data and

found that each piece of evidence did not outweigh the other evidence showing that underselling

was not significant (*i.e.*, primarily the pricing product data). Def. Brief at 28-30. While Defendant

seems to acknowledge that each of these pieces of evidence indicated significant underselling, it

argues that they each, individually, could not overcome other evidence on the record. But Defendant, like the Commission Majority, fails to consider the significant record evidence of underselling <u>as a whole</u>. A lawful consideration of the record as a whole necessarily should have included an assessment of "whatever {evidence} in the record fairly detracts from its weight." *DAK Ams. LLC v. United States*, 456 F. Supp. 3d 1340, 1358 (CIT 2020) ("*DAK I*"). The Commission Majority erred in "treat{ing} each element of the evidence individually, discrediting each piece of evidence in turn, without considering the totality of the evidence." *Golub. v. Sec'y of Health & Hum. Servs.*, 243 F.3d 561, No. 99-5161, 2000 WL 1471643 at 4 (Fed. Cir. 2000).

In this way, contrary to Defendant's claims, this case is more analogous to *DAK I*, as explained in Plaintiffs' Opening Br., Pls.' Br. at 26, than *DAK II* (*DAK Ams. LLC v. United States*, 517 F. Supp. 3d 1349 (Ct. Int'l Trade 2021) ("*DAK II*")). As Defendant notes, in *DAK II*, after further explanation by the Commission on remand, the CIT upheld the Commission's finding of no significant underselling. *See* Def. Brief at 32. The Court noted a number of points by the Commission on remand that supported its affirmance. For example, in *DAK II*, the Commission was able to distinguish the underlying case from others where underselling was mixed but still found to be significant because, in the other cases, "there was a high degree of substitutability, price was an important consideration, and there was some degree of underselling identified." *DAK II* at 1358 (internal citation omitted). No such distinction can be made here. In this case, the Commission itself found a "moderate-to-high degree of substitutability," the Commission acknowledged that "price is an important factor in purchasing decisions for aluminum extrusions," and there was some degree of underselling identified (*i.e.*, subject imports undersold the domestic like product in 39% of quarterly comparisons). Views at 69-70, 78-80. This case is therefore not comparable to *DAK II* as Defendant claims.

Thus, the Commission Majority's underselling analysis and resulting price effects determination were unsupported by substantial evidence, inadequately explained, unreasonable, contrary to relevant agency and judicial precedent and otherwise not in accordance with law, and they should be remanded.

### B.    The Commission's Determination that Subject Imports Did Not Have an Adverse Impact on the U.S. Industry Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law

Stemming largely from its erroneous underselling and price effects determinations, the Commission Majority's determination that subject imports did not have an adverse impact on the domestic industry was also in error. Defendant's response confirms the centrality of the erroneous underselling finding to the impact determination, repeatedly citing that finding in support of the determination of no adverse impact. *See* Def. Brief at 33-34. Because the impact finding was expressly supported by the Commission Majority's unlawful underselling analysis, and independently contradicts the weight of record evidence, a remand as to price effects requires a remand of the impact determination as well. *See DAK I* at 1367 (remanding impact determination, which was colored by erroneous underselling determination).

Largely informed by the underselling finding, the Commission Majority found no correlation between the subject imports and the domestic industry's negative and declining performance during the period. This finding was directly opposed to the overwhelming record evidence. For example, Defendant notes that the Commission Majority acknowledged that subject import volume and market share increased from 2021 to 2022, but states that this "was due to the domestic industry's supply constraints" (which again largely relied on the underselling determination). Def. Brief at 33. Yet the evidence showed that subject imports were actually higher in the second half of 2022 (when any supply constraint issues were lessening) than in the

**Ct. No. 24-00209**                                                    **NON-CONFIDENTIAL VERSION**

first half of 2022. Petitioners' Post-Hearing Br. at Exhibit 1, p. 46. Specifically, using prices that purchasers directly said were lower than U.S. prices, subject imports took [    ] points of market share from U.S. extruders from first-half to second-half 2022, causing a decline in U.S. production, a cost-price squeeze, and a 3.3 point drop in U.S. producers' operating margin. *Id.* at Exhibit 2. In 2023, despite more than 83% of purchasers and nearly 90% of U.S. producers reporting no constraints, subject imports largely kept the market share they had taken and continued to gain as a percentage of U.S. production. Final Staff Report at II-14 and C-3 (Table C.1) The Commission's explanation – that "it would not have expected the domestic industry to quickly regain this market share" because sales were made through contracts – contradicts the record evidence that [    ] of importers' sales were made on a *spot* basis. Def. Brief at 34; Final Staff Report at V-5 (Table V-4). If the Commission Majority did not find underselling in [    ] % of quarterly comparison to be significant, it is difficult to understand why it would consider the [    ] % of importer sales made through contracts to be so significant. Regardless, whether or not it was "expected" that the domestic industry would regain the market share lost to subject imports does not make its continued loss any less injurious.

