**PUBLIC VERSION**

Slip Op. 26-101

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| U.S. ALUMINUM EXTRUDERS COALITION,<br><br>and<br><br>UNITED STEEL, PAPER, AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>COALITION FOR FAIR MEXICAN IMPORTS OF ALUMINUM EXTRUSIONS, et al.,<br><br>Defendant-Intervenors. | Before: Joseph A. Laroski, Jr., Judge<br><br>Consol. Court No. 24-00209 |

**OPINION**

[Sustaining in full the final negative determination of the U.S. International Trade Commission concerning its antidumping and countervailing duty investigations of aluminum extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam and denying plaintiffs' motion for judgment on the agency record.]

Dated: September 02, 2026

Robert E. DeFrancesco, III, of Wiley Rein LLP, of Washington, D.C., for plaintiffs U.S. Aluminum Extruders Coalition and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union.

With him on the brief were Alan H. Price, Elizabeth S. Lee, Enbar Toledano, and Laura El-Sabaawi.

Michael K. Haldenstein, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, of Washington, D.C., for defendant United States. With him on the brief were Margaret D. MacDonald, General Counsel, Karl S. Von Schriltz, Assistant General Counsel, and Anthony C. Famiglietti, Attorney-Advisor.

Eugene Degnan, of Morris, Manning & Martin LLP, of Washington, D.C., for defendant-intervenor East Asia Aluminum Co., Ltd. With him on the brief were Donald B. Cameron, Julie C. Mendoza, R. Will Planert, Brady W. Mills, Mary S. Hodgins, Jordan L. Fleischer, Edward J. Thomas III, Nicholas C. Duffey, and Jenny (Shiyu) Liang.

Jack A. Levy, of Rock Creek Trade LLP, Jessica R. DiPietro, of ArentFox Schiff LLP, Daniel L. Porter, of Pillsbury Winthrop Shaw Pittman LLP, Douglas J. Heffner, of Faegre Drinker Biddle & Reath LLP, Kelsey Christensen, of Clark Hill PLC, and Matthew Robert Nicely, of Akin Gump Strauss Hauer & Feld LLP, of Washington, D.C., for defendant-intervenors Coalition for Fair Mexican Exports of Aluminum Extrusion, Danfoss LLC, and Dorman Products, Inc., et al.

Laroski, Judge: This action concerns the U.S. International Trade Commission's final negative determination in its antidumping and countervailing duty investigations concerning aluminum extrusions imported from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam. Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam, 89 Fed. Reg. 92,720 (Int'l. Trade Comm'n. Nov. 22, 2024) ("Final Determination"); see also the accompanying views of the Commission in Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam, USITC Pub. 5560, Inv. Nos. 701-TA-695-698

and 731-TA-1643-1644 and 1646-1657 (Final), P.R. 354, C.R. 915 (Nov. 20, 2024) ("Views"). In that determination, the U.S. International Trade Commission ("Commission") concluded that the domestic industry was not materially injured and was not threatened with material injury by reason of subject imports.[1]

U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (collectively, "plaintiffs") challenge the Commission's determination under section 516A of the Tariff Act of 1930, as amended ("the Act"), arguing that the Commission's price effects, adverse impact, and threat of material injury analyses are unsupported by substantial evidence and otherwise not in accordance with law. Pl. Mem. in Supp. of Mot. for J. on the Agency R., ECF Nos. 83–84, at 1 (May 12, 2025) ("Aluminum Br."). The Commission requests that the court sustain its determination. Def. Resp. in Opp'n to Pls.' Mot. for J. on the Agency R., ECF Nos. 88–89, at 1 (Aug. 11, 2025) ("ITC Br."). Defendant-Intervenors CEDAL Duran S.A., et al, (collectively, "Defendant-Intervenors") likewise oppose the U.S. Aluminum Extruder Coalition's motion. Def.-Int. East Asia Aluminum Co., Ltd. Br. in Opp'n. to Pls.' Mot. for J. on the Agency R., ECF No. 97, at 1 (Sep. 15, 2025) ("East Asia Aluminum Br."); Def.-Int. CEDAL Suran S.A. et al Resp. Br. in

---

[1] The Commission reached its negative determination by a majority vote. Commissioners David S. Johanson and Jason E. Kearns issued the majority views, while Chair Amy A. Karpel dissented and would have reached an affirmative determination. Commissioner Rhonda K. Schmidtlein did not participate in the proceedings. Views at 3.

Opp'n. to Pls.' Mot. for J. on the Agency R., ECF No. 98–100, at 1 (Sep. 15, 2025) ("DI Br.").

For the reasons below, the court concludes that the Commission's determinations are supported by substantial evidence and otherwise lawful. Accordingly, the court sustains the Commission's determination in full.

## BACKGROUND

On October 4, 2023, plaintiffs U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (collectively, "plaintiffs") filed petitions with the Commission and the U.S. Department of Commerce ("Commerce") requesting antidumping and countervailing duty relief from imports of aluminum extrusions from fourteen countries (the "subject countries"). Views at 3.[2] The Commission issued a final staff report on October 17, 2024. Memorandum from Nannette Christ, Director, Office of Investigations, to the Commission, re: Investigation Nos. 701-TA-695-698 and 731-TA-164-1644 and 1646-1657 (Final): Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates and Vietnam – Staff Report, P.R. 334, C.R. 885 ("Final Staff Report"). In its final determination, the Commission determined that during the January 2021 to March

[2] Unless otherwise indicated, citations to the Views refer to the confidential version. See Views, C.R. 915 (Nov. 20, 2024).

2024 period of investigation ("POI"), the U.S. domestic industry was neither materially injured nor threatened with material injury by subject imports from subject countries. Views at 3, 37.

Before the Commission, plaintiffs argued that throughout the POI, imports of certain aluminum extrusions caused and threatened to cause material injury to the domestic industry. See Aluminum Br. at 6. Specifically, plaintiffs presented evidence that subject imports undersold the domestic like product and adversely impacted the domestic industry. Id. at 8. Plaintiffs asserted that underselling – rather than supply constraints – caused the financial and market share declines that the domestic industry experienced throughout the POI. Id. at 9.

In the final phase of its investigations, the Commission performed an injury analysis of subject imports. Views at 56; 19 U.S.C. §§ 1671d(b), 1673d(b). The Commission considered how subject aluminum extruder imports affected the domestic industry and whether there had been significant price underselling by the imported goods. Views at 78. The Commission found that the volume of subject imports, though significant, did not have significant price effects and was not responsible for an adverse impact on the U.S. aluminum extrusions industry during the POI. Views at 77. The Commission likewise found that "the pricing data show predominant overselling by subject imports that generally increased in terms of reported sales volume over the POI," and thus determined the subject countries did not significantly undersell in the domestic market. Id. at 81. The Commission emphasized that subject import purchasers provided non-price reasons for

purchasing imported rather than U.S.-produced products. Id. at 86. The final determination acknowledged that pricing products may "provide relatively limited coverage of U.S. shipments of subjected imports and the domestic product" because aluminum extrusions are produced for purchasers in various shapes and sizes for distinct applications. Id. at 79. Nevertheless, the Commission deemed the pricing data probative of the relative prices in the U.S. aluminum extrusions market. Id. at 79–80.

The Commission further determined there was no adverse impact to the domestic industry by reason of subject imports. Id. at 107. Although "many of the domestic industry's indicators declined over the POI," the Commission found these declines resulted from the industry's supply constraints in 2021 and 2022 and the decline in apparent U.S. consumption from 2022 to 2023, in the wake of COVID-19. Id. at 92, 98. Thus, there was no "causal nexus between cumulated subject imports and declines in the domestic industry's performance during the POI." Id. at 102. Similarly, the Commission found that subject imports had no adverse impact on the domestic industry in the first three months of 2024. Id. Although subject import volume and market share rose at times throughout the POI, the Commission concluded that such trends were not caused by underselling because the record reflects predominant overselling. Id. Plaintiffs commenced this action to challenge the Commission's final determination, and the court heard oral argument on May 6, 2026.

## JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction pursuant to section 516A of the Tariff Act of 1930 ("the Act"), as amended, which authorizes judicial review of final determinations by the Commission in antidumping and countervailing duty investigations. See 19 U.S.C. § 1516a(a)(2)(B)(i). The court reviews such determinations under 28 U.S.C. § 1581(c), which grants the court exclusive jurisdiction over civil actions commenced under section 516A of the Act. See 28 U.S.C. § 1581(c).