Then, in interim 2024, subject imports gained the most market share at the domestic industry's expense – [    ] percentage points. Final Staff Report at C-3 (Table C-1). At this point, not a single domestic producer was supply constrained. Prehearing Report at II-14. There were no supply constraints at issue during this time, yet subject imports continued to take market share, having a distinct adverse impact on the domestic industry.

Defendant's identification of individual domestic producers that reported supply constraints early in the period, *see* Def. Brief at 36, fails to recognize that U.S. importers were also experiencing supply constraints at this time. As the Commission Minority explained, the number

of domestic producers that reported supply constraints "was comparable in absolute terms to the number of responding importers reporting supply constraints." Minority Views at 22 and n. 64. This was an industry-wide issue, and not an explanation for purchasers to shift from domestically produced extrusions to subject imports.

The Commission also disregarded evidence that <u>86%</u> of purchasers reported that U.S. extrusions were either comparable or superior to subject imports in terms of availability. Final Staff Report at II-36 (Table II-15). This is wholly inconsistent with the Commission Majority' conclusion that these same purchasers switched because U.S. extrusions were unavailable.

Finally, Defendant attempts to dismiss inconsistent findings by the Commission in other cases, stating that each Commission determination is *sui generis*. Def. Brief at 39. While that may be, it is also true that "consistency is a core value of administrative law." *DAK II* at 1353. "{T}hough past agency decision-making may not be precedential in the same way as case law through *stare decisis*, it remains of great importance," and departures from prior determinations must be adequately explained. *DAK I* at 1355-1356. Yet the Commission failed to provide such adequate explanation here. For example, in *Brass Rod from India*, based on facts very similar to those in the underlying investigation, the Commission found an adverse impact and material injury despite post-pandemic supply constraints. The Commission reasoned:

> Although the domestic industry experienced supply constraints in 2021 as a result of the COVID-19 pandemic, so did importers and foreign producers, and purchasers reported that the domestic industry no longer had such supply constraints in 2022. Moreover, large majorities of purchasers reported that the domestic industry was comparable or superior to subject imports… in terms of availability, delivery time, and reliability of supply.

*Brass Rod from India*, Inv. No. 701-TA-686, USITC Pub. 5485 (Feb. 2024) (Final) at 57. Like the Commission Majority before it, Defendant does not attempt to distinguish such past cases, even though the factors that the Commission found significant in finding an adverse impact there

Ct. No. 24-00209                                                    NON-CONFIDENTIAL VERSION

were the same factors present in this case. The Commission should be required to meaningfully

distinguish these cases on remand.

In sum, the record did not support a finding that subject imports had no adverse impact on

the domestic industry during the POI – that they were not even "a cause" of material injury to the

industry. As the Federal Circuit as explained:

> {A}n affirmative material-injury determination under the statute requires no more
> than a substantial-factor showing. That is, the 'dumping' need not be the sole or
> principal cause of injury. As long as its effects are not merely incidental, tangential
> or trivial, the foreign product sold at less than fair value meets the causation
> requirement."

*Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1381 (Fed. Cir. 2003). That

"substantial-factor showing" was clearly established in the underlying case, and the Commission's

adverse impact determination must be remanded.

### C.   The Commission's Negative Threat Determination Was Not Supported by Substantial Evidence nor in Accordance with Law

The Commission Majority's threat analysis was heavily influenced by its erroneous

overselling and supply constraints findings and thus, for reasons similar to those outlined above,

the Commission Majority's finding of need not be the sole or principal cause of injury. As long

as its effects are not merely no threat of material injury must be remanded as well.

Defendant argues that the Commission reasonably found no likelihood of substantially

increased cumulated subject import volumes in the imminent future, despite finding subject

imports to be significant during the POI, including a [    ] % increase in such imports in the interim

period. Def. Brief at 40; Views at 77. Defendant argues that this determination was reasonable

because the subject import increase was allegedly related to domestic industry supply constraints.

This finding was unreasonable for the reasons explained in Plaintiffs' opening brief and above.

*See also* Def.-Int. Br. at 25-26.