The court sustains the Commission's determinations, findings, and conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and requires the court to consider the record as a whole, including evidence that detracts from the agency's determination. Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 488 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Although the court does not reweigh the evidence or substitute its judgment for that of the Commission, the agency must provide a reasoned explanation that permits the court to discern the path of its analysis and ensures that it has considered the relevant evidence. See id.; Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962); Timken U.S. Corp. v. United States, 421 F.3d 1350, 1354–57 (Fed. Cir. 2005).

**PUBLIC VERSION**

Within this framework, the Commission may draw reasonable inferences from the record and weigh conflicting evidence, and the court may not, "displace the [Commission's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." Universal Camera Corp., 340 U.S. at 488. The possibility of drawing "two inconsistent conclusions" from the evidence, in other words, does not prevent the Commission's determination from being supported by substantial evidence. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1352 (Fed. Cir. 2006). At the same time, the Commission must base its determination on the record evidence and may not rely on conjecture or disregard significant contrary evidence without explanation. Id.

Furthermore, the Commission is "is presumed to have considered all of the evidence on the record" and is "not required to explicitly address every piece of evidence presented by the parties." Nucor Corp. v. United States, 318 F. Supp. 2d 1207, 1247 (CIT 2004) (quoting USEC Inc. v. United States, 34 F. App'x 725, 730–31 (Fed. Cir. 2002)), aff'd, 414 F.3d 1331 (Fed. Cir. 2005). Instead, the Commission need only address the issues that are material to its determination. Timken U.S. Corp., 421 F.3d at 1354 (citing Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 892 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ("SAA")).

Finally, when evaluating challenges to the Commission's choice of methodology, this court has explained that it will "affirm the chosen methodology as

long as it is reasonable." JMC Steel Grp. v. United States, 70 F. Supp. 3d 1309, 1316 n.4 (CIT 2015) (citing Shandong TTCA Biochem. Co., Ltd. v. United States, 774 F. Supp. 2d 1317, 1327 (CIT 2011) (citations omitted)).

**LEGAL FRAMEWORK**

In the final phase of antidumping and countervailing duty investigations, the Commission determines whether a domestic industry is materially injured or threatened with material injury by reason of subject imports. 19 U.S.C. §§ 1671d(b), 1673d(b). In reaching an injury determination, the Commission must consider (i) the volume of subject imports, (ii) their effect on domestic prices, and (iii) their impact on domestic producers in the context of domestic production operations. Id. § 1677(7)(B). In assessing volume, the Commission determines whether the volume of subject imports (or any increase in that volume), in either absolute terms or relative to domestic production or consumption, is significant. Id. § 1677(7)(C)(i). With regard to price effects, the Commission considers whether there has been significant price underselling by subject imports and whether subject imports have significantly depressed domestic prices or prevented price increases that otherwise would have occurred. Id. § 1677(7)(C)(ii). In assessing impact on the domestic industry, the Commission considers all relevant economic factors that bear on the state of the domestic industry, and no single factor is dispositive. Id. § 1677(7)(C)(iii).

In making a threat determination, the Commission considers whether "further dumped or subsidized imports are imminent and whether material injury

by reason of imports would occur unless an order is issued or a suspension agreement is accepted." Id. § 1677(7)(F)(ii). The statute provides nine factors for the Commission's consideration, id. § 1677(7)(F)(i), and the Commission must consider these factors "as a whole." Id. § 1677(7)(F)(ii). Generally, the Commission organizes its threat analysis using the same volume-price-impact framework that it uses to assess material injury. See Views at 108 n.434.

Overall, the Commission's statutory directive is to determine whether the domestic industry is materially injured or threatened with material injury "by reason of" subject imports. 19 U.S.C. §§ 1671d(b), 1673d(b). Subject imports need not be the main or predominant cause of material injury to the domestic industry; rather, "[a]s long as its effects are not merely incidental, tangential, or trivial, the foreign product sold at less than fair value meets the causation requirement." Nippon Steel Corp. v. USITC, 345 F.3d 1379, 1381 (Fed. Cir. 2003). This causation requirement remains consistent even where other economic factors besides subject imports also have adverse effects on the domestic industry. See Taiwan Semiconductor Indus. Ass'n v. USITC, 266 F.3d 1339, 1345 (Fed. Cir. 2001) (quoting SAA at 852) ("[T]he Commission need not isolate the injury caused by other factors from injury caused by unfair imports . . . Rather, the Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports.")).

## DISCUSSION

Plaintiffs challenge the Commission's final negative determination in the antidumping and countervailing duty investigations of aluminum extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam. See Aluminum Br. at 4, 16–17. Plaintiffs argue that the Commission's injury and threat of injury analyses were flawed for several reasons, including both a flawed price effects analysis and a flawed threat analysis. Id. at 4–5.

Nevertheless, because the Commission reasonably performed its price effects analysis, adverse impact analysis, and threat analysis, the court concludes that the Commission's determination is supported by substantial evidence.

### I. The commission reasonably performed its price effects analysis when determining no material injury

Plaintiffs argue that subject imports undersold the domestic like product and suppressed and depressed U.S. prices, and therefore the Commission's negative material injury determination warrants remand. Aluminum Br. at 16. The parties do not dispute that the volume of subject imports was "significant" during the POI. Id.at 17 (citing 19 U.S.C. § 1677(7)(C)(i)). Plaintiffs contend that the Commission erred in concluding that this significant volume of subject imports did not result in significant price effects for the domestic industry. Id. at 17 (citing Views at 77–78).

In determining whether subject imports have caused material injury, the Commission "shall consider": (i) the volume of imports of subject merchandise; (ii)

the effect of imports of that merchandise on prices in the United States for domestic like products (the "price effects analysis"); and (iii) the impact of such merchandise on domestic producers of domestic like products (the "adverse impact analysis"). 19 U.S.C. § 1677(7)(B)(i)(I)-(III).

To perform its price effects analysis, the Commission considers whether "there has been significant price underselling by the imported merchandise as compared with the price of domestic like products in the United States," as well as whether "the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree." Id. § 1677(7)(C)(ii)(I)–(II). Under substantial evidence review, the court must affirm the Commission's price effects determination if it is reasonable and supported by "the record as a whole, even if some evidence detracts from the Commission's conclusion." Hitachi Metals, Ltd. v. United States, 949 F.3d 710, 716 (Fed. Cir. 2020).

Here, the Commission's underselling analysis is supported by substantial evidence because the Commission reasonably (A) considered plaintiffs' underselling factor arguments; (B) considered the data before it; (C) recognized and explained the limited nature of record data; (D) relied on pricing product data that were not flawed; and (E) considered the record as a whole.

### (A) The Commission reasonably analyzed the record as a whole when it considered plaintiffs' underselling arguments

Plaintiffs argue that the Commission's underselling analysis "disregard[ed] the clear weight of the evidence" by elevating "pricing product data above all else" in determining that subject imports oversold the domestic like product during the POI. Aluminum Br. at 20. In support of this argument, plaintiffs highlight eleven factors in the record and argue that at least ten of those factors demonstrated significant and injurious underselling (the "ten factors"). Id. at 18–19. Plaintiffs likewise contend that the eleventh factor – pricing product data – also demonstrated "pervasive underselling . . . in a market characterized by price sensitivity and moderate-to-high substitutability." Id. at 19 (citing Views at 69; Staff Report at II-1). In sum, plaintiffs argue that not only did the Commission unreasonably disregard "every other piece of record evidence" in favor of pricing product comparisons, but it also incorrectly analyzed the pricing product data itself in failing to find underselling. Id. at 20.

The Commission responds that plaintiffs do not challenge whether the Commission considered the ten factors but instead ask the court to reweigh those factors because they prefer a different outcome. ITC Br. at 20. The Commission contends that it did not rely on a single data point; instead, the Commission followed its traditional underselling methodology, which includes comparing quarterly sales prices for representative pricing products reported by domestic

producers and importers, as well as lost sales information. Id. at 20–21 (citations omitted).

In determining that the record did not demonstrate significant underselling, the Commission found that pricing data demonstrated pervasive and increasing overselling, that there were "[[[redacted]]] numbers of confirmed lost sales, and that non-price factors affected purchasing decisions." Views at 86. The court is not persuaded that the Commission "improperly disregard[ed]" the ten factors, Aluminum Br. at 20, because the Commission addressed these factors in its determination and reasonably explained why this evidence ultimately did not outweigh other evidence demonstrating underselling.