Ct. No. 24-00209                                      NON-CONFIDENTIAL VERSION

Moreover, Defendant argues that the Commission's volume finding was reasonable because the interim 2024 increase was due largely to elevated imports in one month, March 2024, which the Commission found was influenced by Commerce's impending preliminary determinations and likely imposition of provisional measures. Def. Brief at 39-40. *See also* Def.-Int. Br. at 29-30. The Commission's reasoning here is flawed. That subject imports would have rushed into the market at extremely high volumes to beat the imposition of duties does not indicate that subject producers are somehow uninterested in increasing shipments to the U.S. market or that subject imports are not a threat to the domestic industry. Quite the opposite. This surge demonstrates the extent of subject producers' interest in and reliance on the U.S. market, and their ability and incentive to significantly and rapidly increase shipments of extrusions to the United States. This one-month rush of imports supports a finding of threat, not the Commission Majority's conclusion.

Defendant also argues that the Commission Majority was justified in finding that the seasonality of demand (which it says typically increased in the spring and summer) influenced the March 2024 import surge. Def. Br. at 41. This still does not explain why subject imports in March 2024 were so much higher than they were in March 2023. The interim period comparison, by definition, is a comparison of the same seasons. The Commission's reliance on seasonality trends to support its threat finding was unreasonable.

The additional reasons proffered for the Commission's volume finding similarly fail to support its determination. Defendant notes that the Commission found that U.S. importers reported declining volumes of arranged imports from the second quarter of 2024 through the first quarter of 2025. *Id.* at 42. That importers would have fewer imports already arranged in time periods farther out into the future is natural, seen in nearly all cases, and does not indicate that such

imports would not substantially increase when closer to the relevant time period. Similarly, foreign producers' projected decrease in inventories is not indicative of steady or decreasing future volumes of imports. *See* Def.-Int. Br. at 26. This "subjective" evidence could mean anything – perhaps foreign producers would hold lower inventories in the future because they would ship those volumes to the U.S. market rather than hold them in inventory. It is also highly inconsistent for the Commission to find that the increase in U.S. importers' inventories was <u>not</u> important (because most extrusions are made-to-order) but that the decrease in foreign producers' inventories was somehow significant. Def. Br. at 42. Contrary to Defendant's arguments, these findings do not support the Commission's conclusion that no significant increase in subject import volume was likely.

The Commission's finding on likely price effects was similarly unreasonable, in that it relied on the erroneous underselling and price effects findings discussed above, and should be remanded.

Finally, the Commission's likely impact analysis should also be remanded, as it relied heavily on the erroneous underselling and supply constraint determinations discussed above.

Thus, as set forth in Plaintiffs' opening brief, because the Commission Majority's negative threat finding was predicated on its erroneous underselling and supply constraint findings, it must also be remanded. *See, e.g., United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. United States*, 348 F. Supp. 3d 1328, 1339 (Ct. Int'l Trade 2018) ("Because the court remands the final determination to reconsider the present price effects finding, as explained *supra*, the court directs the Commission to reconsider the negative threat determination on this basis as well."); *Altx, Inc. v. United States*, 25 CIT 1100,

1373, 167 F. Supp. 2d 1353, 1373 (2001) ("The Commission must therefore undertake its threat determination anew based on its reconsidered present material injury determination.").

> **D.**    **Plaintiffs Do Not Ask the Court to Overrule the Commission's Determination Because of the Views of the Dissenting Commissioner**

Defendant erroneously states that Plaintiffs "ask{} the Court to remand the Commission's determinations based on the findings of the dissenting Commissioner." Def. Brief at 45. Plaintiffs do not suggest that the Commission Majority's determination was unreasonable <u>because</u> the dissenting Commissioner dissented. Plaintiffs cite the dissenting Commissioner's opinion because it provides a clear, well-supported and well-reasoned explanation of the record evidence. Indeed, the courts themselves have cited dissenting Commissioner opinions in remanding Commission Majority determinations, even suggesting that the Commission on remand should consider the dissent's reasoning. *See, e.g.*, *US Synthetic Corp. v. ITC*, 128 F.4th 1272, 1284 (Fed. Cir. 2025); *Tropicana Prods., Inc. v. United States*, 31 C.I.T. 548, 575 (2007) ("while the court understands that the dissent is not under direct assault here, the dissent's finding of no causation appears to be more logical and supported than the Commission's finding of causation. It would be helpful upon remand for the Commission to engage the dissent").

III.    **CONCLUSION**

For the reasons detailed above and in our opening brief, we respectfully submit that this

Court should remand the Commission's final determination consistent with the arguments made in

this brief.

Respectfully submitted,

*/s/ Robert E. DeFrancesco, III*
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the U.S. Aluminum Extruders Coalition
and the United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial and
Service Workers International Union*

Dated: October 27, 2025

### CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for the U.S. Aluminum Extruders Coalition's and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union's Reply Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 7,050 words.

*/s/ Laura El-Sabaawi*
(Signature of Attorney)

Laura El-Sabaawi, Esq.
(Name of Attorney)

U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union
(Representative Of)

October 27, 2025
(Date)