Below, the court analyzes each of the factors that plaintiffs cite, as well as the Commission's responses to each:

(i) Factors One, Six, and Nine: Lost Sales and Revenues

Factors One, Six, and Nine concern evidence that certain purchasers viewed subject imports as lower priced, that domestic producers reported losing sales or reducing prices because of subject-import competition, and that producers alleged substantial lost sales and revenues. Aluminum Br. at 19. Plaintiffs summarize these factors as follows:

> (1) A majority of purchasers reported that subject imports were lower priced than U.S. extrusions. This was direct reporting from purchasers about subject imports actually purchased during the POI. Of the [[[redacted]]] purchasers that purchased subject imports instead of U.S. extrusions, [[[redacted]]]—including the [[[redacted]]]—reported that the imports were lower-priced than U.S. extrusions. Petitioners' Post-Hearing Br. at 4; Petitioners' Final Comments at 5; Staff Report at V-47.

> . . .
> (6) U.S. producer questionnaires likewise confirmed that subject import prices were much lower than U.S. extruder prices, resulting in price suppression or depression: "of the 31 responding U.S. producers, 28 reported that they had to either reduce prices or roll back announced price increases" to avoid losing sales to subject imports. Id. at 7; Staff Report at H-46 (Table H-9), H-47 (Table H-9), V-47.
> . . .
> (9) Significant lost sales and revenues submitted by U.S. producers, showing losses of nearly [redacted]]], demonstrated subject import underselling. Id. at 8 & n.45.

Id. at 18–19.

Each of the above factors relates to the Commission's lost sales analysis, which the Commission conducted reasonably. In the preliminary phase, domestic producers identified more than 100 purchasers with which they alleged that they had lost sales or revenues because of subject imports. Final Staff Report at V-47–48. During the final phase, Commission staff contacted purchasers and obtained responses concerning their purchasing decision. Views at 81–82. The resulting record showed that 36 of 55 responding purchasers had purchased or imported subject merchandise instead of domestically produced aluminum extrusions, and that 31 of those purchases reported that subject imports were lower priced. Id. But only 11 purchasers reported that price was a primary reason for choosing subject imports. Id. at 81. Those 11 purchasers estimated that the quantity of aluminum extrusions from subject sources purchased instead of domestic products ranged from [[[redacted]]] short tons to [[[redacted]]] short tons during the POI. Final Staff Report at V-48.

The Commission reasonably concluded that these results do not demonstrate significant underselling on an industry-wide basis. As an initial matter, while the Commission did find that "31 of 36 purchasers that purchased subject imports instead of the domestic like product," the Commission reasonably explained that this tally does not necessarily indicate "that subject imports were priced lower." Views at 82 n.329. As the Commission articulated, this tally merely demonstrates "that 31 purchasers indicated that they made a purchase when subject imports were lower priced, but it does not indicate what fraction of their purchases were lower priced." Id. Underscoring this point, in the Final Staff Report, the Commission found that only two of the responding 35 purchasers reported that U.S. producers had reduced prices as a result of competing with lower priced imports, further suggesting that underselling was unlikely. See Final Staff Report at V-48 (citing tables V-18). The Commission therefore reasonably distinguished between evidence that subject imports were lower priced in some transactions and evidence that lower prices more broadly drove purchasers away from the domestic like product or caused the domestic industry to lower its prices.

The Commission also did not disregard the producer questionnaire responses that plaintiffs identify in Factor Six. See Views at 81. Domestic producers reported allegations of lost sales, price reductions, and rolled-back price increases, and the Commission took those allegations into consideration. See id. For starters, the Commission considered that of 55 responding purchasers, 36 reported that since January 1, 2021, they had purchased or imported aluminum extrusions from

subject countries instead of domestic merchandise. Id. Of those purchasers, 31 reported the subject import price was lower than the domestic price, but only 11 reported price was the primary reason to purchase imported merchandise. Id. In weighing these data points, the Commission considered that imported merchandise made up only [[[redacted]]] percent of the reported purchases and imports of aluminum extrusions from subject sources over the POI, id. at 81–82, and the fact that "only two of 25 responding purchasers indicated that domestic producers had reduced prices during the POI to compete with lower-priced subject imports." Id. at 87. Thus, the Commission did not reject the producers' reports out of hand; rather, it evaluated those reports against purchaser-specific evidence and other data collected during the investigations to reach its conclusions.

Lastly, the Commission reasonably declined to treat petitioners' claimed [[[redacted]]] aggregate lost sales and revenues figure in Factor Nine as dispositive. See Views at 85–86; Petitioners' Post-Hearing Brief, P.R. 307, C.R. 814/842 at 7–8 n.45 (Oct. 9, 2024) ("Petitioners' Post-Hearing Br."). After contacting over 50 of the purchasers that domestic producers had identified to investigate these lost sales allegations, the Commission collected more particularized responses regarding purchase decisions and pricing and ultimately determined that there were not enough demonstrable lost sales for the Commission to find significant negative price effects. Final Staff Report at V-47. The Commission then reasonably decided to assign greater weight to this more particularized evidence that it collected itself during the final phase than to petitioners' initial claimed figure.

See Views at 85–86. The court may not reweigh this evidence merely because plaintiffs would draw a different conclusion. See Universal Camera Corp., 340 U.S. at 477.

Accordingly, Plaintiffs' arguments with regard to Factors One, Six, and Nine do not demonstrate that the Commission ignored evidence of lower-priced subject import or lot sales. Instead, these factors reflect evidence that the Commission reasonably considered but ultimately found insufficient to demonstrate significant underselling upon further investigation.

(ii) Factor Two: Purchasers' Assessments of Relative Prices

Factor Two concerns purchasers' general assessments that domestically produced aluminum extrusions were higher-priced than subject imports from each of the subject countries. Plaintiffs summarize that evidence as follows:

> (2) U.S. purchasers also reported that U.S. extrusions were inferior in price to (i.e., higher priced than) extrusions from all subject sources. Petitioners' Post-Hearing Br. at 5; Petitioners' Final Comments at 5; Prehearing Report at II-33, II-34–II-48 (Table II-15). Notably, U.S. and subject extrusions were reported as comparable on all other factors, and nonsubject import prices were comparable to U.S. prices. Petitioners' Final Comments at 5-6; Staff Report at II-36–II-50 (Table II-15).

Aluminum Br. at 18.

The Commission reasonably considered this evidence and found that quarterly pricing data was nevertheless more probative of relative prices than purchasers' subjective ratings. Views at 84. As the Commission explained, pricing product data "are based on objective evidence of actual prices paid" and are specific to each quarter of the POI, while purchaser responses only provide purchaser-

specific information about pricing. Id. Thus, the Commission did not disregard the purchaser responses that plaintiffs cite in Factor Two; rather, the Commission reasonably found objective pricing data more illustrative of trends over the POI than purchasers' subjective ratings of relative price levels. Id. Plaintiffs' disagreement with that assessment does not establish that the Commission's determination was unreasonable.

(iii) Factor Three: Purchase-Cost Analysis

Factor Three concerns petitioners' purchase-cost analysis, which plaintiffs argue demonstrated widespread underselling even after accounting for the additional costs associated with imported merchandise. Plaintiffs summarize that evidence as follows:

> (3) Plaintiffs prepared a purchase cost data analysis for importers with reported pricing products covering all U.S. shipments. Even adjusted to account for additional costs related to importing, that analysis showed subject import underselling in [[[redacted]]]. Petitioners' Post-Hearing Br. at 5 and Exhibit 37.

Aluminum Br. at 18.

The Commission specifically acknowledged plaintiffs' proposed purchase-cost data analysis and reasonably explained that it did "not find these yearly [average unit value] data probative given the limited quantities involved and changes in prices over the POI." Views at 81 n.324. The Commission also explained that it was "unclear the extent to which importers imported aluminum extrusions for their own use" and noted the "additional burden such data collection would impose on importers." Id. at 80 n.319. Thus, the Commission addressed plaintiffs' proposed

purchase-cost data analysis and reasonably explained why this data was less reliable than the pricing product data it used.

(iv) Factor Four: Average Unit Values

Factor Four concerns petitioners' reliance on average unit value ("AUV") data, which in their view demonstrated that subject imports consistently undersold the domestic like product. Plaintiffs summarize that evidence as follows:

> (4) Subject import average unit values ("AUV") were [[[redacted]]] lower, [[[redacted]]] lower, and [[[redacted]]] lower than U.S. producer AUVs in 2021, 2022, and 2023, respectively, and [[[redacted]]] lower in interim 2024. Id.; Prehearing Report at C-1–C-5 (Table C-1). Indeed, new, product specific AUV data in the final staff report showed that, in [[[redacted]]] of available comparisons, subject imports were priced lower than U.S. product for crash relevant extrusions, extrusions for window wall units, extrusions for heat exchangers, and all other types of extrusions. Petitioners' Final Comments at 6; Staff Report at M-3–M-6 (Figures M-1– M-4).

Aluminum Br. at 18.

The Commission did, in fact, consider subject import AUVs, and it reasonably assigned relatively limited weight to those data compared to other record evidence. As the Commission explained, AUVs "are based on approximations of the value of the aluminum extrusions in annual shipments of window wall units and heat exchangers" – and are therefore "influenced by differences in product mix and changes in product mix over time." Views at 85.[3] Contrary to plaintiffs' assertions,

---

[3] As this court and the Federal Circuit have previously recognized, while AUV data can provide useful contextual information, such data are generally less probative where the merchandise at issue encompasses a relatively broad range of product types. Under these circumstances, differences in average unit values may reflect differences in product mix rather than differences in the prices charged for comparable products. See Allegheny Ludlum Corp. v. United States, 287 F.3d 1365, 1373–74 (Fed. Cir. 2002); Nucor Corp. v. United States, 594 F. Supp. 2d 1320, 1363 (CIT 2008).

the Commission did not "disregard" the AUV data; rather, it reasonably concluded that quarterly pricing-product data, which compare actual transaction prices for defined products, provided a more reliable measure of relative pricing. See id.

(v) Factor Five: Contemporaneous Documentary Evidence

Factor Five concerns contemporaneous reports and other documentary evidence that, in plaintiffs' view, demonstrate significant underselling by subject imports. Plaintiffs summarize that evidence below:

> (5) Petitioners presented a uniquely significant amount of contemporaneous, documented evidence showing that customers frequently and specifically informed U.S. producers that subject imports were priced lower than their U.S. extrusion prices. See Petitioners' Post-Hearing Br. at 5–7 (detailing sixteen specific reports from actual purchasers).

Aluminum Br. at 18–19.

The Commission considered this contemporaneous documentary evidence and reasonably explained why it did not alter its finding of predominant overselling. See Views at 85–86 n.339. Here, plaintiffs argue that the Commission disregarded sixteen purchaser reports identified in Petitioners' Pre-Hearing Brief. See Petitioners' Prehearing Brief, P.R. 267, C.R. 789/797 at 73–74 (Sep. 25, 2024) ("Petitioners' Prehearing Br."). The record, however, reflects that the Commission adequately addressed the substance of such evidence. See Views at 85–86 n.339. For instance, the Commission explicitly discussed Exhibit 19 of Petitioners' Pre-Hearing Brief, which [[ [redacted]

[redacted]]]. Id. After analyzing this exhibit, the Commission found that it was ultimately less persuasive than pricing product data, because the exhibit itself [[[redacted]]] – and therefore it was a later-created description of pricing rather than an actual, contemporaneous record of communication with purchasers. Id. (citing Petitioners' Pre-Hearing Br. at 73–74). Likewise, the Commission addressed Exhibit 22 of Petitioners' Pre-Hearing Brief and explained that the exhibit consisted primarily of a request and provision of a quote [[[redacted]]] – rather than contemporaneous evidence of underselling transactions or specific lost sales. Id. These examples demonstrate that the Commission considered the documentary evidence upon which plaintiffs rely and explained why it did not find that evidence dispositive.

The fact that the Commission cited to petitioners' pre-hearing brief rather than the later post-hearing brief – which plaintiffs point to as evidence that the Commission overlooked certain documents – likewise does not demonstrate that the Commission failed to consider any underlying evidence. See Aluminum Br. at 22 (citing Petitioners' Post-Hearing Br. at Exs. 3, 26). Indeed, Petitioners' Pre-Hearing Brief relied on many of the same reports and exhibits identified in petitioners' post-hearing submission, further indicating that the Commission was addressing the

substance of the evidence regardless of which particular brief it cited. See Views at 85 (citing Petitioners' Pre-Hearing Br. at 73–74 and Exs. 19–25); see also Petitioners' Post-Hearing Br. at Exs. 3–26.

The Commission's broader explanation of petitioners' documentary evidence was sufficient to demonstrate that it considered such evidence as a whole and reasonably found that it did not establish significant underselling. See Views at 85–86. Although the Commission did not separately address each of the sixteen reports identified in Petitioners' Pre-Hearing Brief, it was not required to do so. Rather, absent a showing to the contrary, "the ITC is presumed to have considered all of the evidence on the record." Aluminum Extrusions Fair Trade Comm. v. United States, 36 CIT 1370, 1373 (2012). Because plaintiffs have not overcome that presumption here, substantial evidence supports the Commission's consideration of the contemporary documentary evidence on the record as well as the Commission's determination that such evidence does not demonstrate significant underselling by subject imports.

(vi) Factor Seven: Purchaser Testimony

Factor Seven concerns additional purchaser statements and testimony that, in plaintiffs' view, demonstrate significant underselling and pricing pressure. Plaintiffs describe this evidence as follows:

> (7) Significant testimony at the Staff Conference and Hearing confirmed the extremely and unfairly low pricing of subject imports. Petitioners' Post-Hearing Br. at 7 n.40 (collecting relevant cites).

Aluminum Br. at 19.

The Commission considered this testimonial evidence and reasonably explained why it did not alter its overall pricing analysis or support a finding of underselling by subject imports. The Commission explicitly acknowledged that "purchasers generally indicated that subject imports are lower-priced than the domestic like product" and that "most responding purchasers reported that subject imports were lower priced." Views at 84. Despite such evidence, nevertheless, the Commission found that the more reliable evidence consisted of verified quarterly pricing data comparing specific products and transactions over time. Id. As the Commission explained, "the pricing product data are based on objective evidence of actual prices paid, and are specific to each quarter of the POI" – whereas "purchasers' subjective ratings of relative price levels do not illustrate trends over the POI." Id.

Nor was the Commission required to discuss each individual purchaser statement or testimony that plaintiffs identify. Rather, the Commission was required to consider the record as a whole, including any material evidence that detracts from its conclusions, and explain its reasoning sufficiently. Here, the Commission did so by acknowledging petitioners' arguments regarding purchaser testimony, evaluating material testimonial evidence, and reasonably explaining why that evidence did not establish significant underselling.

(vii) Factor Eight: Dumping Margins

Factor Eight involves the significant dumping margins that Commerce calculated in its determination, which in plaintiffs' view corroborate the existence of

significant underselling by subject imports. Plaintiffs summarize that evidence as follows:

> (8) Commerce found nearly all subject country imports to be dumped, at margins up to 605%. [Petitioners' Post-Hearing Br.] at 8 & n.44.

Aluminum Br. at 19.

The Commission, however, reasonably considered the antidumping determination and dumping margins that Commerce calculated and explained why it did not find them dispositive for purposes of the Commission's price effects analysis. As the Commission recognized, Commerce's dumping calculations serve a different statutory purpose and are based upon a different methodology than the Commission's inquiry into whether subject imports significantly undersold the domestic like product during the POI. Views at 91–92 n.365. Rather than disregard Commerce's dumping determination, the Commission explicitly took into account that Commerce had found "that subject producers in all subject countries [were] selling subject imports at less than fair value" during the relevant period. Id. After considering Commerce's findings alongside other record evidence, however, the Commission reasonably explained that it found the latter – especially pricing product comparisons – more probative under its independent statutory analysis. Id. The court may not reweigh this evidence or substitute its judgment for the Commission's. See Universal Camera Corp., 340 U.S. at 477.

(viii) Factor Ten: Preliminary Pricing Data

Factor Ten concerns plaintiffs' contention that the preliminary-phase pricing data corroborated its underselling claims and that the Commission erred by relying on the revised final-phase pricing data instead. Plaintiffs describe that evidence as follows:

> (10) Reliable data from the preliminary phase showed "subject imports predominantly undersold the domestic product by volume in each year of the POI." Id. at 7; USITC Pub. 5477 at 63.

Aluminum Br. at 19.

Here, the court concludes that it was reasonable for the Commission to rely more heavily on pricing data from the final phase of the investigations than on less comprehensive pricing data collected during the preliminary phase. See Final Staff Report at V-7–8 n.6 (noting that final phase pricing data from **[[**[redacted]**]]** importers were either removed or adjusted); 19 U.S.C. § 1673b(a)(2). Specifically, the Commission explained why differences in the two datasets limited the utility of referencing to the preliminary dataset in tandem with data collected in the final phase:

> The Commission has on occasion utilized questionnaire data from the preliminary phase of the investigations, but unlike in the preliminary phase of the investigations, the importers' questionnaire in the final phase of the investigations instructed importers to include transportation costs to the United States in their reported prices when the U.S. sales are valued on an ex works basis in the country of export.

Views at 83 n.333. Given this methodological difference, the Commission reasonably determined that the final phase pricing data provided a more complete and reliable basis to evaluate underselling.

(ix) Factor Eleven: Final Phase Pricing Product Data

Finally, Factor Eleven concerns plaintiffs' contention that the Commission erred in its analysis of the final phase pricing product data itself. More specifically, plaintiffs argue that the Commission "failed to explain why subject import underselling in 39.1% of available pricing comparisons was not indicative of adverse price effects, even though the Commission has recognized in other instances that underselling does not need to occur in the majority of occurrences in order for it to be injurious." Aluminum Br. at 20 (citing Views at 80).

The court disagrees. The Commission did not simply conclude that adverse price effects were absent because subject imports undersold the domestic like product in fewer than half of pricing product comparisons. See Views at 80. Rather, the Commission comprehensively evaluated the frequency of underselling together with the magnitude of underselling, the prevalence of overselling, the relative importance of non-price factors to purchaser sourcing decisions, the limited evidence of confirmed lost sales, and the evidence of domestic supply constraints, among other record evidence. Id. In light of that much broader context, the Commission reasonably concluded that the level of underselling that it found was not sufficient to establish significant adverse price effects.

* * *

In sum, the Commission considered and reasonably addressed each of the factors that plaintiffs point to as evidence of significant underselling. The question before this court is not whether it might weigh each factor differently or reach a

different conclusion based on the same evidence, but instead whether the Commission reasonably considered the record before it and explained its reasoning. The court concludes that it did.

**(B) The Commission reasonably relied upon other record evidence**

Plaintiffs argue that the Commission also failed to mention or reasonably analyze certain "other record evidence" in addition to the eleven factors discussed above. Aluminum Br. at 21 (citing Views at 85–86). Plaintiffs refer, for instance, to evidence that a "[[ [redacted] ]], as well as a [[ [redacted] ]]" as examples of "other record evidence" that the Commission purportedly failed to consider in reaching its conclusion that subject imports did not significantly undersell the domestic like product. Id. at 22 (citing Petitioners' Post-Hearing Br. at Exs. 3, 26). Plaintiffs argue that the Commission either failed to consider this additional record evidence, or, where the Commission did consider it, failed to appreciate that its analysis should have resulted in the opposite conclusion. See id.

The Commission must consider the record "as a whole" in determining whether subject imports injure the domestic industry and domestic producers. Hitachi Metals, Ltd., 949 F.3d at 716. Here, the fact that the Commission did not specifically name or independently analyze each individual exhibit does not undermine its overarching conclusion that the record as a whole does not

demonstrate significant underselling or lost sales. See Nucor Corp., 318 F. Supp. 2d at 1247. The Commission explicitly addressed petitioners' "anecdotal evidence of underselling" in its Views – including by discussing numerous specific exhibits from [[redacted]] to [[redacted]] – and the Commission ultimately concluded that this evidence did "not demonstrate significant underselling or pricing pressure by subject imports." Views at 85–86 n.339. In short, the Commission did consider what plaintiffs refer to as "other record evidence," and it reasonably concluded that such evidence, taken together, did not undermine its price effects analysis or warrant a different conclusion. See id.

**(C) The Commission did not rely upon unreasonably limited pricing data**

Plaintiffs also argue that the Commission's reliance upon quarterly pricing data was unreasonable because the data were "quite limited in coverage." Aluminum Br. at 23. The quarterly pricing data were purportedly limited because:

> Pricing product data accounted for only [[redacted]] of domestic shipments and [[redacted]] of cumulated import shipments—individually comprising, e.g., just [[redacted]] of Chinese import shipments, [[redacted]] of Italian import shipments, and [[redacted]] of import shipments from a number of subject countries. See Views at 79 & n.318. And that is [[redacted]] of reported import shipments. Importers that submitted questionnaire responses to the Commission represented less than [[redacted]] of total extrusion imports during the POI, and less than [[redacted]] of subject import shipments. If the Commission had full importer coverage to more accurately represent the total U.S. market, that [[redacted]] would in fact be much, much smaller, demonstrating just how unrepresentative the data was of the overall market, given the significant evidence to the contrary. In total, the Commission found that only '17 U.S. producers and 18 importers provided usable pricing data for sales of the requested

products'—and even so, 'not all firms reported pricing for all products for all quarters.'

Aluminum Br. at 23 (citing Views at 78–79). In short, plaintiffs contend that the quarterly pricing data covered too little of the market to support conclusions about the pricing behavior of subject imports generally.

The Commission, however, did not overlook the scope of the dataset and reasonably found that the quarterly pricing data was sufficiently representative and reliable to support its price-effects analysis. While the Commission acknowledged that the quarterly pricing data were relatively limited, the Commission explained that it would expect "the pricing products to provide relatively limited coverage of U.S. shipments of subject imports and the domestic product." Views at 79. The Commission also reasonably explained that broader coverage is difficult to obtain, because aluminum extrusions are produced to order for purchasers and come in "a large variety of shapes and sizes for many different applications" – which ensures that any set of defined pricing products is likely to capture only a limited share of the market. Id. at 79–80.[4] The Commission further elaborated that even though the data were limited, the Commission carefully developed it to provide "apples-to-apples price comparisons." Id. at 79–80. Finally, the Commission also noted that

[4] As the Commission notes, this court has previously held that the Commission "is not precluded from relying on available pricing data simply because the pricing data does not encompass the entire or even a majority portion of the market." ITC Br. at 14–15 (quoting Altx, Inc. v. United States, 26 CIT 709, 720–21 (2002)). Indeed, this court has recognized that "[s]ampling, like averaging, is a necessary statistical technique without which the Commission's task would be virtually impossible." ITC Br. at 15 (quoting U.S. Steel Grp., 96 F.3d at 1366).

petitioners themselves had previously represented "that the pricing products provide sufficient coverage and data representative of the aluminum extrusions market," id. at 80, and only now argue the opposite. Given all of the above, the court concludes that the Commission reasonably determined that the quarterly pricing data was sufficient in coverage and representativeness to properly conduct its price-effects analysis.

**(D) The Commission did not rely upon "flawed" pricing product data**

Plaintiffs argue that the Commission's pricing product data was "flawed" for two principal reasons. First, plaintiffs contend that the Commission's pricing-product data improperly compared products at different levels of trade. Aluminum Br. at 24. Second, plaintiffs contend that the pricing product dataset itself was unreliable because the Commission excluded certain preliminary-phase data while accepting a late-stage revised questionnaire from one particular importer. Id.

Regarding levels of trade, plaintiffs specifically argue that the Commission's pricing product comparisons were unreliable because certain importers reported sales of downstream articles at different levels of trade from the domestic products to which they were compared. Id. According to plaintiffs, those sales did not provide an apples-to-apples comparison of like products, because prices at a downstream level of trade may incorporate additional processing, services, or other value that is not similarly present in sales made further upstream in the supply chain. Id. Plaintiffs further contend that, while they identified specific instances of such downstream sales reporting during the administrative proceedings, the

Commission responded in a conclusory manner that the pricing data did not contain level-of-trade discrepancies, without adequately addressing contrary record evidence or removing the challenged sales from its pricing product comparisons. Id.

The Commission disputes plaintiffs' contentions. ITC Br. at 82–83. Further, Defendant-Intervenors respond that plaintiffs have not substantiated their claim that downstream articles and products sold at different levels of trade were improperly included in the pricing-product data. DI Br. at 13 (citing Aluminum Br. at 24). In Defendant-Intervenors' view, the Commission's response to plaintiffs' levels-of-trade concerns was reasonable because the Commission staff investigated the identified responses, contacted the relevant firms, and either confirmed that the data had been correctly reported or obtained corrections where necessary. DI Br. at 13. Defendant-Intervenors therefore contend that purported level-of-trade errors provide no basis for discounting the pricing-product data. DI Br. at 13.

The court concludes that the Commission considered and reasonably disregarded the plaintiffs' levels-of-trade argument. See Views at 83. The Commission specifically responded to petitioners' case briefing, in which petitioners argued that an importer had "reported pricing data [[ [redacted] ]]." Views at 83 n.332 (citing Petitioners' Pre-Hearing Br. at 80). In response to this contention, the Commission explained that it

was "unpersuaded by Petitioners' arguments that pricing data should be disregarded in these investigations" and that "Commission staff confirmed that pricing data do not include data for products not matching the pricing products or prices derived from sales of downstream products that contain aluminum extrusions." Views at 83. In short, the Commission did not overlook plaintiff's levels-of-trade concerns. The Commission investigated them, verified the relevant reporting, and reasonably concluded that the pricing-product data were not distorted in the manner alleged.

Beyond the levels-of-trade issue, plaintiffs argue that the Commission's pricing product data is flawed because the Commission excluded certain preliminary phase pricing data while accepting a late-stage revision to an importer's final-phase questionnaire response. Aluminum Br. at 24. First, plaintiffs contend that the Commission improperly omitted pricing product data submitted during the preliminary phase by importers that did not respond during the final phase. Id. at 24. Plaintiffs maintain that inclusion of preliminary-phase responses would have produced a dataset showing majority underselling by volume. Id.at 24. Second, plaintiffs challenge the Commission's acceptance of an importer's unsolicited revision to its pricing product data shortly before the close of the administrative record, arguing that this "eleventh hour" revision transformed the quarterly price comparisons from majority underselling to majority underselling. Id.at 24–25. According to plaintiffs, the fact that "one importer [[[redacted]]]" could materially alter the outcome of the

Commission's underselling analysis demonstrates the inherent limitations of the pricing product dataset. Id.at 25 (citing Petitioners' Final Comments, P.R. 341, C.R. 909/911 at 7–8 (Oct. 25, 2024) ("Petitioners' Final Comments")).

In response, Defendant-Intervenors argue that the Commission reasonably declined to incorporate preliminary-phase pricing data into the final dataset because the two datasets were not directly comparable. The Defendant-Intervenors point out that "the instructions for reporting import pricing values for ex-works sales had changed from the preliminary to final-phase questionnaires" – and therefore "any reported data pulled forward from the preliminary investigations would *inherently be* distorted by the exclusion of transportation costs in ex-works sales." DI Br. at 11-12 (citing Views at 63 n.333). Defendant-Intervenors further contend that the Commission properly accepted the relevant importer's revision because the importer identified a specific mistake – reporting sales under the closest product category even when the merchandise did not satisfy that category's definition – and submitted "clear and specific" corrections before the administrative record closed. Id. In sum, Defendant-Intervenors argue that the Commission reasonably excluded data collected under an incomparable methodology and accepted a timely correction designed to remove inaccurately reported sales.

The Commission likewise contends that plaintiffs failed to demonstrate that the pricing product data were unrepresentative. ITC Br. at 19. In particular, the Commission argues that plaintiffs identify "[no] quantitative evidence" indicating that the pricing product data were unrepresentative of the overall market. Id.

(citing U.S. Steel Grp., 96 F.3d at 1366 (holding that "[g]eneral allegations . . . are insufficient" to demonstrate that a data sample is unrepresentative)). The Commission therefore maintains that plaintiffs' criticism amounts to disagreement with the Commission's weighing of the evidence, rather than a showing that the pricing product data were legally insufficient to support the Commission's determination. Id.

Here, the court concludes that neither the Commission's exclusion of the preliminary-phase pricing data nor its acceptance of an importer's revised final-phase response undermines its determination. The Commission reasonably declined to incorporate the preliminary-phase data because the reporting instructions had changed between the preliminary and final investigations, such that the preliminary responses did not account for transportation costs in the same manner as the final-phase responses. Views at 83 n.333. The Commission also reasonably permitted the importer to revise its response before the administrative record closed, and the fact that the Commission relied on such data does not reflect negatively upon the Commission's determination – especially where the Commission acknowledged the revision and explained its decision to consider the revised data. Id. at 83–84 n.334.[5] In sum, the Commission reasonably relied upon the final dataset, because the Commission reasonably determined that the dataset

---

[5] In its Views, the Commission explains its decision to accept the revised data in spite of petitioners' timing-based objections, and further notes that the Commission staff "continued to verify that data are correct after the staff report issued." Views at 83–84 n.334.

excluded certain incomparable preliminary data and incorporated a substantiated and timely correction.

**(E) The Commission lawfully considered the record as a whole and reasonably considered any detracting evidence**

Plaintiffs argue that the Commission failed to consider the record as a whole, as required by DAK Americas LLC v. United States, because it elevated quarterly pricing data above other evidence that, in plaintiffs' view, demonstrated significant underselling. Aluminum Br. at 26 (citing 456 F. Supp. 3d 1340, 1367 (CIT 2020) ("DAK I")). According to plaintiffs, the Commission violated the requirements of DAK I by "disregarding . . . probative evidence" while requirements weighed pricing product data. Aluminum Br. at 20. Specifically, plaintiffs contend:

> [A] lawful consideration of the record as a whole necessarily should have included a meaningful acknowledgment of [the pricing product data's] limitations, the fact that even that belatedly adjusted data set indicated substantial underselling, and the fact that every other piece of record data demonstrated underselling to a significant and injurious degree.

Id. at 26.

In response, the Commission argues that DAK I is not instructive here because the Commission considered the record as a whole and reasonably considered evidence that, in plaintiffs' view, detracted from its conclusion. Id. at 31–32. According to the Commission, the latter case DAK Americas LLC v. United States ("DAK II") is more instructive than its predecessor DAK I, because in the latter case, the court sustained the Commission's determination on remand after

concluding that the Commission had adequately addressed potentially conflicting record evidence. ITC Br. at 31–32 (citing 517 F. Supp. 3d 1349, 1357 (CIT 2021)).

Both DAK I and DAK II apply the same basic substantial evidence principle that the Commission must sufficiently address detracting evidence when conducting an injury determination. In DAK I, this court remanded the Commission's underselling analysis because the Commission unreasonably relied on flawed pricing data and failed to adequately address evidence that detracted from its conclusion. See DAK I, 456 F. Supp. 3d at 1353, 1357–1358. In DAK II, by contrast, this court sustained the Commission's underselling determination – which was based upon the same underlying pricing data – because this time, the Commission supplied the missing explanation of potentially detracting evidence. DAK II, 517 F. Supp. at 1356–1357. Thus, the distinction between the two decisions is not whether detracting evidence existed, but instead whether the Commission considered and reasonably explained its treatment of that evidence. See id. at 1362.

Here, the court concludes that the Commission satisfied its legal obligation to consider the record as a whole and address detracting evidence. Unlike in DAK I, the Commission did not simply rely on the quarterly pricing comparisons while leaving potentially contrary evidence unexplained. See, e.g., Views at 84–91. Rather, much like in DAK II, the Commission reasonably explained why the data it relied upon were sufficient and considered enough of the record evidence to withstand substantial evidence review. See id. More specifically, the Commission

acknowledged the limitations of its quarterly pricing comparisons, explained why it nevertheless considered them the most probative direct evidence of relative prices, id. at 79–80, and separately considered and addressed the other evidence upon which plaintiffs rely, including purchaser perceptions, average unit value data, lost sales allegations, the purchase-cost analysis, and preliminary-phase pricing data, see id. at 84–91. Moreover, the Commission's approach was consistent with its "well-established practice" of focusing its "underselling analysis on a comparison of the number of instances of underselling to the number of instances of overselling as reflected in the quarterly pricing data." DAK II, 517 F. Supp. at 1357. This case therefore more closely resembles DAK II than DAK I: the Commission considered the record as a whole, confronted detracting evidence, and explained why that evidence did not outweigh the quarterly pricing comparisons and other data points supporting its finding that there was no significant underselling during the POI.

**II. The Commission reasonably performed its adverse impact analysis**

Plaintiffs argue that the Commission erred in determining that subject imports did not adversely impact the domestic industry. Aluminum Br. at 16–17. The Commission responds that its adverse impact determination is reasonable and in accordance with law because the record does not establish that subject imports caused the domestic industry's declines in performance and instead demonstrates that those declines resulted from supply constraints and weaker demand. ITC Br. at 33.

In assessing impacts on the domestic industry, the Commission "shall evaluate all relevant economic factors which have a bearing on the state of the industry." 19 U.S.C. § 1677(7)(C)(iii). The Commission evaluates "all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry." Id. These factors include output, market share, capacity utilization, inventories, employment, wages, growth, and factors affecting domestic prices. Id. § 1677(7)(C)(iii)(I–V).

The Commission reasonably performed its adverse impact analysis because (A) the Commission's reliance on domestic supply constraints is supported by substantial evidence; (B) the Commission reasonably explained that certain specified "other evidence" does not independently support an affirmative adverse impact determination; and (C) the Commission's underselling determination is not erroneous and therefore does not require remand on adverse impact.

**(A) The Commission's analysis of and reliance on domestic supply constraints data is supported by substantial evidence**

Plaintiffs argue that the Commission's supply constraints analysis is not supported by substantial evidence and "arbitrarily depart[s] from relevant agency precedents." Aluminum Br. at 33 (referencing Brass Rod from India, Inv. No. 701-TA-686, USITC Pub. 5485 (Feb. 2024) (Final); Truck & Bus Tires from Thailand, Inv. No. 731-TA-1658, USITC Pub. 5562 (Dec. 2024) (Final); Certain Mobile Access Equipment & Subassemblies Thereof from China, Inv. No. 701-TA-665, USITC Pub. 5242 (Dec. 2021) (Final)). In plaintiffs' view, the Commission's finding that subject

imports increased during the first half of 2022, id. (citing Views at 112 n.447), is consistent with petitioners' data-based submission during the administrative proceedings that subject imports were higher in the second half of 2022 than in the first, id. (citing Petitioners' Post-Hearing Br. at 46). Plaintiffs also point out that subject imports "gained the most market share at the domestic industry's expense in interim 2024," by which time the domestic industry no longer faced supply constraints. Id. (citing Petitioners' Final Comments at 9–13). According to plaintiffs, these errors and inconsistencies prove that the Commission's supply constraints analysis lacked substantial evidentiary support. Id.

Contrary to the plaintiffs' arguments, however, the Commission's supply constraints analysis is supported by substantial evidence. See Views at 112. As an initial matter, the Commission's findings are entirely consistent with the 2022 data that petitioners presented during the administrative proceedings: the Commission's observation that subject imports increased in the first half of 2022 does not conflict with petitioners' submission that subject imports were higher during the second half of the year. See Views at 112; Aluminum Br. at 33.

More broadly, the Commission reasonably explained why it found that supply constraints significantly affected the domestic industry's ability to supply the U.S. market, which forced purchasers to buy subject imports instead. Views at 99. The Commission considered record data indicating that four of the five largest domestic producers, which accounted for more than [[redacted]] of the industry's sales by quantity in 2023, reported supply constraints in 2021 and 2022. See id. (citing U.S.

Producers' Questionnaires, C.R. 319–23, 339–47, at IV-18 (ITC Oct. 2023)). The largest domestic producer, which accounted for over [[ [redacted] ]] of the industry's sales in 2023, reported that [[ [redacted] ]], and further reported that [[ [redacted] ]]. See id. at IV–8(b), IV–18.

The Commission's adverse impact determination is also supported by substantial evidence because the Commission reasonably relied on U.S. purchaser responses demonstrating that domestic producers were often unable to supply requested aluminum extrusions. In the Views, the Commission notes that domestic producers were in several instances "unable or unwilling to supply aluminum extrusions, placed them on allocation, or had unacceptable lead times." Views at 100. The Commission likewise considered evidence that most large purchasers of domestically produced aluminum extrusions reported supply constraints, nine of which accounted for over [[ [redacted] ]] of the [[ [redacted] ]] short tons of reported purchases of the domestic like product. Views at 100–01; see CR/PR at Table V-15 (showing purchasers and volumes purchased). Although the Commission acknowledged that some purchasers reported supply constraints among importers, it ultimately determined that supply constraints were more prevalent amongst domestic producers. Views at 101; see CR/PR at Table II-4; CR/PR at Table II-12. Taken together, this evidence reasonably supported the

Commission's conclusion that the domestic industry's declining performance resulted from its own supply limitations, rather than from subject imports.

Plaintiffs' arguments based on prior Commission determinations are also misplaced, because the Commission reasonably explained that the present investigations involved materially different facts and economic circumstances. For instance, while plaintiffs point to Brass Rod from India as evidence that supply constraints do not necessarily preclude a finding of adverse impact, the nature and timing of the supply constraints were different materially between the two investigations. See Aluminum Br. at 30. In Brass Rod from India the domestic industry's COVID-related supply constraints had largely abated by 2022. See Brass Rod from India at 57. Here, by contrast, the Commission found that the domestic aluminum extrusion industry continued to experience supply constraints through 2022. See Views at 99. Given this difference, the Commission reasonably concluded that Brass Rod from India does not compel a different result in this case.

Finally, contrary to plaintiffs' contention that the Commission's analysis is inconsistent with interim-period market share data and lead-time information, the Commission reasonably grounded its conclusions in the record. With respect to interim period market share, the Commission reasonably determined that the increase in subject import market share from interim 2023 to interim 2024 did not establish injurious price effects. See id. at 112–13. Although subject imports gained market share in this interim comparison, the Commission reasonably found that the record does not demonstrate that the increase was driven by subject import

underselling. Id. Rather, subject imports oversold the domestic like product in 13 of 21 quarterly comparisons corresponding to 80.8 percent of reported subject import sales volume in interim 2024, and the record further reflected both the importance of non-price factors in purchasing decisions and the scarcity of confirmed lost sales due to price. Id. at 102–03; see CR/PR at Table V-14 (revised by INV-WW-135). With respect to lead times, the Commission relied upon data showing that most domestic producers and purchasers reported a change in lead times in 2021 and 2022. Views at 99–100; see CR/PR at Table II-12. But because the record indicates that demand for aluminum extrusions is seasonal, the Commission reasonably declined to compare data between the first and second halves of 2022, concluding that such comparisons would not reliably measure whether supply constraints had eased. Views at 90; see CR/PR at II-5 and II-18.

In sum, given the considerable record evidence that the largest domestic producers and purchasers faced supply constraints and extended lead times, the limited evidence that importers faced similar supply constraints or extended lead times, and the Commission's thorough explanation of each, the Commission's analysis is supported by substantial evidence.

**(B) The Commission reasonably explained that the domestic industry was not impacted "by reason of" subject imports**

Plaintiffs argue that even if supply constraints contributed to the domestic industry's declining performance, the domestic industry was still adversely impacted "by reason of" subject imports. Aluminum Br. at 33. Plaintiffs note that,

under established case law, subject imports "need not be the sole or principal cause of injury." Id. at 33 (quoting Nippon Steel Corp., 345 F.3d at 1381). Instead, "as long as the injuring action's effects are not merely incidental, tangential or trivial, the foreign product sold at less than fair value meets the causation requirement." Id. (quoting Nippon Steel Corp., 345 F.3d at 1381). Connecting this causation requirement to the facts of this case, plaintiffs highlight that while supply constraints eased in 2023, the domestic industry nevertheless failed to gain back any of the market share it lost in 2022, and capacity utilization rates steadily declined over the POI. Id. at 34. In response, the Commission contends that it considered all such evidence and reasonably determined that it does not warrant a finding of causation. ITC Br. at 36.

The court concludes that the Commission reasonably determined that supply constraints from 2021 to 2022 and a decline in apparent U.S. consumption from 2022 to 2023 explain the decline in domestic producers' output and financial performance. See Views at 102–104. Relying on hearing witness testimony, the Commission explained that for the domestic industry, locating qualified suppliers is often a time-consuming and expensive process, and switching back and forth between suppliers can involve "extreme cost" and prove "cost-prohibitive." Id. at 103 n.423. Given the time-intensive nature of finding and replacing suppliers, the Commission explained that "[one] would not have expected the industry to rapidly regain market share" lost in 2022, "even after the domestic industry's supply constraints eased." Id. at 103. In short, the Commission considered the relevant

record evidence regarding supplier cost and replacement and reasonably concluded that supply constraints – rather than subject imports – caused the domestic industry's performance declines during the POI.

**(C) The Commission's underselling determination is not erroneous and does not require remand of the Commission's adverse impact determination**

Plaintiffs argue that because the Commission's underselling analysis itself was erroneous, and because the Commission's underselling determination underpins its adverse impact analysis, the court must therefore remand the Commission's determination on adverse impact. Aluminum Br. at 32 (citing DAK I, 456 F. Supp. 3d at 1349 (remanding an adverse impact determination which relied on an erroneous underselling determination)). The Commission responds that its underselling finding was reasonable, and therefore its resulting adverse impact analysis was reasonable as well. ITC Br. at 35–40.

In its underselling analysis, the Commission considered numerous data points, including predominant overselling by subject imports over the POI, the [[ [redacted] ]] volume of confirmed lost sales by reason of price, and the importance that surveyed purchasers reportedly attached to non-price factors when making purchasing decisions. Views at 86. Based upon this evidence, the Commission concluded that subject imports did not significantly undersell the domestic like product and did not significantly suppress or depress domestic prices. Id. at 91.

The court has already established that the Commission's underselling analysis was supported by substantial evidence, see supra Section I, and the court

therefore concludes that the Commission's resulting adverse impact analysis was reasonable as well. While DAK I instructs that remand may be warranted where an adverse impact determination rests on a faulty underselling finding, the court sustains the adverse impact determination here because the Commission's underselling analysis finds substantial support in the record.

### III. The Commission reasonably performed its threat of material injury analysis

Plaintiffs argue that the Commission's threat determination warrants remand because of the Commission's "erroneous overselling and supply constraints determinations" and because the Commission "failed to consider" certain record evidence and arguments. Aluminum Br. at 35. In response, the Commission contends that these arguments are "largely derivative" of Plaintiffs' earlier positions regarding price effects and adverse impact – which, as discussed supra, the Commission disputes. ITC Br. at 40 (citing Aluminum Br. at 35–38).

Section 771(7)(F) of the Act directs the Commission to determine whether a U.S. industry is threatened with material injury by analyzing whether "further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued or a suspension agreement is accepted." 19 U.S.C. § 1677(7)(F)(ii). "In determining whether an industry in the United States is threatened with material injury by reason . . . of the subject merchandise," the Commission considers several relevant economic factors. Id. § 1677(7)(F)(i). The Commission considers these threat factors "as a whole" in

determining whether "further dumped or subsidized imports are imminent and whether material injury by reason of subject imports would occur unless an order is issued." Id. § 1677(7)(F)(ii). These factors include likely volume, likely price effects, and likely impact. Id. § 1677(7)(F)(i)(I) –(IX).

Here, in concluding that subject imports did not pose an imminent threat of material injury to the domestic industry, the Commission reasonably determined that (A) the likely volume of subject imports did not support a threat determination; (B) subject imports were not likely to have significant price effects in the imminent future; and (C) subject imports were not likely to have a significant adverse impact on the domestic industry.

**(A) Likely Volume**

Plaintiffs challenge the Commission's likely volume of subject imports determination on the ground that "subject imports undisputedly increased over the POI and in interim 2024 as compared with interim 2023." Aluminum Br. at 35 (citing Petitioners' Prehearing Br. at 113; Views at 111–12). In plaintiffs' view, the Commission improperly "disregarded that growth as predictive of future trends based in large part on its erroneous supply constraints determination." Id.

Plaintiffs also contend that the Commission "failed to meaningfully acknowledge the substantial increase in subject market share at the end of the period" – namely a [[redacted]] percent increase in interim 2024." Id. at 36. This interim period growth, plaintiffs argue, could not have been explained by domestic industry supply constraints, because supply constraints would have dissipated by 2024. Id.

Instead, in plaintiffs' view, "such a surge demonstrates the extent of subject producers' interest in and dependence on the U.S. market, as well as their ability to export huge volumes of extrusions to the United States within a very short timeframe." Id.

Finally, plaintiffs challenge the Commission's explanation that "the seasonality of demand" impacted the March 2024 increase in subject import market share. Id. Plaintiffs reason that March 2021 and March 2023 correspond to the same season as March 2024, and therefore seasonality "does not explain why subject imports were so much greater at the end of the period than in either of those prior years." Id. (citing Final Staff Report at Table IV-13).

Despite plaintiffs' arguments, however, the Commission reasonably determined that the likely volume of subject imports did not support a threat determination. The Commission initiated its likely volume analysis by considering that subject import volume and market share increased from 2021 to 2022 because of domestic industry supply constraints and declined from 2022 to 2023 when apparent U.S. consumption weakened. Views at 111–12. Given that the court has already concluded that the Commission's supply constraints analysis was reasonable, see supra Section II.A., the court continues to hold here that the Commission reasonably relied upon supply constraint evidence to determine that the likely volume of subject imports did not support a threat determination.

Regarding interim 2024 market share, the Commission expressly acknowledged the increase in imports' market share during that period and

ultimately concluded that such an increase was largely attributable to importers' awareness of impending duties. See Views at 112. As the Commission explained, this increase in interim 2024 market share "reflects elevated subject imports during one month, March 2024" – and such an increase "would have been influenced by Commerce's impending preliminary determinations and possible imposition of provisional measures." Id. at 112–13. The Commission correctly notes here that the Act explicitly grants the Commission discretion to discount post-petition data in recognition of this very phenomenon that market share may increase as importers race to ship subject merchandise into the United States at a lower duty rate in anticipation of impeding duty increases. See 19 U.S.C. § 1677(7)(I). In sum, the Commission acknowledged the increase in subject import market share in interim 2024 and reasonably determined that such increase was attributable to other factors such as anticipation of impeding duty increases.

Furthermore, the Commission's references to seasonality do not undermine its likely volume analysis. Here, plaintiffs argue that seasonality cannot explain the March 2024 surge, because subject imports did not see comparable increases in March 2021 or March 2023. Aluminum Br. at 36–37. Nevertheless, the Commission did not identify seasonality as the sole explanation for that increase; rather, the Commission found that elevated subject import volume in March was likely influenced by Commerce's impending preliminary determination and the possible imposition of provisional measures – in addition to seasonal demand swings as yet another factor. Views at 112–113. Thus, even assuming that

seasonality alone might not account for the unusually high March 2024 volume, the Commission reasonably concluded that the March 2024 increase reflected temporary circumstances rather than a broader trend indicating that significant increases in subject import volumes were imminent. See id.

Finally, the Commission's likely volume finding also rests upon several other sources of record evidence, none of which plaintiffs challenge. See id. at 113–16 (relying on at least nine other types of evidence, including subject producer production capacity, capacity utilization, home market shipments, and more). Because the Commission reasonably considered the record evidence and explained its analysis and conclusions, the Commission's negative likely volume finding is supported by substantial evidence and otherwise in accordance with law.

**(B) Likely Price Effects**

Plaintiffs argue that the Commission relied upon the purportedly flawed underselling analysis discussed above to reach its likely price effects determination. Aluminum Br. at 37. In response, the Commission points again to its underselling analysis and explains that pricing data indicate "predominant and increasing overselling by subject imports" during the POI, justifying a negative likely price effects determination. ITC Br. at 43 (citing Views at 119).

Given that the court has concluded that the Commission's underselling analysis was reasonable, plaintiffs' argument here fails as well. See supra Section II.A. Furthermore, beyond the overselling evidence discussed above, the Commission also considered additional evidence about price effects, including

evidence that subject imports did not suppress prices for the domestic like product to a significant degree. See Views at 118–19. The Commission summarized:

> Given our finding that cumulated subject import volumes are not likely to increase significantly in the imminent future, the absence of significant underselling or adverse price effects during the POI, the fact that subject imports increasingly oversold the domestic like product over the POI (with underselling declining to just 19.2 percent by volume in the interim period), and the absence of any evidence that subject import pricing patterns are likely to change significantly in the imminent future, we further find that the lack of significant underselling and price effects observed during the POI will likely continue in the imminent future.

Id. at 119.

Because the Commission reasonably considered the record evidence as a whole and thoroughly explained its decision, its likely price effects determination is supported by substantial evidence and otherwise in accordance with law.

**(C) Likely Impact**

Plaintiffs argue that the Commission's likely impact discussion turned on erroneous overselling findings and related supply constraints determinations, so its likely impact determination "must be remanded." Aluminum Br. at 37–38.

Despite plaintiffs' arguments to the contrary, however, the Commission reasonably considered the record and explained how it weighed the relevant data. See Views at 119–22. In doing so, the Commission principally relied on its earlier supply constraints and underselling determinations, which the court has already sustained. See supra Section II.A.; Views at 119–20. The Commission also considered other record evidence when conducting its likely impact analysis,

including the domestic industry's financial performance, trade indicators, volume and market share figures, operating and net margins, and capacity utilization. See Views at 119–21. In sum, the Commission reasonably weighed the totality of record evidence and concluded, "[o]n balance," that "the industry is not vulnerable." Id. at 121. The court may not reweigh this evidence.

## CONCLUSION

The court concludes that the Commission's price effects, adverse impact, and threat determinations are supported by substantial evidence and in accordance with law. Judgment will enter accordingly, sustaining the Commission's final determination in full.

/s/ Joseph A. Laroski, Jr.
Judge

Dated: September 2, 2026
New York, New York